IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-00873-RM-CBS

GRANT NEAL,

     Plaintiff,

v.

COLORADO STATE UNIVERSITY-
PUEBLO, THE BOARD OF GOVERNORS
OF THE COLORADO STATE
UNIVERSITY SYSTEM, ROOSEVELT
WILSON, individually and as agent for
CSU PUEBLO, JENNIFER DELUNA,
individually and as agent for CSU PUEBLO,
LESLEY DIMARE, individually and as agent
for CSU PUEBLO, KAITLYN BLAKEY,
individually and as agent for CSU PUEBLO,
MARIE HUMPHREY, individually and as agent
for CSU PUEBLO, THE UNITED STATES
DEPARTMENT OF EDUCATION, THE
UNITED STATES DEPARTMENT OF
EDUCATION OFFICE FOR CIVIL RIGHTS,
JOHN B. KING, JR., individually and as agent
for the UNITED STATES DEPARTMENT OF
EDUCATION, CATHERINE LHAMON,
individually and as agent for the UNITED
STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS, and
THE UNITED STATES OF AMERICA,

     Defendants.

_____

AMENDED COMPLAINT AND JURY DEMAND

_____

Plaintiff Grant Neal, (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP and Michael Mirabella, P.C., for his Amended Complaint against Colorado State University-Pueblo, the Board of Governors of the Colorado State University System, Roosevelt Wilson, individually and as agent for Colorado State University-Pueblo, Jennifer DeLuna, individually and as agent for Colorado State University-Pueblo, Lesley DiMare, individually and as agent for Colorado State University-Pueblo, Kaitlyn Blakey, individually and as agent for Colorado State University-Pueblo, Marie Humphrey, individually and as agent for Colorado State University-Pueblo, the United States Department of Education, the United States Department of Education's Office for Civil Rights, John B. King, Jr., individually and as agent for the United States Department of Education, Catherine Lhamon, individually and as agent for the United States Department of Education's Office for Civil Rights, and the United States of America, (collectively, "Defendants"), respectfully alleges as follows:

## <u>THE NATURE OF THIS ACTION</u>

1.      This case arises out of the actions taken and procedures employed by Defendants Colorado State University-Pueblo ("CSUP" or the "University"), the Board of Governors of the Colorado State University System ("Defendant Board of Governors"), Roosevelt Wilson ("Defendant Wilson"), Jennifer DeLuna ("Defendant DeLuna"), Lesley DiMare ("Defendant DiMare"), Kaitlyn Blakey ("Defendant Blakey") and Marie Humphrey ("Defendant Humphrey")(collectively, the "CSUP Defendants") concerning false allegations of non-consensual sexual activity made against Plaintiff, a male sophomore student at Colorado State University-Pueblo.

2.      This case further arises out of the actions taken and procedures employed by Defendants the United States Department of Education ("Defendant DOE"), the United States Department of Education's Office for Civil Rights ("Defendant OCR"), John B. King, Jr. ("Defendant King"), Catherine Lhamon ("Defendant Lhamon"), and the United States of America ("Defendant U.S.")(collectively, the "Federal Defendants") concerning the improper implementation and enforcement of the United States Department of Education Office for Civil Rights' 2011 Dear Colleague Letter (hereinafter the "Dear Colleague Letter") in violation of the Administrative Procedure Act, 5 U.S.C. § 553 (the "APA").

3.      While the Federal Defendants designate the Dear Colleague Letter as a "guidance" document that merely interprets the requirements of Title IX of the Education Amendments of 1972, in actuality, the Dear Colleague Letter advances new substantive rules and creates binding obligations on the affected parties under threat of severe penalties, including investigation and rescission of federal funding for non-compliant educational institutions.

4.      Upon information and belief, the federal government allocated approximately $154 billion to education in fiscal year 2015, making up approximately 4.2% of the entire federal budget.

5.      Since its enactment in 2011, the Dear Colleague Letter has produced sweeping changes to the regulatory landscape and ensuing conduct by every educational institution receiving federal funding across the country.

6.      The Dear Colleague Letter has aggressively dictated how colleges and universities handle sexual assault and sexual harassment on campus, by laying out specific requirements that schools must adopt and utilize, causing schools to brand more students "rapists"

3

based on the excessively low "preponderance of the evidence" burden of proof (equating to a mere 50.01% probability that the alleged misconduct occurred), permitting a form of double jeopardy by allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or intimidating" to the "victim," all of which violate an accused student's fundamental rights to due process.

7.     The Federal Defendants violated § 553 of the Administrative Procedure Act when they intentionally evaded the requisite notice and comment rulemaking while nonetheless enforcing the Dear Colleague Letter as binding law.

8.     The Federal Defendants' failure to abide by the proper rulemaking procedures has resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and all disciplinary decisions arising therefrom, including the decision finding Plaintiff responsible herein, unconstitutional, arbitrary and void.

9.     The allegations underlying the actions taken by the Defendants concern an instance of consensual sexual activity that occurred during the afternoon of October 25, 2015 (the "Incident") between Plaintiff and fellow sophomore Jane Doe,[1] a student in CSUP's Athletic Training Program.

10.    The following day, a peer of Jane Doe's in the Athletic Training Program unilaterally reported a case of alleged misconduct against Plaintiff to faculty members at CSUP,

---

[1] Plaintiff refrains from disclosing Jane Doe's identity herein because she is not a party to this action.

notwithstanding that she was not an eyewitness to the interaction between Plaintiff and Jane Doe, and did not have any direct knowledge of the encounter between the two consenting adults.

11.     Ultimately, on December 18, 2015, Defendant DeLuna notified Plaintiff that he had been found responsible for "Sexual Misconduct" in violation of CSUP's Code of Conduct (the "Decision"). CSUP assessed an unwarranted and severe penalty of suspension for the duration of Jane Doe's education at CSUP (the "Sanction").

12.     Throughout the investigation and adjudication, the CSUP Defendants repeatedly violated Plaintiff's rights to due process when they failed to abide by CSUP's own guidelines and regulations and acted in direct violation of federal and/or state law; a non-exhaustive list of the CSUP Defendants' wrongful actions include the following: (i) Defendants failed to afford Plaintiff a hearing on the charges against him; (ii) Defendants failed to conduct a thorough and impartial investigation; (iii) Defendants failed to provide Plaintiff proper notice of the charges; (iv) Defendants evidenced a gender bias against Plaintiff as the male athlete accused of sexual misconduct throughout the investigative process; (v) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; and (vi) Defendants failed to utilize an adequate standard of review.

13.     When the CSUP Defendants subjected Plaintiff to disciplinary action, they did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. In light of the evidence (or lack thereof), the Decision can only be explained by CSUP's discriminatory bias against males and its underlying motive to protect the University's reputation and financial wellbeing, by acting in compliance with the Dear Colleague Letter.

14.     Upon information and belief, in response to the significant pressure placed on the CSUP Defendants by the Federal Defendants to comply with the mandates of the 2011 Dear Colleague Letter, CSUP conducted a substantially flawed and biased investigation process leading to an erroneous Decision and Sanction.

15.     As such, Plaintiff has been greatly damaged by the actions of Defendants. His education and career prospects have been severely compromised as he is unable to gain admission to another university to obtain his degree and the significant monies spent on obtaining a college education at CSUP have been squandered. In addition to the damages sustained by Plaintiff, including his inability to continue his education and receive his degree, the loss of his wrestling and football scholarships, and his removal from the football team, Plaintiff has sustained tremendous damages to his future education, career and athletic prospects, and reputation, as a result of the Decision and Sanction.

16.     Plaintiff therefore brings this action to obtain relief based on causes of action for, among other things, violation of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process, breach of contract, violation of the Administrative Procedure Act, and any other state or federal law causes of action which may be inferred from the facts as set forth herein.

## THE PARTIES

17.     Plaintiff is a natural person, citizen of the United States, and resident of the State of Colorado. During the events described herein, Plaintiff was a student at Colorado State University-Pueblo and resided off campus.

18.      Upon information and belief, Defendant CSUP is a regional comprehensive public institution of higher learning, with an address of 2200 Bonforte Blvd, Pueblo, Colorado 81001.

19.      Upon information and belief, Defendant Board of Governors consists of 15 members and has such powers, rights and privileges as are granted to it under the Colorado Constitution and Colorado law, including, but not limited to: suing and being sued; controlling and directing all monies received by it; making determinations relating to personnel matters; promulgating rules and regulations for the safety and welfare of students, employees and property; and promulgating rules and regulations necessary for the governance of the respective institutions and entities it governs.[2]

20.      Upon information and belief, Defendant Wilson is an individual residing in the State of Colorado and was the Director of the Office of Equal Opportunity/Affirmative Action and Title IX Coordinator at Colorado State University-Pueblo at all relevant times herein.

21.      Upon information and belief, Defendant DeLuna is an individual residing in the State of Colorado and was the Director of Diversity and Inclusion at all relevant times herein.

22.      Upon information and belief, Defendant DiMare is an individual residing in the State of Colorado and was the President of Colorado State University-Pueblo at all relevant times herein.

23.      Upon information and belief, Defendant Blakey is an individual residing in the State of Colorado and is the current Associate Director, Office of Equal Opportunity, Affirmative Action and Deputy Title IX Coordinator at Colorado State University-Pueblo.

---

[2] *See* C.R.S. 23-30-102(1).

24.     Upon information and belief, Defendant Humphrey is an individual residing in the State of Colorado and was the Dean of Students and Residence Life at Colorado State University-Pueblo at all relevant times herein.

25.     Defendant DOE is a federal executive department established in the Executive Branch of the United States Government charged with *inter alia*, enforcing educational laws regarding civil rights including, but not limited to Title IX of the Education Amendments of 1972, whose headquarters are located in Washington, D.C. Defendant DOE is an agency within the meaning of 5 U.S.C. § 701(b)(1).

26.     Defendant OCR is an agency within the Defendant DOE that is charged with ensuring compliance by recipients of federal education funding with, *inter alia*, Title IX of the Education Amendments of 1972. Defendant OCR is headquartered in Washington, D.C. Defendant OCR is an agency within the meaning of 5 U.S.C. § 701(b)(1).

27.     Defendant King is the Secretary of Education of the Defendant DOE charged with overseeing and managing Defendant DOE and has direct authority over Education policy promulgated by Defendant DOE. Defendant King, in his official capacity, is the officer personally responsible for compliance with any court decree to the extent such decree relates to or impacts Defendant DOE.

28.     Defendant Lhamon is the Assistant Secretary for Defendant OCR and primary advisor to Defendant King with authority over Education policy promulgated by Defendant DOE. Defendant Lhamon is in charge of maintaining and operating Defendant OCR and therefore has direct authority to ensure educational institutions are in compliance with federal civil rights law including, but not limited to Title IX of the Education Amendments of 1972. Defendant Lhamon,

in her Official Capacity as the Assistant Secretary for Defendant OCR, is the officer personally responsible for compliance with any court decree to the extent such decree relates to or impacts the Defendant OCR.

29.     Defendant U.S. is the United States of America.

30.     Plaintiff and Defendants are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

31.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; (ii) 28 U.S.C. § 1331 confers original jurisdiction on federal courts to review agency action; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

32.     This Court has personal jurisdiction over Defendant CSUP on the grounds that it is conducting business within the State of Colorado.

33.     This Court has personal jurisdiction over Defendant Board of Governors on the grounds that it is conducting business within the State of Colorado and is the governing body of Colorado State University-Pueblo.

34.     This Court has personal jurisdiction over Defendant Wilson on the grounds that he was acting as an agent of CSUP at all relevant times herein.

35.     This Court has personal jurisdiction over Defendant DeLuna on the grounds that she was acting as an agent of CSUP at all relevant times herein.

9

36.     This Court has personal jurisdiction over Defendant DiMare on the grounds that she was acting as an agent of CSUP at all relevant times herein.

37.     This Court has personal jurisdiction over Defendant Blakey on the grounds that she was acting as an agent of CSUP at all relevant times herein.

38.     This Court has personal jurisdiction over Defendant Humphrey on the grounds that she was acting as an agent of CSUP at all relevant times herein.

39.     Defendant DOE is an agency within the meaning of 5 U.S.C. § 701(b)(1). This Court has personal jurisdiction over Defendant DOE on the grounds that it has engaged in continuous and systematic business activities within the State of Colorado sufficient to satisfy the "minimum contacts" requirement in this Court, specifically with respect to its implementation and enforcement of the 2011 Dear Colleague Letter and mandated compliance by colleges and universities located within the State of Colorado, under threats of investigation and rescission of federal funds.

40.     Defendant OCR is an agency within the meaning of 5 U.S.C. § 701(b)(1). This Court has personal jurisdiction over Defendant OCR on the grounds that it has engaged in continuous and systematic business activities within the State of Colorado sufficient to satisfy the "minimum contacts" requirement in this Court, specifically with respect to its implementation and enforcement of the 2011 Dear Colleague Letter and mandated compliance by colleges and universities located within the State of Colorado, under threats of investigation and rescission of federal funds.

41.     This Court has personal jurisdiction over Defendant King on the grounds that he was acting as an agent of the United States Department of Education at all relevant times herein.

42.     This Court has personal jurisdiction over Defendant Lhamon on the grounds that she was acting as an agent of the United States Department of Education's Office for Civil Rights at all relevant times herein.

43.     Pursuant to 5 U.S.C. § 702, in relevant part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof … [p]rovided that any mandatory or injunctive decree shall specify the Federal officer or officers (by name and title), and their successors in office, personally responsible for compliance."

44.     5 U.S.C. § 702 further provides, in relevant part: "The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States."

45.     Accordingly, this court has jurisdiction over all Defendants pursuant to 5 U.S.C. §§ 702-03.

46.     Venue for this action is proper in this court pursuant to 5 U.S.C. § 703.

47.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Colorado State University-Pueblo is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

48.     Further, venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district and Plaintiff resides in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.    Agreements, Representations, Covenants &
Warranties Between Plaintiff and Colorado State University-Pueblo**

49.     Plaintiff was an exemplary student and athlete at Regis Jesuit High School, a Jesuit, Catholic, college preparatory high school located in Aurora, Colorado where he was a two time state champion wrestler and football player.

50.     Setting his sights on an elite pre-med curriculum combined with a top-rated football program, Plaintiff applied and was accepted to CSUP's class of 2018.

51.     During his first three semesters at CSUP, Plaintiff excelled both academically, as a Biology-Pre Med major, and athletically as a member of the football team. He achieved a 3.67 GPA, was named Regional D2 freshman player of the year for the CSUP football team and received two competitive scholarships for academic achievements in the Pre-Med program.

52.     In addition to his studies and athletics, Plaintiff was active in his community. While in high school, he volunteered at inner-city elementary schools and coached youth football and wrestling. He continued his volunteer work in college when he took under his wing a young boy who had suffered traumatic injuries, bringing him into the Thunderwolves football family. Further, Plaintiff participated in the SOUL club at CSUP, a student action group on campus whose efforts included advocating for women's rights.

53.     Upon his acceptance to the University, CSUP provided Plaintiff with copies of its school policies, including the Student Code of Conduct (the "Code") and the Sexual Misconduct Policy (the "Policy")(and collectively, the "Policies"), the current policies of which are available on the University's website.

54.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, CSUP's Policies state in relevant part:

> Colorado State University-Pueblo has zero tolerance for sexual misconduct. All members of the University community, and their guests, have the right to be free from unwanted sexual contact, coercion, abuse, violence, threats of violence, and harassment. Students are expected to conduct themselves in a manner that does not infringe upon the rights of others.

55.     CSUP's Policies set forth the procedures by which students who have been accused of violating one or more of the enumerated policies are investigated, heard, and, possibly, disciplined.

56.     The Policy specifies that students accused of sexual misconduct shall be afforded the following rights, among others:

- The right to be treated with respect by University officials;

- The right to a prompt investigation and appropriate resolution;

- The right to be fully informed of campus conduct rules and procedures;

- The right to be fully informed of the nature and extent of all alleged violations contained within the complaint;

- The right to be present for all testimony given and evidence presented before a hearing authority;

- The right to present witnesses and documentary evidence;

- The right to question and/or challenge witnesses and documentary evidence presented by others; and

- The right not to have any personal information released by the University to the public without prior consent.

57.     The Code further provides the following rights to any student involved in the disciplinary process:

- The right to fair treatment;

- The right to privacy;

- The right to written notice;

- The right to a hearing;

- The right to an advisor; and

- The right to an appeal.

58.     The University's Sexual Misconduct Policy provides that students accused of sexual misconduct are entitled to the hearing process set forth in the Code.

59.     However, the Policy grants significant unrestrained discretion to the University, providing that it "reserves the right to take whatever measures it deems necessary in response to an allegation of sexual misconduct in order to protect students' rights and personal safety."

60.     Any person may file a complaint with the Office of Student Conduct. This includes the University, who reserves the right to initiate a complaint, serve as the complainant, and initiate conduct proceedings, without a formal complaint made by the alleged victim.

61.     Once a complaint is received, the University retains the right to proceed with the disciplinary process, even if a complainant chooses not to participate. However, disciplinary action should only be taken without a complainant's consent if such action is deemed necessary to protect the safety, security and/or integrity of the University and/or its members.

62.     Once a complaint has been filed, it shall be resolved in one of three ways:  (i) if there is no basis for the complaint, no further action is taken; (ii) further investigation may be

conducted if it is determined the complaint may be substantive but enough information is not yet available to hear the complaint; or (iii) the complaint is referred to a hearing.

63.    Complaints involving sexual misconduct may be referred to and investigated by the Title IX Coordinator or a designee.

64.    During a disciplinary hearing, both parties may provide information to the hearing authority for consideration, including witness statements and evidence.

65.    Determinations of responsibility are made using the preponderance of the evidence standard, which is defined by the Code as: "whether it is more likely than not that a Respondent committed the alleged violation(s)."

66.    The Assistant Dean for Student Conduct and Case Management is authorized to consider all forms of misconduct and impose all forms of disciplinary sanction.

67.    Decisions made as a result of the hearing shall be provided in writing to the respondent. The decision will be provided to both parties simultaneously.

68.    Any party submitting an appeal must do so in writing within five (5) business days of the date the student was notified of the decision. Requests for appeal may be based on the following grounds:

- A procedural error significantly impacted the outcome of the hearing;

- The information presented in the initial disciplinary hearing was insufficient to establish a violation of the Code occurred;

- The sanctions imposed in the initial disciplinary hearing were substantially disproportionate to the severity of the violations; or

- New information is now available, sufficient to alter the decision, which was not known at the time of the hearing.

69.     The Appeal Review Officer will conduct an initial review to determine if the Request for Appeal is timely and meets the limited grounds for appeal noted above. If it is determined, in the Appeal Review Officer's sole discretion, that the appeal has met the criteria for appeal, the matter will be referred to the Appeal Committee.

70.     The Appeal Committee is designated by the Dean of Student Life/Affairs, or designee, to hear all appeals granted by the Appeal Review Officer. The Committee consists of three members: the Chief Justice of Associated Students' Government, one faculty member and one staff member.

71.     When a student is found responsible for a violation, one or more sanctions shall be imposed. In considering an appropriate sanction, the following factors may be considered:

- The circumstances surrounding the misconduct, including respondent's intent;

- The actual and potential consequences of the misconduct;

- The precedent established by the University for similar conduct;

- The previous disciplinary history of the student;

- The student's attitude throughout the disciplinary process; and

- Whether the conduct was directed at a person due to that person's sex, race, age, national origin, sexual orientation, gender identity, etc.

## II.     The Afternoon of October 25, 2015 (the "Incident")

72.     Plaintiff and Jane Doe became friendly when they first met in the fall of 2014. Jane Doe had transferred to CSUP's Athletic Training Program from another university.

73.     Though they became close friends and were interested in each other, they decided not to pursue a romantic relationship during the football season because this could jeopardize Jane Doe's position in the Athletic Training Program. Both Plaintiff and Jane Doe recognized the generally accepted rule that trainers were not permitted to fraternize with athletes, and that doing so could result in severe consequences including removal from the Athletic Training Program.

74.     However, as time went on, they continued to talk frequently and grew closer. Plaintiff was attracted to Jane Doe in part because she was interested in Plaintiff as a person, and not just because he was a prominent athlete at CSUP.

75.     On Friday, October 23, 2015, Plaintiff and Jane Doe decided to go on a casual date to the movies. After the movie, they returned to Plaintiff's car where they began to kiss. As the kissing became more passionate, Jane Doe proceeded to perform oral sex on Plaintiff. He simultaneously began to digitally penetrate her. Subsequently, Plaintiff drove Jane Doe back to her house. Upon arriving at her house, Jane Doe informed Plaintiff that she did not yet want to leave his company.

76.     On Saturday, October 24, 2015, both Plaintiff and Jane Doe attended a party at a fellow student's house off campus, which was also attended by many members of the football team. While they flirted throughout the evening and continued to touch each other, they were cognizant of avoiding any public displays of affection and left the party separately, so as not to jeopardize Jane Doe's position in the Athletic Training Program.

77.     On Sunday, October 25, 2015, Plaintiff was hosting a barbeque for several friends at his home. The gathering was set to begin at 6:30 p.m.

78.     At approximately 5:00 p.m., Jane Doe texted Plaintiff and invited him over to her apartment at the Walking Sticks Apartments in Pueblo. She indicated that she was "home alone" and that she was "excited to see [him]." Though his friends were expected to arrive soon, Plaintiff agreed to meet up with Jane Doe as he looked forward to spending time with her.

79.     When Plaintiff arrived at Jane Doe's apartment, he noticed that none of her roommates were home.

80.     Plaintiff and Jane Doe went into her bedroom where they began to discuss the status of their relationship. It was clear to both of them that their relationship was naturally progressing from close friends into something more serious. Plaintiff indicated that he did not think it would be a good idea for them to be in a relationship when the football season started because, as a trainer, Jane Doe was not permitted to fraternize with players under her care.

81.     After talking for approximately ten to fifteen minutes, they mutually began to kiss. As their kissing became more intimate, they each began to take off their own clothing, on their own volition.

82.     During this time, Plaintiff's phone continued to ring as he received numerous calls and text messages from guests who were not able to get into his house for the barbeque.

83.     Plaintiff and Jane Doe continued to kiss and touch each other affectionately for approximately ten to fifteen minutes on her bed, despite the constant distractions from Plaintiff's phone.

84.     Plaintiff was on top of Jane Doe as she kissed his neck, while their genitals touched. As the intimacy progressed, knowing that they both wanted to engage in sexual

intercourse, Jane Doe advised Plaintiff that she was not on birth control. Accordingly, Plaintiff asked if he should put on a condom. Jane Doe clearly and unequivocally responded "yes."

85.     Thus, Plaintiff got off of Jane Doe immediately and put on a condom. Subsequently, they proceeded to engage in consensual sexual intercourse, during which Jane Doe pulled Plaintiff into her and demonstrated her enjoyment both verbally and non-verbally.

86.     Thereafter, Plaintiff put his clothes back on and expressed his reluctance to leave Jane Doe's apartment; he desperately wanted to spend more time with her but knew he had to tend to the festivities at his house, where friends were beginning to gather.

87.     Before he left, Jane Doe asked him several times if he would stay, pulling him in to kiss her more. As she did so, Plaintiff began to kiss her neck. Reluctant to give her a hickey, Plaintiff stopped and told Jane Doe "I don't want to give you a hickey because I don't want to put you in an awkward position around the football players because they know we've been hanging out." Jane Doe instructed him to keep kissing her neck, indicating she would wear a hooded sweatshirt to cover it up the following day.

88.     Subsequently, Jane Doe kissed him goodbye and Plaintiff returned to the gathering at his house. Later that evening, they engaged in a friendly conversation via text message, before saying good night.

89.     The following day, a peer of Jane Doe's in the Athletic Training Program (the "Complainant") noticed a hickey on Jane Doe's neck and questioned her about it. Jane Doe indicated that she had engaged in sexual activity with Plaintiff the previous day. Given Plaintiff's status as a high profile football player, Complainant presumed that Plaintiff had engaged in non-consensual contact with Jane Doe.

90.     Complainant subsequently took it upon herself to make an unsubstantiated report to Dr. Roger Clark, Director of Athletic Training ("Dr. Clark") that Jane Doe had been raped by Plaintiff, notwithstanding her lack of direct knowledge concerning the encounter.

91.     Subsequently, Jane Doe sent a text message to Plaintiff at approximately 3:48 p.m. stating "I need to talk to you ASAP after practice!!!!! Like in person even if we just talk in your car! Please!" She further texted ""I've been running around all day talking to so many people, trying to make things right!!! One of the other Athletic Training students screwed me over!...She went behind my back and told my AT advisor stuff that wasn't true!!! I'm trying so hard to fix it all. I want to tell you what's going on. Please!"

92.     Confused by the substance of Jane Doe's messages, it was evident to Plaintiff that Jane Doe was very upset and that something had gone terribly wrong. He agreed to meet her in the parking lot of the recreation center after his football practice.

93.     When he arrived to the parking lot, Jane Doe got into his car, visibly extremely upset. Jane Doe stated to Plaintiff: "I can't believe they're doing this," while shedding tears. Plaintiff tried to console her, assuming she was upset because she was in trouble with the Athletic Training Program for socializing with an athlete.

94.     Jane Doe advised Plaintiff that one of her peers in the Athletic Training Program had observed the hickey on Jane Doe's neck and questioned her about it. Jane Doe told Plaintiff that her peer mistakenly assumed that Plaintiff had taken advantage of her. The Complainant had observed them spending time together the previous weekend and knew that Plaintiff was a high profile football player; adopting all stereotypical traits that often accompany the "student athlete,"

Complainant concluded the sexual contact between Jane Doe and Plaintiff was non-consensual, despite Jane Doe's indications to the contrary.

95.     Recognizing the potential magnitude of Complainant's false assumptions, unbeknownst to Jane Doe, Plaintiff began to record their conversation on his cell phone. The audio recording revealed the friendly and genuine rapport between Plaintiff and Jane Doe. Further, unaware that she was being recorded, Jane Doe clearly stated to Plaintiff that he did not engage in any inappropriate or harmful behavior and that he did not rape her.

96.     Plaintiff further discovered that Complainant had gone to Dr. Clark, and made a statement regarding the encounter between Plaintiff and Jane Doe, notwithstanding that she had no independent knowledge for making such a complaint, or any indication whatsoever from Jane Doe herself that something inappropriate had occurred.

97.     Upon information and belief, Dr. Clark subsequently told his wife Laura Clark, the Athletic Training Clinical Instructor ("Mrs. Clark"), about this complaint against Plaintiff, despite the lack of any applicable protocol or a necessity to do so.

98.     As Jane Doe remained in Plaintiff's car, trying to determine how to rectify the situation, she received a phone call from both Dr. Clark and Mrs. Clark. Plaintiff heard Jane Doe explicitly state to both Dr. Clark and Mrs. Clark: "I'm fine and I wasn't raped."

99.     At the conclusion of this phone call, Jane Doe then called her mother to tell her that she was not raped, that she was not taken advantage of and that she and Plaintiff had engaged in consensual sexual intercourse. Jane Doe even asked her mother to call Dr. Clark to clear up this false allegation.

100.     However, upon information and belief, Dr. Clark had already referred the matter to CSUP's Title IX office. When he received a phone call from Jane Doe's mother, he advised her that the situation was now out of his hands and that Jane Doe would have to clear this up with Title IX Coordinator, Defendant Wilson.

101.     Feeling extremely upset and anxious, Jane Doe asked Plaintiff if he would drive them somewhere for a while to clear their minds.  They drove around CSUP for approximately 15 to 20 minutes, before deciding to go to Plaintiff's house, as this was off campus.

102.     Again concerned about being seen socializing with an athlete, Jane Doe asked Plaintiff to confirm that no one was home, as his roommates were also members of the football team, before they entered the house.

103.     After Plaintiff confirmed that no one was there, they entered the house and went into Plaintiff's bedroom. Jane Doe asked Plaintiff why he was not kissing her, as they usually did. Expressing his concern about the situation, Plaintiff suggested they instead watch some television, hoping it would distract them both from the unfolding events. They watched television for a little while; as they became more relaxed, they began to kiss. As the kissing became more passionate, they each removed their own clothing. Plaintiff put on a condom and they again engaged in consensual sexual intercourse.

104.     Unbeknownst to Plaintiff, during this second sexual encounter, Plaintiff's two roommates, Q.V. and C.F. had returned to the house. While looking for Plaintiff, they approached his bedroom where they peaked in and both observed Plaintiff and Jane Doe engaging in sexual intercourse, with Jane Doe sitting on top of Plaintiff and straddling him, in a dominant position.

105.     Later that day, Jane Doe called Plaintiff to inform him that she was required to appear at a meeting with Defendant Wilson to discuss the encounter of October 25. Jane Doe instructed Plaintiff not to disclose their second sexual encounter during his imminent meeting with Defendant Wilson. Though confused by this request, Plaintiff vowed to support her wishes and promised he would not disclose the second consensual encounter to Defendant Wilson.

106.     Significantly, despite the lack of any training or experience, Mrs. Clark took it upon herself to act as investigator of the alleged incident when she encouraged Jane Doe and two of her peers in the Athletic Training Program to meet with her and discuss the encounter further. Rather than contact the Title IX office to initiate an investigation upon first learning of the allegations, Mrs. Clark instead took the three students out to lunch where they engaged in "group think" concerning the underlying encounter and reached a consensus evaluation that Plaintiff had engaged in misconduct, while suppressing any evidence to the contrary.

107.     Mrs. Clark's involvement from the outset was excessive and inappropriate; instead, she should have complied with her responsibilities as a mandated reporter and contacted the Title IX office rather than conducting her own superficial and predisposed investigation.

### III.     Failure to Conduct a Fair and Impartial Investigation

108.     CSUP's Code provides: "All students have the right to expect a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has

occurred before any sanctions are imposed…All students will be treated with respect throughout the disciplinary process."

109.     Notwithstanding, the CSUP Defendants performed a one sided and biased investigation in favor of a third-party complainant's allegations of sexual misconduct against Plaintiff.

110.     Here, the complainant was not the alleged victim, but a peer of Jane Doe's, who reported a second hand account of a sexual encounter between two consenting adults. After confronting Jane Doe about a hickey on her neck, and having observed Plaintiff and Jane Doe interact previously, Complainant presumed that Plaintiff, as a member of the football team, must have engaged in non-consensual sexual contact with Jane Doe.

111.     Complainant reported what she believed was a non-consensual encounter to the Athletic Training Director who, in turn, presented the unsubstantiated claim to CSUP's Title IX office.

112.     Notwithstanding that the report of alleged misconduct came in the form of hearsay, Dr. Clark reported the alleged incident to Defendant Wilson, former Director of the Office of Equal Opportunity/Affirmative Action and Title IX Coordinator at CSUP, who commenced a formal investigation, based merely on the uncorroborated report of a third-party.

113.     In pursuing an investigation against Plaintiff, Defendant Wilson failed to consider Jane Doe's motivation for insinuating to Complainant that something improper may have occurred, when Complainant confronted Jane Doe about the hickey on her neck. Namely, recognizing the potential consequences of being disciplined for engaging in a relationship with a football player,

Jane Doe described the encounter to Complainant in a manner that would conceal her relationship with Plaintiff, while also protecting her position in the program.

114.     In fact, at no time did Jane Doe tell Defendant Wilson that she was involved in non-consensual sex with Plaintiff. To the contrary, at her meeting with Defendant Wilson on October 27, Jane Doe informed Mr. Wilson: "our stories are the same and he's a good guy. He's not a rapist, he's not a criminal, it's not even worth any of this hoopla!"

115.     Nonetheless, CSUP pursued an investigation calculated to lead to the foregone conclusion that Plaintiff was responsible for the misconduct alleged.

116.     Defendant Wilson accepted the statements of subjective, hearsay witnesses as credible and ignored evidence tending to exculpate Plaintiff, all while demonstrating an inherent prejudice against male athletes.

117.     On October 27, 2015, Plaintiff received written notice from Defendant Humphrey that he was "being investigated for possible alleged violation of the *Code of Student Conduct* including Non-consensual Contact and Non-Consensual Sexual Intercourse." [sic]. He was also instructed that he was not permitted to have any further contact with Jane Doe. The notice did not properly identify which specific provisions Plaintiff allegedly violated, citing only to CSUP's general Policy.

118.     CSUP's Sexual Misconduct Policy defines Non-Consensual Sexual Intercourse as follows:

> "…vaginal penetration by a penis, object, tongue or finger, anal penetration by a penis, object, tongue, or finger, or oral copulation (mouth to genital contact or genital to mouth contact), however slight, with any object, by any person upon any other person, without consent."

119.     Additionally, Consent is defined in relevant part as follows:

"Consent is informed, knowing and voluntary. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. Consent can be given by words or actions, as long as those words or actions create mutually understandable permission regarding the conditions of sexual activity."

120.     Notably CSUP's Sexual Misconduct policy does not provide a definition of "Non-Consensual Contact."

121.     Defendant Wilson administered a one-sided investigation when he proceeded to conduct an investigation without fully informing Plaintiff of the exact charges against him, or permitting him to review a detailed description of the allegations within the complaint.

122.     Notwithstanding that CSUP failed to provide Plaintiff with written notice of the specific charges against him, Plaintiff was required to meet with Defendant Wilson, on October 29, 2015 and present his version of events. Demonstrating a presumption of guilt against Plaintiff, Defendant Wilson began the meeting by interrogating Plaintiff, asking him three times: "Did you rape [Jane Doe]?" By the third time, Defendant Wilson was standing up and looming over Plaintiff, apparently intending to intimidate him.

123.     During this meeting, it further became apparent that Defendant Wilson blamed the football team and the culture associated with it in part for the alleged Incident, saying that the players "have a problem."

124.     From the outset, Plaintiff was presumed guilty of the misconduct alleged. In violation of the University's own self-imposed policies and Plaintiff's fundamental rights to fair process, Defendants required Plaintiff to prove his innocence, rather than requiring the University to prove his guilt. Failing to act as an impartial investigator, Defendant Wilson indicated to

Plaintiff that the Complainant had described the encounter as an egregious act of rape and threatened that "he would get to the bottom of it."

125.    At the end of the meeting, Plaintiff requested that Defendant Wilson provide him with a copy of his statement, which Mr. Wilson had hand written rather than recorded. Defendant Wilson indicated he would need a couple of days to type it out and would then email it to Plaintiff. However, by November 5, Plaintiff still had not received a copy of his statement. He again followed up with Defendant Wilson regarding the status of the written statement; however, Defendant never responded to this request. In fact, Plaintiff did not receive a copy of his statement until November 20, during his second meeting with Defendant Wilson.

126.    CSUP's Code provides:  "All students have the right to continue their education free from the threat of harassment, abuse, retribution, and/or violence." Interim measures may only be imposed in limited circumstances; for instance, when necessary "to protect the safety, security, and/or integrity of a Complainant, the University, and/or any member(s) of its community."

127.    Though none of these circumstances were applicable here, on November 17, 2015, Defendant Humphrey arbitrarily assessed an unwarranted interim suspension upon Plaintiff. Pending completion of the investigation, he was only permitted on campus to attend classes, go to the library for class related assignments and attend any additional meetings directly related to the investigation of the complaint. Additionally, he was prohibited from participating in any extracurricular activities on campus, including playing football.

128.    Evidencing a presumption of guilt from the outset, CSUP's Code permits the imposition of an interim sanction should the University deem it necessary to protect the "safety,

security, and/or integrity of a Complainant, the University, and/or any member(s) of its community."

129.     On November 17, 2015, Defendant Humphrey delivered to Plaintiff a Notice of Interim Suspension, pending the completion of the investigation and prior to the issuance of any finding of responsibility.

130.     Defendants imposed the unwarranted interim sanction on Plaintiff though none of the applicable criteria were met. In fact, subsequent to the issuance of the No Contact Order, on October 30, 2015, both Plaintiff and Jane Doe were authorized, by Defendant Humphrey and Defendant Wilson, to travel together to Black Hills State University for a football game and stay in the same hotel. Certainly, this would not have been permitted had Plaintiff been a threat to any member of the University community.

131.     On November 20, Plaintiff met with Defendant Wilson for a second investigative meeting. Head Football Coach John Wristen ("Coach Wristen") appeared as Plaintiff's advisor. When Coach Wristen tried to make a statement in Plaintiff's defense, Defendant Wilson responded that he was "The Chief," in a clear effort to assert his authority over a fellow CSUP colleague.

132.     At this time, Defendant Wilson indicated that there were ultimately four individuals who came forward to report the encounter to the Title IX office.

133.     Subsequently, on December 3, 2015 at 5:39 p.m. less than 24 hours before the hearing, Plaintiff received notice that an "informal disciplinary hearing" (the "Hearing") was scheduled for the following day. Curiously, CSUP's policies do not contain any definition or explanation of an "informal disciplinary hearing."

134.     This last minute notice deprived Plaintiff of the opportunity to adequately prepare a response to the allegations and formulate a defense prior to appearing for the Hearing.

135.     CSUP's Code provides: "Written notification of a hearing shall include…a detailed description of the allegations to be considered." Nonetheless, the Notice of Hearing dated December 3, 2015 merely stated that an informal disciplinary hearing was being convened "to consider allegations that you may have violated the *Code of Student Conduct, Sexual Misconduct (non-consensual sexual intercourse)*." The notice obscurely pointed Plaintiff to section 18 of the Code, which vaguely identified an example of such allegation as "Any act that violates the University's *Sexual Misconduct Policy*." Certainly, this is not the type of detailed description intended by the drafters of CSUP's Code of Conduct. The failure to identify the specific allegations against him substantially hindered Plaintiff's ability to prepare for the Hearing and formulate his response to the charges.

136.     Nonetheless, Plaintiff appeared for the Hearing on December 4, 2015, accompanied by his advisor, Chris Turner ("Mr. Turner"), which in actuality was nothing more than an investigatory meeting. The Hearing, which proceeded before Director of Diversity and Inclusion Defendant DeLuna, was a sham, intended to promote CSUP's appearance of impartiality while in reality, it was conducted solely to create a record for a predetermined result.

137.     The Hearing was replete with procedural errors that deprived Plaintiff of his rights to fair process, in violation of both CSUP's own policies, as well as federal and state law.

138.     For instance, CSUP's policies do not afford a respondent the right to a formal hearing before an impartial panel of factfinders, to confront and question his accuser, or to challenge the witnesses against him. Instead, the Hearing of December 4, 2015 consisted of

Defendant DeLuna providing Plaintiff a copy of the Investigative Report dated December 3, 2015 (the "Report") and instructing him to review it in her presence.

139.     While Plaintiff was charged with the task of thoroughly reviewing, analyzing and responding to the 14 page Investigation Report under duress, he was prohibited from either copying the Investigation Report or taking notes. As a result of the stress of the situation and the insufficient time allotted for his review, Plaintiff was subsequently unable to recall the identities of the witnesses favorable to Jane Doe. Accordingly, Defendants deprived Plaintiff of his fundamental right to cross-examine and challenge witnesses against him, in violation of his rights to fair process.

140.     Upon his review, Plaintiff discovered that the Report prepared by Defendant Wilson demonstrated the one-sided and biased investigation of the subject Incident.

141.     For instance, Defendant Wilson mischaracterized the testimony provided by Jane Doe in order to elicit testimony that would support a finding of guilt. Specifically, Jane Doe clearly stated that she advised Plaintiff that she did not want to have *unprotected* sex because she was not on birth control; she never stated that she did not want to have sex at all.  Yet, Defendant Wilson concluded that Jane Doe's "intentions were not to have sex at all that evening…" There is no basis for this uncorroborated inference. Jane Doe conveyed that initially, she intended to invite Plaintiff over to discuss the future of their relationship. Her intentions changed however once Plaintiff arrived and they began to engage in consensual sexual activity.

142.     Further, within the Report, Defendant Wilson attributed unwarranted weight to the testimony of witnesses who had no independent knowledge of the encounter at issue, while failing to question a single witness favorable to Plaintiff. Depriving Plaintiff of the opportunity to

identify witnesses in support of his defense, Defendant Wilson professed that he was in charge of the investigation and would be the only person to declare someone a witness in this matter.

143.     In fact, when Plaintiff questioned Defendant DeLuna at the meeting of December 8, 2015 regarding whether he could identify witnesses to her or whether she needed to speak with anyone about his character, she declined, stating her review was based only on what was in the file and the information gathered at the Hearing.

144.     As evidenced by the Report, Defendant Wilson accepted as true Dr. Clark's testimony, notwithstanding that his only knowledge of the Incident came in the form of hearsay from Complainant, who was not a direct witness to the encounter. Indeed, when Dr. Clark approached Jane Doe directly to ask whether she had been raped, Jane Doe stated explicitly: "I'm fine and I wasn't raped." Yet, rather than comply with his mandated reporter role, Dr. Clark instead coerced Jane Doe into believing that something inappropriate had in fact occurred, encouraged her to go to the health center immediately, advised her that what happened was not right, and told her to call her mother, before finally reporting the Incident to CSUP's Title IX office.

145.     One of the other "witnesses" identified in the Report, Laura Clark, similarly lacked any independent knowledge concerning the alleged Incident. She only learned of the encounter through her husband, Dr. Clark, who was informed of the purported Incident by a peer student of Jane Doe's. Further, given her position as Athletic Training Clinical Instructor, Mrs. Clark was not an impartial or credible witness. Undoubtedly, when approached by two members of the Athletic Training Program faculty, Jane Doe certainly would be inclined to present a story of misconduct to protect her position. Had she admitted to consensually engaging in sexual

relations with a football player, she could have jeopardized her place in the highly competitive Athletic Training Program.

146.    Mrs. Clark similarly coerced Jane Doe into admitting something improper had occurred, encouraged her to report the Incident, pressured Jane Doe to speak with a counselor on campus, and even called the counseling center on her behalf to set up an appointment.

147.    In addition, the Report inexplicably included a comment from Mrs. Clark, in which she stated "it saddens me that she wants to protect this person because he was a football player, but the University needs to know about what happened as it is not acceptable." This subjective and uninformed opinion should not have been included in the Report as it had no bearing whatsoever on the veracity of the allegations and served only to further bias the factfinder against Plaintiff as the male accused.

148.    Upon learning that Dr. Clark and Mrs. Clark had reported the most egregious and damaging allegations to CSUP's Title IX office, Plaintiff expressed his concern regarding a potential conflict of interest; namely, Dr. Clark and Mrs. Clark hold Jane Doe's degree, as a member of the Athletic Training Program. The fact that two staff members who oversee Jane Doe's program ultimately reported the complaint on her behalf negates any semblance of impartiality. Certainly, they would seek to protect one of their own students. Yet, Defendants brushed off this conflict of interest as a formality and failed to address it any further.

149.    Notably, while accepting as true the statements of biased third-party witnesses, Defendant Wilson failed to disclose to Plaintiff the identities of the remaining adverse witnesses referenced in the Report, thus hindering Plaintiff's ability to challenge their credibility and confront all witnesses against him.

150.     CSUP's Sexual Misconduct Policy provides the following rights to a student accused of sexual misconduct: "The right to present witnesses and documentary evidence, and the right to question and/or challenge witnesses and documentary evidence presented by others." Notwithstanding, Plaintiff was not afforded the opportunity to identify witnesses favorable to his defense and was deprived of the right to question and challenge all witnesses against him; in fact, he was never even made aware of the identities of all witnesses referenced in the Report.

151.     Defendants further violated Plaintiff's rights to fair process when they failed to provide him with a copy of the Report, despite his repeated requests. In fact, he did not obtain a full copy of the Report until after his appeal was denied.

152.     On December 8, 2015, Plaintiff met with Defendant DeLuna for a follow up meeting to clarify the information provided by Plaintiff on December 4, 2015. Plaintiff reiterated that he did not penetrate Jane Doe prior to putting on a condom, and that they engaged in consensual sexual activity.

153.     Nonetheless, on December 18, 2015, Defendant DeLuna issued a Decision Letter finding Plaintiff "engaged in non-consensual sexual intercourse with the Complainant." Interestingly, the Decision Letter repeatedly refers to Jane Doe as the complainant, when in fact, the complainant was an uninvolved third-party. Defendant DeLuna imposed a sanction of suspension pending Jane Doe's graduation or disenrollment from campus, in addition to the following conditions: (i) Plaintiff will need to enroll in an educational course and/or counseling for a minimum of 6 weeks regarding sexual assault/victimization and demonstrate completion of the course or counseling in writing; and (ii) a "No Contact Order" is in effect indefinitely, until further notice is received from the Dean of Student Life or Defendant DeLuna.

154.     Significantly, Defendant DeLuna, the hearing officer in charge of issuing the final decision, did not personally interview the Complainant, Jane Doe, or Plaintiff. Instead, her decision was made based solely on the one-sided and misleading Report prepared by Defendant Wilson, calling into question her ability to act objectively. Undoubtedly, she was unlikely to question or disturb the findings reached by Defendant Wilson, thus denying Plaintiff of the right to have his case heard by an impartial adjudicator.

155.     After the Sanction was imposed, Defendant Wilson advised Plaintiff that all suspensions were initiated by Defendant Humphrey, and not by him. However, Defendant Humphrey advised Plaintiff that she was acting on Defendant Wilson's recommendation and that she did not know the details of the case, nor did she want to know them. By their own admission, a staff member who was not even aware of the details of the matter was in charge of imposing Plaintiff's suspension.

156.     Defendants further denied Plaintiff of his rights to due process when they deprived him of any meaningful opportunity to appeal. The failure to set forth a detailed factual finding in a college's disciplinary determination is a substantial failure of due process, as it forecloses the accused student's ability to effectively challenge the determination in administrative appeals and in the courts and to ensure the decision was based on the evidence in the record.

157.     Here, the Decision Letter dated December 18, 2015 consisted of a blanket statement: "I found that the Statements of the Complainant and the individuals that she confided in after the incident to be credible. These statements were consistent and demonstrated by a preponderance of the evidence that you did not have the Complainant's consent."

158.     Defendant DeLuna failed to provide any explanation as to what specific details, facts, or statements led to this Decision. The Decision issued by Defendant DeLuna therefore lacks the requisite detailed factual findings to support the Decision, including how the evidence stated in the Report was used and weighted to reach the conclusion.

159.     Consequently, the failure of the University to provide a statement detailing the factual findings and the evidence relied upon by the investigator in reaching the Decision precluded Plaintiff from effectively challenging the outcome and Sanction.

160.     Further, Plaintiff was denied any meaningful opportunity to appeal as the Appeal Review Officer was the very same person who issued the initial notice of investigation letter and imposed the interim suspension, Defendant Humphrey. Undoubtedly, Defendant Humphrey was not an objective factfinder unfamiliar with the matter.

161.     The failure to designate an independent and impartial panel to review and consider Plaintiff's appeal was therefore a significant violation of Plaintiff's due process rights.

162.     Certainly, the lack of detailed findings included within the Decision and failure to provide a fair and impartial panel to review the appeal usurped Plaintiff's ability to challenge the Decision and Sanction.

163.     Notwithstanding that CSUP failed to provide any rationale or explanation for its Decision, on January 6, 2016, Plaintiff timely submitted an appeal of the Decision based on the following grounds: (i) the information presented in the initial disciplinary hearing was insufficient to establish that violation(s) of the Code occurred; (ii) the Sanction imposed was disproportionate to the severity of the violation; and (iii) new information is now available which would alter the

Decision. However, on January 19, 2016, Defendant Humphrey denied the appeal and upheld the erroneous Decision and Sanction.

164.     Further, CSUP's policies employ the patently unfair single investigator model by which an investigator is afforded unwarranted authority. Not only is the investigator given complete discretion to determine how to conduct the investigation, decide what information is necessary and relevant to include in the investigative report, selectively present the facts that he deems relevant, and present his findings to the hearing officer, but also he is permitted to offer a subjective assessment as to the evidence and credibility of the parties, provide a conclusion of findings and recommend disciplinary action. Given the hearing officer does not conduct her own investigation or interviews, but instead relies entirely on the Report prepared by the Title IX Coordinator, she is unlikely to question or disturb the findings of a colleague. As such, CSUP's policies lacked the requisite level of checks and balances to ensure the administration of an objective investigation and adjudication.

165.     Thus, in a clear conflict of interest, the position of judge, jury and executioner was entrusted to an individual not only pressured to meet a quota by the Office for Civil Rights, but also one who has not been educated in any form of law.

166.     Defendant Wilson conducted a one sided investigation in favor of the Complainant's allegations when he excluded relevant and exculpatory evidence, afforded significant weight to witnesses lacking any independent knowledge of the events and denied Plaintiff of his procedural rights, all in an effort to fit within the narrative that Plaintiff was guilty of the misconduct alleged.

167.     Had Defendant Wilson conducted a thorough and impartial investigation, he would have concluded that while hearsay witnesses presented one version of the events, Plaintiff and Jane Doe themselves unequivocally stated that they had engaged in consensual sexual intercourse.

168.     Accordingly, Defendants failed to conduct a fair and impartial investigation when they deprived Plaintiff of a hearing before an impartial tribunal, accepted the statements of hearsay witnesses as credible and utilized the single investigator model in the preparation of the investigative report.

### IV.     Gender bias against Plaintiff as the male accused

169.     CSUP was required to conduct an impartial and unbiased investigation process when evaluating an allegation of sexual misconduct against Plaintiff.

170.     Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants at CSUP.

171.     Upon information and belief, the CSUP Defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

172.     Upon information and belief, the CSUP Defendants have recognized the increased pressure, both internally, and from the United States government to aggressively discipline male students accused of sexual misconduct.

173.     In fact, according to the Colorado State University-Pueblo Fire Safety & Security Reports from 2011 through 2015 (the Clery Reports), the number of on-campus forcible sex offenses investigated has increased, from only 1 in 2010 to 7 in 2014.

174.    The CSUP Defendants demonstrated a bias against Plaintiff as the male accused when they failed to inform him of the nature of the allegations against him, in violation of Plaintiff's right to fair process. While CSUP commenced its investigation of the alleged incident on October 26, 2015, it did not inform Plaintiff of the exact charges against him until December 4, 2015, after Defendant Wilson had completed his investigation and after Plaintiff had been required to provide a statement and appear for two investigative meetings.

175.    Defendant Wilson deliberately conducted the subject investigation prior to notifying Plaintiff of the exact charges against him. Requiring Plaintiff to participate in the investigative process, submit to interviews and provide statements before being made aware of the exact nature of the allegations against him allowed Defendant Wilson to build his case against Plaintiff and ensure that the hearing officer would ultimately find him responsible for the charges alleged.

176.    Further, Defendant Wilson displayed a clear bias against the football team at CSUP, attributing certain stereotypical characteristics to members of that class. At the meeting on October 29, 2015, Defendant Wilson seemed to cast blame on the football team as a whole and the culture associated with it when he blatantly stated the players "have a problem." It was evident that Defendant Wilson had some innate prejudice against male athletes, including Plaintiff.

177.    Furthermore, the Report curiously notes that the allegation against Plaintiff was one of four involving athletes, within the timeframe of October 6, 2015 - October 27, 2015. It is pointed out that three of the four respondents were members of the football team, and one was a member of the soccer team. Yet, it is inexplicable why such a reference was even included in the Report concerning Plaintiff; other potential allegations had no bearing on the events at issue or the

relationship between Plaintiff and Jane Doe. Certainly, the insertion of such highly inflammatory and irrelevant information was intended for the sole purpose of slanting the factfinder's ultimate determination. The inclusion of this information demonstrates an inherent prejudice against male athletes and a sweeping statement of guilt against Plaintiff.

178.     Incredibly, during the meeting of October 29, Defendant Wilson advised Plaintiff that he would be holding a meeting with the football team in the coming weeks to address this "obvious problem" (referring to sexual misconduct complaints). In fact, this meeting did take place, on or about November 9, 2015. At that time, a female counselor identified Plaintiff, by name, as an example to the entire football team of a re-enactment, about the difference between consensual and non-consensual sexual contact. As Plaintiff was the only individual with his first name on the team, he was readily identifiable by all those present. Significantly, at the time of this meeting, the investigation on the charges against Plaintiff was still underway and a hearing had not yet been scheduled. Not only did CSUP commit a significant violation of Plaintiff's privacy and confidentiality rights when it disclosed this information to the entire football team, but also it evidenced a clear presumption of guilt against Plaintiff, prior to the conclusion of the investigation or issuance of the decision.

179.     Evidently, Defendant Wilson was not a neutral and unbiased fact finder, but discriminated against Plaintiff throughout the process by failing to undertake a thorough and impartial investigation.

180.     Moreover, CSUP's policies and procedures are set up to disproportionately affect the male student population as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

181.    For instance, CSUP's Sexual Misconduct Policy provides "the University reserves the right to initiate a complaint, to serve as complainant, and to initiate conduct proceedings without a formal complaint by the victim of misconduct." There is a certain conflict of interest when the university acts as complainant, where, as here, the alleged "victim" is not the person who files the complaint. Of course, the school will certainly find a respondent guilty when it acts as the complainant in a sexual misconduct investigation, as it did here.

182.    Based on the foregoing, the CSUP Defendants evidenced a clear gender bias against Plaintiff as the male accused throughout the investigation and hearing process, in violation of Title IX and his rights to fair process.

### V.    Failure to abide by the preponderance of the evidence standard

183.    Defendant OCR's 2011 Dear Colleague Letter requires that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. The CSUP Code defines preponderance of the evidence as: "whether it is more likely than not that a Respondent committed the alleged violation(s)."

184.    The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or CSUP's policies is such a standard referenced. However, CSUP's investigation process demonstrated a clear gender bias, which resulted in a Decision that did not afford Plaintiff the requisite presumption of innocence.

185.    Specifically, the CSUP Defendants improperly placed the burden of proof on Plaintiff to establish that Jane Doe had consented to the alleged sexual activity, when it accepted at face value the Complainant's allegations, accepted as credible third-party witness statements

concerning the issue of consent, and disregarded overwhelming physical evidence tending to exculpate Plaintiff, including a voice recording of Jane Doe stating nothing improper had occurred, hand written letters, snap chats, numerous text messages and a subsequent sexual encounter less than 24 hours after the alleged Incident.

186.     Upon accepting Complainant's uncorroborated account of the events, the CSUP Defendants discriminated against Plaintiff, based solely on his gender. A fair reading of the evidence reveals that Complainant's account of the events lacked any corroboration or reliability:

- Plaintiff and Jane Doe had an ongoing relationship both before and after the alleged Incident. An audio recording taken by Plaintiff, subsequent to Jane Doe's revelation of her conversation with Complainant, reveals a civil and non-threatening rapport between them; Jane Doe, unaware that she was being recorded, clearly states Plaintiff did not rape her.

- Concerned about the consequences of Complainant's actions, Jane Doe and Plaintiff went back to Plaintiff's house where he consoled Jane Doe and assured her she could not get in trouble for the hickey. They then engaged in consensual sexual intercourse again, one day after the alleged Incident.

- This second encounter was witnessed by Plaintiff's two roommates who mistakenly peaked into Plaintiff's bedroom while Plaintiff and Jane Doe engaged in sexual intercourse. In considering Plaintiff's appeal, Defendant Humphrey erroneously disregarded this critical information and failed to seek the testimony of such witnesses on the grounds that such information could have been available at the time of the Hearing. However, Plaintiff did not discover that his roommates had witnessed this encounter until after the investigation was concluded. Thus, Defendants purposefully overlooked any evidence tending to exculpate Plaintiff and negate their assumption that the alleged Incident was non-consensual.

- Various administrators at CSUP persuaded Jane Doe to acknowledge that Plaintiff had engaged in inappropriate conduct, based upon a recitation of the encounter by an uninformed third-party witness. The Report notes that Dr. Clark advised Jane Doe "what [Plaintiff] has done is not right"; and encouraged her to call her mother. Similarly, Mrs.

Clark, who only learned of the claims through her husband, coerced Jane Doe into admitting that something improper had occurred, encouraged her to report the Incident and scheduled an appointment with the counseling center on Jane Doe's behalf.   The foregoing actions went beyond providing support to an alleged victim of sexual misconduct; instead, faculty members of the Athletic Training Program encouraged one of their students to take action against an athlete, despite her reluctance to do so.

- Concerned about her conversation with Complainant, and unaware of the severity of the forthcoming accusations against Plaintiff, Jane Doe text messaged Plaintiff and asked him to meet her immediately; stating "I need to talk to you ASAP after practice!!!!! Like in person even if we just talk in your car! Please!" She further texted "I've been running around all day talking to so many people, trying to make things right!!! One of the other Athletic Training students screwed me over! And it involves you too!!! I'm been bawling my eyes out all day trying to fix this...She went behind my back and told my AT advisor stuff that wasn't true!!! I'm trying so hard to fix it all. I want to tell you what's going on. Please!" [sic].

- When Jane Doe received a phone call from both Dr. Clark and Mrs. Clark, while in Plaintiff's presence, she explicitly stated: "I'm fine and I wasn't raped." Additionally, Jane Doe called her mother to tell her that she was not raped, was not taken advantage of and that she and Plaintiff had had consensual sexual intercourse. Jane Doe even asked her mother to call Dr. Clark to clear up this false allegation.

- On or about November 2015, Jane Doe left an unsigned handwritten note in Plaintiff's mailbox at his home, stating "I miss you & care about you so much Grant! Everything will work out...I promise ☺" This is certainly not the actions of a sexual assault victim. To the contrary, it demonstrates her concern and affection for Plaintiff.

- Despite the implementation of reciprocal No Contact Orders, Jane Doe continued to contact Plaintiff subsequent to the filing of a complaint on her behalf. She communicated with him via private message in the Snap Chat phone application, stating "I hope you know I still care about you so much! I'm trying so hard to fix this... you don't deserve any of this. I just wanna talk to you again... I'm sooooo SORRY!" I hope that you are okay. I'm so worried. I'm so sorry! I'm so upset they did this. You're the only one who can see these...."

- The three "complainants" who ultimately came forward were not eyewitnesses to the alleged Incident; instead not one of them had any independent knowledge of the events, and based their claims solely on hearsay.

- Defendant DeLuna concluded that Plaintiff "penetrated" Jane Doe without her consent, prior to putting on a condom. Plaintiff clarified that he never inserted his penis into Jane Doe before he put on the condom, their genitals only touched while both naked. Yet, Defendant DeLuna stated something to the effect of "penetration" can include any touching, and is defined as "whatever the victim feels it is."

- Jane Doe's sister is also a student at CSUP and was often in the chemistry building for classes, along with Plaintiff. Throughout the investigation, Jane Doe's sister continued to be very friendly with Plaintiff and initiate conversations with him daily. Certainly, if Plaintiff had engaged in any improper conduct toward Jane Doe, her sister would not continue to engage in such friendly interactions with him.

187.    Accordingly, the CSUP Defendants failed to utilize the requisite preponderance of the evidence standard when they found third-party witnesses to be more credible than Plaintiff despite the lack of any corroborating evidence, wholly discounted all evidence tending to support Plaintiff's version of events, and presumed Plaintiff guilty from the outset. The CSUP Defendants conducted an investigation designed to reach a predetermined result.

188.    Assuming *arguendo* that such a standard of review was proper in the disciplinary context, the CSUP Defendants violated this provision when they placed the burden of proof on Plaintiff to prove that Jane Doe consented to the sexual activity.

**VI.**   **Title IX of the Education Amendments of 1972**

189.     On June 23, 1972, President Richard M. Nixon signed Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681, et seq., into law. A comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity, the principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices.[3]

190.     The statute provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

191.     Title IX applies, with a few specific exceptions, to all aspects of federally funded education programs or activities, including educational institutions such as colleges, universities, and elementary and secondary schools, as well as any education or training program operated by a recipient of federal financial assistance.

192.     The Revised Sexual Harassment Guidance dated January 19, 2001 (the "2001 Guidance") issued by Defendant OCR required schools to "adopt and publish a policy against sex discrimination and grievance procedures providing for *prompt and equitable resolution* of complaints of discrimination on the basis of sex." (*emphasis added*).[4]

---

[3] https://www.justice.gov/crt/overview-title-ix-education-amendments-1972-20-usc-1681-et-seq.
[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21.

193.    The 2001 Guidance further instructed that the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[5]

194.    To ensure the requisite level of due process, the 2001 Guidance identified the minimum level of procedures that must be in place, including:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[6]

195.    Further, the 2001 Guidance instructed that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [7]

196.    Significantly, nowhere in the 2001 Guidance was the "preponderance of the evidence" standard mentioned.

197.    Rather, in its Revised Sexual Harassment Guidance of 2001, the OCR provided colleges and universities with wide latitude in adopting policies and procedures that best fit the

---

[5] *Id.* at 22 (emphasis added).
[6] *Id.* at 20.
[7] *Id.* at 21.

particular institution, noting: "[p]rocedures adopted by schools will vary considerable in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience." [8]

198.    As such, the subsequent enactment of uniform procedures and standards of review as promulgated by the 2011 Dear Colleague Letter unambiguously created a new set of binding rules and imposed new obligations on the affected parties.

## VII.    The 2011 Dear Colleague Letter

199.    The 2011 Dear Colleague Letter was formally announced by Vice President Joe Biden and former U.S. Secretary of Education Arne Duncan at the University of New Hampshire on April 4, 2011.

200.    According to Defendant Lhamon, the Dear Colleague Letter was designed to "help schools better understand their obligations under Title IX to prevent and respond to sexual violence."

201.    However, the 2011 Dear Colleague Letter was not, in practice or effect, a genuine guidance document, as it instructed educational institutions receiving federal funds to adopt specific procedures in the handling of sexual misconduct cases, and coerced the schools' compliance by threatening to rescind potentially billions of dollars in federal funding.

202.    Since its enactment, the 2011 Dear Colleague Letter has aggressively dictated how colleges handle sexual assault and sexual harassment on campus, by laying out specific requirements that schools must adopt and utilize, which essentially equate the filing of a complaint to guilt, and promulgating an overly broad definition of sexual harassment.

---

[8] *Id.* at 20.

203.     Specifically, the requirements outlined in the Dear Colleague Letter have pressured schools to crack down on sexual misconduct investigations, causing schools to brand more students "rapists" based on the excessively low "preponderance of the evidence" burden of proof (equating to a mere 50.01% probability that the alleged misconduct occurred), permitting a form of double jeopardy by allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or intimidating" to the "victim."

204.     The Dear Colleague Letter's elimination of the accused's right to cross-examination is of particular concern. It is well established that cross-examination is a fundamental procedural protection and "beyond any doubt the greatest legal engine ever invented for the discovery of truth."[9] Especially in cases where a determination of responsibility hinges on the credibility of the parties and witnesses, as it did in Plaintiff's case, the right to cross-examine one's accuser is essential to ensure due process.

205.     Notably, the complainant in this matter was not a party to the sexual encounter, but instead a third-party witness whose complaint was based solely on her own irrational assumptions. Thus, the denial of Plaintiff's right to challenge his accuser was a fatal error which contributed to the CSUP Defendants' erroneous Decision, and one which stemmed directly from the Dear Colleague's Letter prohibition of cross-examination.

---

[9] *See California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), quoting 5 J. Wigmore, Evidence § 1367, p. 29 (3d ed. 1940); *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662, 96 L. Ed. 2d 631 (1987).

206.    The CSUP sexual misconduct policy in effect during all relevant times herein was adopted by Interim President Dr. Julio S. Leon on May 31, 2011, less than two months after the implementation of the Dear Colleague Letter.

207.    The CSUP Student Code of Conduct in effect during the 2010-2011 school year, prior to implementation of the 2011 Dear Colleague Letter, specifically provided as follows with respect to cross-examination of the parties: "Questions may be suggested by the Respondent and/or Complainant to be answered by each other or by witnesses."

208.    Contrarily, the 2015-2016 Student Code of Conduct explicitly provides as follows, with respect to the student's right to a hearing: "These rights should not be construed to allow direct cross-examination of witnesses."

209.    Upon information and belief, to avoid a governmental investigation and potential loss of federal funds, CSUP revised its policies subsequent to 2011, in order to conform to the mandates of the Dear Colleague Letter.

210.    Based on the foregoing, the CSUP Defendants' attempted compliance with the Dear Colleague Letter's arbitrary and capricious directives contributed to an erroneous finding of responsibility against Plaintiff; had such analogous claims been reviewed by a court of law, the factfinder certainly would have arrived at the opposite conclusion.

211.    Based on the foregoing, the Federal Defendants, in enforcing the Dear Colleague Letter without following the notice and comment rulemaking requirements of the Administrative Procedure Act, have imposed on colleges and universities, including Colorado State University-Pueblo, an unworkable regulatory framework that has resulted in severe, unwarranted and

permanent damages to Plaintiff, under the threat of severe penalties including rescission of federal funds.

212.     Through their enforcement of the Dear Colleague Letter, the Federal Defendants have forced schools to set up a quasi-legal system to investigate and adjudicate allegations of sexual misconduct; yet, the policies adopted often violate many civil liberties and fail to afford the accused student with the due process protections associated with a criminal trial.

213.     The foregoing has caused the Dear Colleague Letter to become a highly divisive document, criticized by law professors, lawyers, educators, journalists, civil liberties groups and members of Congress.

### VIII.   Judicial Review of Agency Action

#### A. Statutory Authorization

214.     Sections 702 to 704 of the APA provide a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court.

215.     Due to the lack of any specific statute authorizing judicial review of actions by the Department of Education, Sections 702-704 of the APA afford Plaintiff a general cause of action to challenge Defendant DOE's implementation and enforcement of the 2011 Dear Colleague Letter on the grounds that it failed to comply with the APA's Notice and Comment rulemaking requirements.

216.     The APA provides that judicial review of agency action may be invoked by a person who has been "adversely affected or aggrieved" by any final agency action "within the meaning" of the statute at issue. 5 U.S.C. § 702.

217.    Plaintiff has suffered an injury in fact as a result of Defendants' actions; he was erroneously found responsible for a violation of the University's policies, in response to the governmental pressure imposed on CSUP to issue more guilty findings against male students accused of misconduct.

218.    Plaintiff's damages stem from a final agency action for which there is no other adequate alternative remedy in court to challenge the actions of Defendants.

219.    Title IX does not specifically provide for federal court review of a public university student's challenge to the implementation and enforcement of a purported "guidance" document.

220.    As such, Plaintiff has standing to challenge the validity of the 2011 Dear Colleague Letter.

### B.  Sovereign Immunity Waived

221.    When challenging the action of a federal agency, the APA provides a broad waiver of sovereign immunity: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." *See* 5 U.S.C. § 702.

222.     As such, sovereign immunity is waived where, as here, Plaintiff as an aggrieved party seeks prospective equitable relief and the agency conduct being challenged is considered a final action by Defendant DOE, made subject to judicial review by statute.

223.     Thus, Defendant U.S. has waived its sovereign immunity for actions against the United States, its instrumentalities, and officers for non-monetary injunctive and equitable relief and for the entry of judgments and decrees against the United States in such actions.

### C.  Finality of Administrative Action

224.     An agency decision may be final even though the agency labels it as informal "guidance" or non-binding interpretations, when the agency treats the action as binding for all practical purposes.

225.     Defendant DOE's Dear Colleague Letter of 2011 is a final agency action in that it is the consummation of the agency's decision-making and has been carried out as binding law since its adoption in 2011.

226.     Defendant DOE's Dear Colleague Letter is a final agency action in that it determines rights and obligations of every educational institution that receives federal funding and creates directs legal consequences for those that fail to comply with its directives.

227.     Upon information and belief, in February 2015, the Obama administration proposed a federal budget to Congress that would increase funding to the Department of Education's Office for Civil Rights by approximately 29%, to $130 million.  The requested budget increase purportedly aimed to address the backlog in completing Title IX investigations by earmarking the additional funds for more personnel at the agency's regional offices, in effect rewarding the Federal Defendants' overreaching on college campuses.

228.     Upon information and belief, ultimately, a congressional spending agreement approved an increase in Defendant OCR's budget by about 7%, from $100 million in 2015 to $107 million in 2016.

229.     Upon information and belief, since 2011, Defendant DOE has commenced more than 240 investigations against colleges and universities to determine whether their sexual misconduct policies and procedures are in compliance with the mandates of the Dear Colleague Letter.

230.     Upon information and belief, Defendant DOE has threatened to rescind federal funding from those schools that do not enter into a "voluntary" agreement concerning revisions that will be made to ensure their policies comply with the Dear Colleague Letter.

231.     Indeed, Defendant Lhamon testified at the Senate Hearing on "Sexual Assault on Campus: Working to Ensure Student Safety" on June 26, 2014 (the "Senate Hearing") that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."

232.     As such, Defendant DOE has imposed explicit obligations on educational institutions receiving federal funding, under the threat of potentially severe financial consequences.

233.     Notwithstanding Defendant DOE's repeated characterization of the Dear Colleague Letter as an "informal" guidance document, Defendant DOE has undoubtedly treated the Dear Colleague Letter as binding on regulated parties for all practical purposes.

234.     Defendant Lhamon testified at the Senate Hearing that "we do" expect institutions to comply with Title IX guidance documents.

235.     Defendant Lhamon additionally testified: "The 2011 DCL affirms that the Title IX requirements for sexual harassment and OCR's 2001 guidance on sexual harassment also apply to sexual violence and lays out *the specific Title IX requirements* applicable to sexual violence" (emphasis added), rather than simply recommendations or suggestions.

236.     Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Defendant Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools;" Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

237.     Further negating the Federal Defendants' assertion that the Dear Colleague Letter is interpretative, OCR made clear in 2014 that it saw the letter as binding, when it threatened Tufts University with full defunding when it balked at agreeing to a finding that its current policies violated Title IX as newly construed by Defendant OCR.

238.     In reference to the power of threatening rescission of federal funds, Defendant Lhamon stated in June 2014 that her office's conflict with Tufts University was "the best example of how well that tool is working for us."

239.     There is no doubt that the Dear Colleague Letter has also resulted in significant action and legal consequences; Defendant Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

240.     At the Senate Hearing of June 26, 2014, Senator Lamar Alexander expressed concern that by calling the Dear Colleague Letter's dictates "guidance," Defendant OCR was essentially trying to create new law without adhering to the procedures normally required for new federal regulations under the Administrative Procedure Act, particularly providing the public with notice of the proposed regulations and allowing an opportunity for public comment. Senator Alexander recognized the enormous effect such "guidance" has had on educational institutions and students nationwide, stating: "What [the OCR is] doing is writing out detailed guidance for 22 million students on 7200 campuses…" without identifying the underlying regulatory or statutory authority that allows such agency action.

241.     While Defendant Lhamon contended that OCR guidance did not constitute new regulations, but simply explained what the law is, Defendants overlook the fact that the Dear Colleague Letter, both explicitly and through direct and implicit threats—created new standards and requirements for colleges and universities in dealing with sexual assault.

242.     There is no adequate, alternative remedy with respect to challenging the Federal Defendants' implementation and enforcement of the Dear Colleague Letter; as such, judicial review is warranted here.

### D.  Agency Action Ripe for Judicial Review

243.     The Dear Colleague Letter is ripe for judicial review as it has influenced, and continues to affect, the conduct of regulated parties since 2011.

244.     Should this Court fail to consider the validity of the 2011 Dear Colleague Letter and CSUP's Decision arising therefrom, Plaintiff will continue to suffer undue hardship, along with other similarly situated aggrieved students, across the country.

## IX.     Administrative Procedure Act § 553 Notice and Comment Rulemaking

245.     The APA governs the process by which federal agencies, including the United States Department of Education's Office for Civil Rights, promulgate rules.

246.     The APA defines a "rule" in relevant part as follows: "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy..." 5 U.S.C. § 551(4).

247.     To ensure uniform standards in the conduct of formal rulemaking and adjudication and ensure federal agencies' accountability to the public, the APA imposes the checks and balances system known as notice and comment rulemaking.

248.     Among the purposes of the APA's notice and comment requirements are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."[10]

249.     Under 5 U.S.C. § 553(b)-(c), agency action that promulgates a "substantive" or "legislative" rule requires notice-and-comment rulemaking, which requires publication in the *Federal Register* and the agency's responding to comments as part of its final rule. Agency action that purports to make such amendments without complying with the relevant procedural requirements are of no force or effect and are void *ab initio*.

---

[10] *See United States v. Reynolds*, 710 F.3d 498, 517 (3d Cir. 2013).

250.     However, the APA exempts from these procedural requirements: (1) interpretative rules; (2) general statements of policy; and (3) rules of agency organization, procedure, or practice.

251.     Thus, distinguishing between a substantive rule, which requires notice and comment, and an interpretative rule, which does not, is critical. In determining whether the rule at issue is substantive or interpretative, the Supreme Court has focused on the impact of the potential rule on individual rights and obligations.

252.     "An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation." *Batterton v. Marshall,* 648 F.2d 694, 702 n. 34 (D.C.Cir.1980). The court's inquiry in distinguishing legislative rules from interpretative rules "is whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC),* 653 F.3d 1, 6–7 (D.C.Cir.2011). Interpretative rules are those that clarify or explain existing law or regulations. They do not alter the rights or obligations of those affected.

253.     A legislative or substantive rule, on the other hand, "is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *Nat'l Family Planning & Reprod. Health Ass'n, Inc.,* 979 F.2d at 237. A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy. Furthermore, a rule is considered substantive if it has a present and binding consequence on the affected parties. Often, a legislative rule will include imperative language, such as "must" or "will."

**X.      The 2011 Dear Colleague Letter Violated APA § 553**

254.      While the Federal Defendants designate the Dear Colleague Letter as a "guidance" document which merely interprets the requirements of Title IX of the Education Amendments of 1972, in actuality, the Dear Colleague Letter advances new substantive rules and binding obligations on the affected parties, under threat of severe penalties.

255.      There is no doubt that since its implementation in 2011, the Dear Colleague Letter has resulted in sweeping changes to the regulatory landscape and resultant conduct by every educational institution receiving federal funding.

256.      Defendants have imposed significant pressure on colleges and universities across the country to comply with the mandates of the Dear Colleague Letter, by threatening to conduct investigations into their handling of Title IX complaints, and rescind billions of dollars in federal funding, a powerful weapon that could result in the effective demise of numerous institutions. This intimidation tactic has coerced schools to revise their policies and procedures in an attempt to comply with the Dear Colleague Letter, and dissuaded educational institutions from challenging such action as promulgated by the United States Department of Education's Office for Civil Rights.

257.      Upon information and belief, CSUP has a history of budget deficits: for the 2014-2015 fiscal year, CSUP had an estimated $3.3 million budget deficit; in the university's 2015-2016 fiscal year budget adjustments, a 7 percent decrease in revenue from tuition was anticipated; and to reach its projected fiscal 2017 budget mark, CSUP will cut approximately $500,000 in spending.

258.      Moreover, the University's balance sheets in 2015 showed CSUP owed $108 million in debt on various construction projects.

259.     Upon information and belief, in 2014, the University's audited financial statements for the year ended June 30, 2014 reflect that the University received total revenue of $80,959,807, and that $8,977,030 (roughly 11% of the budget), came from Federal non-operating grants and contracts.

260.     Upon information and belief, given the University's history of budget deficits and shortfalls, a loss of federal funds would severely cripple CSUP's ability to operate.

261.     Upon information and belief, in light of CSUP's ongoing budgetary concerns, the tangible threat of rescission of federal funding coerced CSUP to act in accordance with the directives of the 2011 Dear Colleague Letter, notwithstanding its invalidity *ab initio*.

262.     Upon information and belief, the United States Department of Education is currently investigating over 200 colleges and universities for potential violations of Title IX in their handling of sexual misconduct complaints.

263.     Recognizing its widespread effect, Defendant Catherine Lhamon testified at the Senate Hearing that the 2011 Dear Colleague Letter has "sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 [Dear Colleague Letter.]" Certainly, a true "guidance" document would not have brought about such significant changes at schools across the country.

264.     Further, the Dear Colleague Letter's use of authoritative language reveals the Federal Defendants' intent that this be a binding document for all practical purposes, rather than serving merely as an interpretive rule, general statement of policy, and/or rule of agency procedure or practice.

265.     Specifically, the Dear Colleague Letter's use of the term "must" is precisely the kind of mandatory language that is "a powerful, even potentially dispositive, factor suggesting…substantive rules."[11]

266.     On January 7, 2016, Senator James Lankford, Chairman of the Subcommittee on Regulatory Affairs and Federal Management submitted a letter to Defendant King, questioning whether the Department of Education is exceeding its legal authority by enforcing the 2011 Dear Colleague Letter as binding law. Senator Lankford pointed out that both the 2010 and 2011 Dear Colleague Letters "fail to point to precise governing statutory or regulatory language that supports their sweeping policy changes." He further noted that the letters "advance substantive and binding regulatory policies that are effectively regulations" and as such, should have been submitted to notice and comment procedures. As such, Senator Lankford requested a clarification as to specific statutory and/or regulatory language that the 2010 and 2011 Dear Colleagues purported to construe.

267.     Defendant Lhamon issued a response to Senator Lankford's letter more than one month later, on February 17, 2016. Noticeably, Defendant Lhamon eluded a direct response. Unable to cite to any governing statutory or regulatory authority, she justified the Federal Defendants' position that the Dear Colleague is an "interpretative" rule not subject to notice and comment rulemaking on the grounds that Title IX's *original formulation* in 1972 went through notice-and-comment, and any further OCR interpretation, regardless of how novel, is not required. Seemingly, in Defendant Lhamon's view, the new sweeping regulations imposed on educational

---

[11] *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987).

institutions need not be submitted to the public for comment, as the original statute underwent such procedures, more than 40 years ago.

268.     Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, Defendant Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

269.     Janet Napolitano, president of the University of California and a former prosecutor, Governor of Arizona, and Secretary of the Department of Homeland Security, warned in an article in the *Yale Law & Policy Review* published online in August 2015 that "a cottage industry is being created" on campuses dedicated to handling tasks that fall outside the expertise of colleges and universities.

270.     While the 2011 Dear Colleague Letter claimed to merely interpret statements of existing law, the Federal Defendants imposed substantial new requirements upon recipients of federal funding.

271.     Yet, while purporting to interpret statements of existing law, the Dear Colleague Letter failed to cite to any precise governing statute or regulatory language which would support the implementation of such regulations without allowing for public notice and comment.

272.     Instead, the Dear Colleague Letter relies on its claim that legal precedent firmly establishes the proper standard of review applicable to school disciplinary proceedings.

273.     Indeed, Defendant Lhamon specifically expressed this view in her February 17, 2016 letter response to Senator Lankford, in which she stated "OCR's construction of the Title IX

regulation is reasonable and, as explained in the 2011 DCL, ***is based on case law***, mainly under Title VII of the Civil Rights Act of 1964, which courts have relied upon in analyzing Title IX." (emphasis added).

274.     Not only is Defendant OCR's construction of Title IX based on a defective analysis of prior Supreme Court decisions, but it is also well established that an agency's interpretation of legal precedent is not permitted even the slightest bit of deference.

275.     Accordingly, the Federal Defendants' reliance on prior case law to justify the imposition of new binding requirements under Title IX is patently improper.

276.     Prior to issuing the Dear Colleague Letter, the Federal Defendants did not provide public notice, did not issue a proposed rule, did not provide the public an opportunity to offer comments, and did not consider public comments.

277.     Notwithstanding, the Federal Defendants have grossly exceeded their authority by enforcing the Dear Colleague Letter and its newly created directives as binding law, precisely the threat the APA was enacted to safeguard against.

278.     Such regulations include, but are not limited to the following:

- Grievance procedures *should* include voluntary informal mechanisms for resolution of some types of complaints;

- The school *should* notify a complainant of right to file criminal complaint;

- Schools *should* not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own investigation, and must take interim measures if necessary to protect a student;

- Schools *must* use a preponderance of the evidence standard when evaluating allegations of sexual harassment or violence, to "to be consistent with Title IX standards."

- Schools *must* provide parties an equal opportunity to present relevant witnesses and other evidence;

- OCR *strongly* discourages schools from allowing the parties to personally question or cross-examine each other during the hearing;

- Grievance procedures *should* specify the time frame within which the school will conduct a full investigation, the parties will receive a response regarding the outcome and the parties may file an appeal;

- Both parties *should* be given periodic status updates;

- Both parties *must* be notified in writing about the outcome;

- Title IX *requires* a school to take steps to protect a complainant as necessary;

- Schools *must* have policies and procedures in place to protect against retaliatory harassment.

279.    As noted above, in determining whether a rule is considered substantive or interpretative, a Court will look to the language used within the document. The use of imperative terms such as "must" or "will" often demonstrates that a rule is substantive rather than interpretative. Here, the Dear Colleague Letter repeatedly uses the terms "should" and "must," conveying that such letter is unequivocally a substantive and binding rule.

280.    For instance, the Dear Colleague Letter states "the school *must* use a preponderance of the evidence standard…" when evaluating allegations of sexual harassment or violence. The Dear Colleague Letter further indicates this standard must be used in order "to be

consistent with Title IX standards," implying there is some statutory or regulatory authority for imposing such a standard, when in fact, no such authority exists.

281.    Given its inability to cite a specific authority, the Dear Colleague Letter instead offers two absurd rationalizations for its use of the preponderance of the evidence standard: (1) the Supreme Court's use of such a standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964; and (2) Defendant OCR's use of a preponderance of the evidence standard when resolving complaints against recipients. Neither of these explanations have merit.

282.    First, it is evident that school disciplinary proceedings concerning allegations of sexual misconduct may result in consequences as severe as those arising from criminal charges. Yet, school disciplinary proceedings are not courts of law and therefore are not equipped to ensure fundamental due process protections. As such, there is no basis for concluding the Supreme Court's use of the preponderance of the evidence standard in civil litigation cases translates to review of sexual misconduct complaints at a college or university.

283.    Second, the fact that the OCR has previously used the preponderance of the evidence standard, in its fund termination proceedings, does not imply that this is the appropriate standard for review of sexual misconduct complaints on college campuses. Certainly, an adjudication determining whether a student is responsible for committing an act of sexual misconduct deserves a standard of proof considerably higher than that reserved for civil disputes or a government agency's enforcement proceedings.

284.    Undoubtedly, the severity and permanency of damages that could result from a school's determination that a student committed sexual misconduct warrant a much higher burden of proof than the preponderance of the evidence.

285.   In fact, prior to implementation of the 2011 Dear Colleague Letter, it was generally accepted that the appropriate standard of proof in college disciplinary hearings was the higher standard of "clear and convincing evidence."

286.   As such, Defendants seem to erroneously base their implementation of an arbitrary standard of review on unrelated legal precedent and the agency's own administrative grievance procedures.

287.   As such, Defendant OCR has unilaterally declared that an exceedingly low burden of proof satisfies the requirement that procedures be "equitable," even though such an expectation contradicts the burden of proof applied in actual criminal cases, where similar charges are alleged.

288.   The mandate that schools utilize the preponderance of the evidence standard in determining whether a student is guilty of sexual misconduct has caused colleges and universities to make a rush to judgment, more often than not resulting in a finding of responsibility.

289.   While colleges and universities continue in their struggle to adopt policies and procedures that comply with the mandates of the Dear Colleague Letter, the failure of such schools to provide accused students with sufficient procedural protections has triggered a rapid increase in the number of lawsuits filed by students claiming they were wrongly disciplined under a system that failed to ensure their due process rights were properly protected. Typically, these cases are brought by male students erroneously found responsible for sexual misconduct after being subjected to an arbitrary, biased and Kafkaesque investigation and adjudication.

290.   Over the past year, district courts across the country have ruled in favor of student plaintiffs, finding that both private and public universities failed to afford the accused student with

the requisite level of fair process, stemming from either Fourteenth Amendment due process or the student's private educational contract, during a Title IX investigation. *See Doe v. The Board of Regents of the University System of Georgia, et al.,* N.D. Ga., Civil action 1:15-CV-4079-SCJ, Dkt. 40 (December 16, 2015)(Judge Jones)(denying Board of Regents' motion to dismiss related to expelled student's due process claims); *Doe v. Rector & Visitors of George Mason Univ.*, No. 1:15-CV-209, 2016 WL 775776 (E.D. Va. Feb. 25, 2016)(granting former student's motion for summary judgment in action against state university alleging his Fourteenth Amendment due process and free speech rights were infringed when he was expelled); *Doe v. Brandeis Univ.,* No. CV 15-11557-FDS, 2016 WL 1274533 (D. Mass. Mar. 31, 2016)(denying in part Brandeis University's motion to dismiss breach of contract claims filed by a student disciplined for sexual assault); *Doe v. Brown Univ.,* No. CV 15-144 S, 2016 WL 715794, at *1 (D.R.I. Feb. 22, 2016)(denying in part Brown University's motion to dismiss Title IX erroneous outcome and breach of contract claims filed by student suspended for sexual misconduct); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)(denying in part the University's motion to dismiss Plaintiff's Title IX erroneous outcome claim); *Doe v. Salisbury Univ.,* 107 F. Supp. 3d 481 (D. Md. 2015)(denying in part the University's motion to dismiss Plaintiff's Title IX retaliation claim).

291.     While the United States Department of Education's Office for Civil Rights drafted the Dear Colleague Letter in such a way that it would appear to be merely "interpretive" of Title IX, thus evading the APA's Notice and Comment rulemaking requirement, a plain reading of the Letter clearly demonstrates to the contrary; that is, the Dear Colleague Letter creates new binding law.

292.     While Plaintiff agrees that all students should be able to enjoy a safe educational environment, regardless of sex, and that sexual harassment, discrimination and violence cannot be tolerated, the Federal Defendants must abide by the proper statutory protocol in promoting these objectives.

293.     The Federal Defendants' failure to abide by the requirements of the Administrative Procedure Act has resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and every disciplinary decision arising therefrom, unconstitutional, arbitrary and void.

294.     As noted by Senator Lankford in his March 4, 2016 letter response to Defendant Lhamon's February 17, 2016 correspondence, "Congressional oversight of agency action is a cornerstone to the checks and balances ensured by our Constitution." [12]

295.     As such, given there is a strong presumption favoring judicial review of administrative action,[13] judicial review of the process by which Defendant OCR's 2011 Dear Colleague Letter was enacted and enforced is required here.

### AS AND FOR A FIRST CAUSE OF ACTION
### <u>Violation of Title IX of the Education Amendments of 1972</u>
### <u>(Against the CSUP Defendants)</u>

296.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

297.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be

---

[12] *See* Senator James Lankford to John B. King, Jr. dated March 4, 2016 at p. 4.
[13] *See Mach Mining, LLC v. E.E.O.C.,* 135 S. Ct. 1645, 1651, 191 L. Ed. 2d 607 (2015).

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

298.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

299.     Upon information and belief, Defendant CSUP receives federal funding for research and development.

300.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[14]

301.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[15]

302.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

---

[14] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21.
[15] *Id.* at 22 (emphasis added).

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[16]

303.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [17]

304.    Based on the foregoing, *supra,* at ¶¶ 108-188, Defendant CSUP deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant CSUP's guidelines and regulations.

305.    Based on the foregoing, *supra,* at ¶¶ 108-188, Defendant CSUP failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of the Incident and subsequent adjudication in a manner that was biased against Plaintiff.

306.    CSUP has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at CSUP on the basis of his sex.

---

[16] *Id.* at 20.
[17] *Id.* at 21.

307.    Defendant CSUP had no intention of following its own policies and procedures for Plaintiff as the male accused of sexual misconduct when it erroneously found Plaintiff responsible for sexual misconduct despite the absence of any reliable or credible evidence.

308.    CSUP applied its stated policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

- Defendants commenced an investigation and required Plaintiff to provide a statement concerning his version of the events prior to notifying him of the exact nature of the allegations against him.

- Defendants improperly placed the burden of proof on Plaintiff, as respondent, to disprove statements made by third-party witnesses, which had no independent validity, and establish that Jane Doe had clearly consented to the sexual encounter.

- Defendants disregarded all evidence tending to exculpate Plaintiff, including the voice recording taken by Plaintiff, hand written letters, snap chats, numerous text messages and a subsequent sexual encounter less than 24 hours after the alleged Incident.

- Defendants only interviewed those witnesses favorable to Complainant, and denied Plaintiff of the opportunity to identify witnesses favorable to his defense.

- Defendants deprived Plaintiff of the right to a formal hearing before a panel of impartial decision makers, denied him of the opportunity to confront and question his accuser; and denied him the ability to challenge all witnesses against him.

- Defendants failed to provide Plaintiff any rationale for their Decision, usurping any meaningful opportunity to appeal as he was not informed of the basis for their findings.

309.    Significantly, while Plaintiff's appeal was pending, Defendants introduced a new and updated training on sexual misconduct and Title IX investigations. The training was updated

and issued by Defendant Wilson and Defendant Blakey. Concerning the policies under which Plaintiff was investigated and disciplined, Defendant Wilson acknowledged: "The other training was outdated. Legislature has changed and expanded for civil rights."

310.     Subsequently, in February of 2016, mere days after an individual close to Plaintiff publicly posted to Facebook a message concerning the mishandling of his case, Defendant Wilson unexpectedly resigned from Colorado State University-Pueblo, without explanation or formal announcement to the University community. Certainly, the revision of CSUP's policies and sudden departure of its Title IX Coordinator were more than mere coincidences; rather, they demonstrate a consciousness of the inadequacy of CSUP's policies and fatally flawed procedures.

311.     Upon information and belief, various administrators at CSUP have demonstrated an inherent predisposition against male students accused of sexual misconduct.

312.     Defendant Wilson in particular repeatedly demonstrated his predisposition toward a finding of responsibility against male athletes.

313.     During Plaintiff's first meeting with Defendant Wilson on October 29, it became apparent that Defendant Wilson was critical of the football team and its culture, stating the players "have a problem" in reference to acts of sexual misconduct.

314.     Defendant Wilson's discriminatory bias against males was further evident in the manner in which he drafted the Investigation Report, which peculiarly noted that the subject complaint was one of four (all involving athletes) that allegedly occurred within the timeframe of October 6 - October 27, 2015. For unknown reasons, Defendant Wilson felt it necessary to point out that three of the four respondents were members of the football team, and one was a member of the soccer team. It is incomprehensible why such a reference was even included in a Report

concerning Plaintiff, which must be an objective and unbiased presentation of the facts. Certainly, the inclusion of such highly inflammatory and irrelevant information was intended for the sole purpose of slanting the factfinder's ultimate determination against Plaintiff. Defendant Wilson thus prepared the Report in furtherance of his inherent prejudice against male athletes including Plaintiff.

315.     Furthermore, during the meeting of October 29, Defendant Wilson advised Plaintiff that he would be holding a meeting with the football team in the coming weeks to address this "obvious problem" (referring to sexual misconduct complaints). In fact, this meeting did take place, on or about November 9, 2015. At that time, a female counselor identified Plaintiff, by name, as an example to the entire football team about the difference between consensual and non-consensual contact. As Plaintiff was the only individual with the first name "Grant" on the team, he was readily identifiable by all those present. Thus, when Plaintiff was suspended on an interim basis approximately one week later, it became public knowledge that Plaintiff was being accused of rape. Significantly, at the time of this meeting, the investigation of the charges against Plaintiff was still underway and a hearing had not yet been scheduled. Not only did CSUP commit a significant violation of Plaintiff's privacy and confidentiality rights when it disclosed this information to the entire team, but also it evidenced a clear presumption of guilt against Plaintiff, prior to the conclusion of the investigation and issuance of a decision.

316.     Upon information and belief, Defendants did not make any such similar presentations to any of the women's athletic teams at CSUP.

317.    Upon information and belief, CSUP possesses communications evidencing Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

318.    Upon information and belief, CSUP has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

319.    Upon information and belief, all students that have been expelled from CSUP for sexual misconduct have been male.

320.    Upon information and belief, CSUP's mishandling of Plaintiff's investigation was wrongfully informed by federal pressure from the Federal Defendants.

321.    As outlined above, the outcome was predetermined and simply a motion into a biased, prejudiced and implicitly unfair process, calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged.

322.    Based on the foregoing, Defendant CSUP imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed investigation.

323.    Based on the foregoing, male respondents, and particularly male athletes, in sexual misconduct cases at CSUP are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

324.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

325.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

326. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of the Fourteenth Amendment of the**
**United States Constitution Procedural Due Process**
**(Against the CSUP Defendants)**

327. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

328. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

329. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

330. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

331. Plaintiff's constitutionally protected property interest in his continued enrollment at CSUP and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by CSUP.

332. Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between CSUP and Plaintiff.

333. It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

334. Thus, a person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university

until he has completed his course of study. The state cannot deprive a person of this interest without due process.

335.     As a result, if Plaintiff as a CSUP student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process CSUP used.

336.     Colorado State University-Pueblo, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

337.     Plaintiff had made exceptional academic progress and had obeyed all institutional rules when he was wrongly suspended from CSUP.

338.     Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at the CSUP.

339.     Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

340.     Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

341.     In the course of such investigation and adjudication, CSUP flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment

through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness, due in part to coercion by the Federal Defendants.

342.    Upon information and belief, CSUP was pressured by the Department of Education into complying with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

343.    The CSUP Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, his right to be informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Rather than investigate what occurred on October 25, 2015, Defendants conducted a superficial investigation biased against Plaintiff as a male athlete accused of sexual misconduct.

344.    In attempting to demonstrate their compliance with the 2011 Dear Colleague Letter, the CSUP Defendants subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias.

345.    As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct.

346.    Defendants, as well as other agents, representatives, and employees of the CSUP were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

347.    Defendants all agreed to, approved, and ratified this unconstitutional conduct.

348.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. He is unable to transfer to a comparable undergraduate institution because of the erroneous disciplinary finding. His lifelong goal of becoming of an orthopedic surgeon has been shattered.

349.     Accordingly, the CSUP Defendants are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

350.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

351.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract
### (Against the CSUP Defendants)

352.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

353.     Based on the foregoing, CSUP created express and implied contracts when Plaintiff accepted an offer of admission to CSUP and paid the tuition and fees.

354.     Based on the aforementioned facts and circumstances, Defendant CSUP breached express and/or implied agreement(s) with Plaintiff.

355.     Defendant CSUP committed several breaches of its agreements with Plaintiff during the investigation and hearing process. A non-exhaustive list of CSUP's breaches include the following:

**CSUP failed to conduct a fair and impartial investigation.**

356.     CSUP's Code provides: "All students have the right to expect a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed…All students will be treated with respect throughout the disciplinary process."

357.     CSUP breached its contract with Plaintiff when it failed to conduct a fair and impartial investigation.

358.     Based on the foregoing *supra,* at ¶¶ 108-188, Defendants conducted a one-sided and biased investigation against Plaintiff when, among other things, they accepted the statements of third-party witnesses as more credible than Plaintiff and ignored evidence tending to exculpate Plaintiff of any wrongdoing.

359.     Further, based on the foregoing *supra,* at ¶¶ 108-188, Defendant Wilson demonstrated an inherent prejudice against male athletes accused of misconduct, significantly hindering his ability to conduct an objective investigation.

360.     Evidently, CSUP breached its own self-imposed policies when it pursued an investigation calculated to lead to the foregone conclusion that Plaintiff was responsible for the misconduct alleged.

**Failure to provide Plaintiff with a hearing.**

361.     CSUP's Policies explicitly provide that a student involved in a disciplinary proceeding has the right to a hearing.

362.     Notwithstanding, Defendants deprived Plaintiff of the opportunity to have any kind of hearing, despite the severity of the charges against him and the potentially devastating effects on his future academic and athletic career.

363.     Instead, Defendants subjected Plaintiff to three investigative meetings during which he was interviewed about the subject Incident.

364.     Based on the foregoing *supra,* at ¶¶ 108-188, at no time was Plaintiff afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and challenge any witnesses against him, all before an impartial and objective factfinder.

365.     Thus, Defendants violated the contract with Plaintiff when they failed to afford him a proper hearing on the charges against him.

**Failure to fully inform Plaintiff of the nature and extent of the alleged violations.**

366.     CSUP's Policies provide that a student involved in a disciplinary proceeding has "the right to be fully informed of the nature and extent of all alleged violations contained within the complaint."

367.     Notwithstanding, on October 27, 2015, Plaintiff received written notice from Defendant Humphrey that he was "being investigated for possible alleged violation of the *Code of Student Conduct* including Non-consensual Contact and Non-Consensual Sexual Intercourse." [sic]. The notice did not properly identify which specific provisions Plaintiff allegedly violated, citing only to CSUP's general Policy.

368.     In fact, while CSUP commenced its investigation of the alleged incident on October 26, 2015, it did not inform Plaintiff of the exact charges against him until the "hearing"

date on December 4, 2015, after Defendant Wilson had already completed his investigation and after Plaintiff had been required to provide a statement and appear for two investigative meetings.

369.     Thus, Defendants violated their own self-imposed policies when they failed to fully inform Plaintiff of the nature and extent of all alleged violations contained within the complaint, obstructing his ability to adequately prepare a defense.

**Failure to utilize the preponderance of the evidence standard.**

370.     The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct.

371.     Though an inadequate standard to protect the procedural rights of accused students, Defendant CSUP utilizes this standard of review. As such, CSUP's Policies define preponderance of the evidence as: "whether it is more likely than not that a Respondent committed the alleged violation(s)."

372.     Further, CSUP's Code provides: "All students have the right to expect a fair and impartial disciplinary process in which it is the *responsibility of the University to show that a violation has occurred…*"

373.     Assuming *arguendo* that such a standard of review was proper in the disciplinary context, the CSUP Defendants violated this provision when they improperly placed the burden of proof on Plaintiff to prove that Jane Doe consented to the sexual activity, rather than requiring Complainant to prove that Jane Doe had not consented.

374.     CSUP thus breached its agreement with Plaintiff when it failed to utilize the preponderance of the evidence standard in reaching its Decision. Had it done so, it would have reached the opposite conclusion; namely, that the encounter was consensual.

375.     Based on the foregoing *supra,* at ¶¶ 108-188, a neutral reading of the evidence reveals that Complainant's account of the events lacked any corroboration or reliability; Jane Doe herself never indicated to Defendants that she was subjected to non-consensual contact.

376.     CSUP therefore breached its contract with Plaintiff when it failed to utilize the requisite preponderance of the evidence standard.

**Violation of Plaintiff's rights to privacy and confidentiality.**

377.     CSUP's Policies guarantee that "Students have the right to privacy with respect to all disciplinary action…" The Sexual Misconduct Policy further affords an accused student "the right not to have any personal information released by the University to the public without prior consent" and guarantees "the University will protect the privacy of all parties."

378.     Notwithstanding, the CSUP Defendants violated Plaintiff's fundamental right to privacy and confidentiality during the investigation process.

379.     Shortly after notifying Plaintiff that he was the subject of a Title IX investigation, an individual from CSUP held a meeting with the entire football team, during which she identified Plaintiff by name as part of a re-enactment regarding consent. Plaintiff was readily identifiable to all present as the student accused of rape, despite the fact that the investigation was pending and a decision had not yet been made.

380.     Based on the foregoing *supra,* at ¶¶ 108-188, the CSUP Defendants violated the contract with Plaintiff when they disclosed confidential information concerning his case to his peers, without consent.

**Failure to provide written notification of the charges.**

381.     CSUP's Code states "Written notification of a hearing shall include…a detailed description of the allegations to be considered."

382.     However, the Notice of Hearing letter dated December 3, 2015 merely advised that an informal disciplinary hearing would be convened "to consider allegations that you may have violated the *Code of Student Conduct, Sexual Misconduct (non-consensual sexual intercourse).*

383.     The notice obscurely pointed Plaintiff to section 18 of the Code, which vaguely identified an example of such allegation as "Any act that violates the University's *Sexual Misconduct Policy.*" Certainly, this is not the type of detailed description intended by the drafters of CSUP's Code, nor anticipated by the Federal Defendants.

384.     The failure to specifically identify the allegations against Plaintiff substantially hindered Plaintiff's ability to prepare for the Hearing and formulate his response to the charges.

385.     Accordingly, the CSUP Defendants breached their contract with Plaintiff when they failed to provide proper notice of the charges to be considered at the Hearing.

**Denial of the right to present witnesses and evidence.**

386.     CSUP's Sexual Misconduct Policy guarantees the following to a student accused of misconduct: "The right to present witnesses and documentary evidence, and the right to question and/or challenge witnesses and documentary evidence presented by others."

387.     Notwithstanding, Plaintiff was denied the opportunity to present witnesses in support of his defense. In fact, when Plaintiff questioned Defendant DeLuna as to whether he could identify witnesses for her to speak with, she declined, stating her review of the matter would be based solely on what was included in Defendant Wilson's Report, along with the information gathered at the Hearing (which consisted only of Plaintiff responding to her clarifying questions).

388.     Further, Defendants denied Plaintiff the opportunity to present witnesses and evidence when Defendant Humphrey disregarded the testimony of Plaintiff's roommates, who had observed Plaintiff and Jane Doe engaged in sexual intercourse the day after the Incident. Defendant Humphrey refused to consider this critical information in deciding Plaintiff's appeal, despite the fact that Plaintiff had not discovered that his roommates witnessed this encounter until after the investigation was concluded.

389.     Further, Plaintiff was denied the right to question and challenge adverse witnesses. Not only was Plaintiff deprived of the ability to question the Complainant, but he also was never even made aware of the identities of all witnesses against him. Defendants prevented Plaintiff from establishing his credibility when he was prohibited from challenging the witnesses against him, in violation of his contractual and due process rights.

390.     Plaintiff is entitled to recover damages for Defendant CSUP's breach of the express and/or implied contractual obligations described above.

391.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

392.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against the CSUP Defendants)

393.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

394.     Based on the aforementioned facts and circumstances, Defendant CSUP acted in bad faith when it meted out a disproportionate Sanction notwithstanding the flawed investigative process and lack of evidence in support of Complainant's allegations of sexual misconduct.

395.     Based on the aforementioned facts and circumstances, Defendant CSUP breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

396.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

397.     Plaintiff is entitled to recover damages for Defendant CSUP's breach of the express and/or implied contractual obligations described above.

398.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

399.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Promissory Estoppel
### (Against the CSUP Defendants)

400.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

401.     CSUP's various policies constitute representations and promises that CSUP should have reasonably expected to induce action or forbearance by Plaintiff.

402.     CSUP expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that CSUP would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of CSUP's policies.

403.     Plaintiff relied to his detriment on these express and implied promises and representations made by CSUP, by choosing to attend CSUP rather than other schools of equal caliber and paying the required tuition and fees.

404.     These express and implied promises and representations made by CSUP must be enforced to prevent substantial injustice to Plaintiff.

405.     Based on the foregoing, CSUP is liable to Plaintiff based on Promissory Estoppel.

406.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

407.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Violation of the Administrative Procedure Act § 553**
**(Against the Federal Defendants)**

408.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

409.     The Federal Defendants issued the Dear Colleague Letter, under the guise of a "guidance" document to avoid the notice and comment requirements of the Administrative Procedure Act and subsequent judicial review, when in actuality, this purported "guidance" sets forth the Federal Defendants' final conclusions with respect to Title IX compliance and creates specific legal obligations with clear and draconian consequences for violations.

410.     The Federal Defendants exceeded their authority when they circumvented the Administrative Procedure Act's notice and comment rulemaking requirements and enforced the document as legally binding, under the threat of severe penalties.

411.     The Federal Defendants' failure to abide by the APA's notice and comment requirements has therefore resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and all disciplinary decisions flowing therefrom, including the Decision herein, unconstitutional, arbitrary and void.

412.     Based on the foregoing, the Federal Defendants, in enforcing the Dear Colleague Letter without following the notice and comment rulemaking requirements of the Administrative Procedure Act, have imposed on colleges and universities, including Colorado State University-Pueblo, an unworkable regulatory framework that has resulted in severe, unwarranted and permanent damages to students erroneously accused of misconduct, including Plaintiff, under the threat of severe penalties including rescission of federal funds.

413.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

414.     As a result of the foregoing, Plaintiff is entitled to injunctive and declaratory relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (Against the CSUP Defendants)

415.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

416.     CSUP has committed numerous violations of the Parties' contracts and of federal and state law.

417.     Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the unfair outcome will continue to cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

418.     As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at CSUP.

419.     By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by CSUP be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from CSUP be removed from his education file; (v) any record of the complaint against

Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to CSUP for the Fall 2016 semester;

and (vii) CSUP's rules, regulations and guidelines are unconstitutional as applied.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Against the Federal Defendants)**

420.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully

set forth herein.

421.     Because this Court has jurisdiction as a threshold matter, the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, provides this Court the power to "declare the rights and

other legal relations of any interested party..., whether or not further relief is or could be sought."

28 U.S.C. § 2201; *accord* Fed. R. Civ. P. 57 advisory committee note ("the fact that another remedy

would be equally effective affords no ground for declining declaratory relief").

422.     By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a

declaration that: (i) the Federal Defendants violated the Administrative Procedure Act when they

issued the Dear Colleague Letter without submitting the document to notice and comment

rulemaking; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies;

(iii) such failure has resulted in substantial damages to students erroneously disciplined for sexual

misconduct; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

(i)     on the first cause of action for violation of Title IX of the Education

Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined

at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, athletic and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii) on the second cause of action for violation of the Fourteenth Amendment Procedural Due Process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, athletic and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, athletic and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, athletic and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for promissory estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, athletic and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for violation of the Administrative Procedure Act § 553, a judgment awarding Plaintiff injunctive and declaratory relief;

(vii)     on the seventh cause of action for declaratory judgment against the CSUP Defendants, a judicial declaration that (i) the outcome and findings made by CSUP be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from CSUP be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to CSUP for the Fall 2016 semester; and (vii) CSUP's rules, regulations and guidelines are unconstitutional as applied;

(viii)     on the eighth cause of action for declaratory judgment against the Federal Defendants, a judicial declaration that (i) the Federal Defendants violated the Administrative Procedure Act when they issued the Dear Colleague Letter without submitting the document to notice and comment rulemaking; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to students erroneously disciplined for sexual misconduct; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void; and

(ix)      awarding Plaintiff such other and further relief as the Court deems just, equitable

and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated this 4th day of May, 2016.

/s/ Michael J. Mirabella
[ e-filing – May 4, 2016]

Michael J. Mirabella, Esq.
Michael Mirabella, P.C.
450 E. 17th Ave., Suite 400
Denver, CO  80203
720-931-2094 (ph)
303-592-4385
mmirabella@mbellalaw.com
Counsel for Plaintiff

-and-

/s/ Andrew T. Miltenberg
[ e-filing – May 4, 2016]

Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
Jeffrey Berkowitz, Esq.
363 7th Avenue, Fifth Floor
New York, NY  10001
212-736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
jberkowitz@nmllplaw.com
Counsel for Plaintiff