**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Case No. 1:16-cv-00873-RM-CBS**

**GRANT NEAL,**

**Plaintiff,**

**-against-**

**COLORADO STATE UNIVERSITY-**
**PUEBLO,** *et al.*,

**Defendants.**
_____

**PLAINTIFF GRANT NEAL'S MEMORANDUM OF LAW IN OPPOSITION TO**
**COLORADO STATE UNIVERSITY-PUEBLO DEFENDANTS' MOTION TO DISMISS**
_____

### PRELIMINARY STATEMENT

Plaintiff Grant Neal ("Neal" or "Plaintiff") respectfully submits this Memorandum of

Law in opposition to the motion of the CSU-Pueblo Defendants (the "CSUP Defendants") to

dismiss Plaintiff's Amended Complaint (the "Amended Complaint" or "Am. Cmplt.") pursuant

to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Motion should be denied in its

entirety. Neal states claims for relief under Title IX, the Fourteenth Amendment and state law

that are more than plausible. The Amended Complaint details intentional sex discrimination

against Neal as a male student resulting in an erroneous outcome from a flawed proceeding and a

severe and unjust penalty imposed on Neal. The Amended Complaint also details the denial of

procedural due process and several breaches of contract.

The CSUP Defendants' motion, while initially citing to Rule 12(b)(1), is premised on

Rule 12(b)(6), fails to adhere to the legal rules governing a Rule 12(b)(6) motion to dismiss,

starting with a Court is to assume the facts alleged in a complaint to be true and view the

1

allegations in the light most favorable to the plaintiff, and does so in a way that was rejected in *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016), where the Second Circuit held that the complaint in that case sufficiently pleaded facts from which an inference could be made of intentional sex- based discrimination against the suspended male student.

Here, based on the allegations of the 91-page Amended Complaint that were quite specific and not one bit conclusory, the Court needs to assume the following to be true: (1) a non-witness, non-party filed a complaint of sexual misconduct against Neal on behalf of Jane Doe, stemming from a consensual sexual encounter that occurred on the afternoon of October 25, 2015; (2) despite the non-party complainant's lack of personal knowledge or direct observations of the sexual encounter between Jane Doe and Neal, and notwithstanding Jane Doe's insistence that the sexual intercourse was fully consensual, the CSUP Defendants pursued an investigation against Neal; (3) the prosecutorial minded investigation process was absurdly biased, presuming Neal to be guilty because he is a male, and led to a one-sided, factually erroneous report; (4) the CSUP Defendants held a so called "informal disciplinary hearing" that was no hearing but rather a Kafkaesque proceeding -- Neal was limited to reviewing the investigative report with no right to call witnesses or to question the "Complainant" who was not the person with whom he had consensual sex; (5) Neal was found "responsible" based solely on the findings of the biased investigative report, which referenced Neal having non-consensual sex with "Complainant" even though Neal had no sex with "Complainant" but with Jane Doe who said it was consensual; (6) the CSUP Defendants issued a sanction of suspension pending the completion of Jane Doe's education and Neal lost his scholarships; and (7) there were incidents at the CSUP campus reeking of clear anti-male bias. Given what is alleged in the Amended Complaint, this case easily passes muster under *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) and *Doe v. Columbia*.

Case 1:16-cv-00873-RM-CBS   Document 55   Filed 08/30/16   USDC Colorado   Page 3 of 34

The cases relied upon by the CSUP Defendants are easily distinguishable. In this case, Neal has specifically identified numerous factors that allow a reasonable factfinder to conclude that an erroneous outcome was reached due to gender discrimination. The CSUP Defendants' actions also violated Neal's Fourteenth Amendment procedural due process rights and constituted material breaches of its Code of Conduct and all reasonable expectations that Neal relied upon when accepting admission to Colorado State University-Pueblo ("CSUP"). Neal has been injured by the Defendants' actions and will continue to suffer injury.

## STATEMENT OF FACTS AS ALLEGED IN THE AMENDED COMPLAINT

### A. The Afternoon of October 25, 2015.

Neal and Jane Doe became friendly when they first met in the fall of 2014. (Am. Cmplt. ¶ 72) Though they became close friends and were interested in each other, they decided not to pursue a romantic relationship during the football season. Both recognized the generally accepted rule that trainers were not permitted to fraternize with athletes, and that doing so could result in severe consequences including removal from the Athletic Training Program. (Am. Cmplt. ¶ 73) However, they continued to talk frequently and grew closer. (Am. Cmplt. ¶ 74)

On Sunday, October 25, 2015, Neal was hosting a barbeque at his home. The gathering was set to begin at 6:30 p.m. (Am. Cmplt. ¶ 77) At approximately 5:00 p.m., Jane Doe texted Neal and invited him over to her apartment. She indicated that she was "home alone" and that she was "excited to see [him]." Though his friends were expected to arrive soon, Neal agreed to meet up with Jane Doe as he looked forward to spending time with her. (Am. Cmplt. ¶ 78)

When Neal arrived at Jane Doe's apartment, he noticed that none of her roommates were home. (Am. Cmplt. ¶ 79)  Neal and Jane Doe went into her bedroom where they began to discuss the status of their relationship. It was clear that their relationship was progressing from close friends into something more serious. Neal indicated that he did not think it would be a good idea

for them to be in a relationship when the football season started because, as a trainer, Jane Doe was not permitted to fraternize with players under her care. (Am. Cmplt. ¶ 80)

After talking for approximately ten to fifteen minutes, they mutually began to kiss. As their kissing became more intimate, they each began to take off their own clothing. (Am. Cmplt. ¶ 81) As the intimacy progressed, knowing that they both wanted to engage in sexual intercourse, Jane Doe advised Neal that she was not on birth control. Accordingly, Neal asked if he should put on a condom. Jane Doe clearly and unequivocally responded "yes." (Am. Cmplt. ¶ 84)  Neal got off of Jane Doe immediately and put on a condom. Subsequently, they proceeded to engage in consensual sexual intercourse. (Am. Cmplt. ¶ 85) Thereafter, Neal put his clothes back on and expressed his reluctance to leave; he wanted to spend more time with her but knew he had to tend to the festivities at his house, where friends were beginning to gather. (Am. Cmplt. ¶ 86)

Before he left, Jane Doe asked him several times if he would stay, pulling him in to kiss her more. As she did so, Neal began to kiss her neck. Reluctant to give her a hickey, Neal stopped and told Jane Doe "I don't want to give you a hickey because I don't want to put you in an awkward position around the football players because they know we've been hanging out." Jane Doe instructed him to keep kissing her neck, indicating she would wear a hooded sweatshirt to cover it up the following day. (Am. Cmplt. ¶ 87)

Subsequently, Jane Doe kissed him goodbye, and Neal returned to the gathering at his house. Later that evening, they engaged in a friendly conversation via text message, before saying good night. (Am. Cmplt. ¶ 88)

### B.  The Non-Witness, Non-Party Complainant.

The following day, a peer of Jane Doe's in the Athletic Training Program (the "Non-Party Complainant") noticed a hickey on Jane Doe's neck and questioned her about it. Jane Doe indicated that she had engaged in sexual activity with Neal the previous day. Given Neal's status

as a high profile football player, Non-Party Complainant presumed that the contact between Neal and Jane Doe had been non-consensual. (Am. Cmplt. ¶ 89)

Non-Party Complainant took it upon herself to make an unsubstantiated report to Dr. Roger Clark, Director of Athletic Training ("Dr. Clark") that Jane Doe had been raped by Neal, notwithstanding her lack of personal knowledge concerning the encounter. (Am. Cmplt. ¶ 90)

Subsequently, Jane Doe sent a text message to Neal at approximately 3:48 p.m. stating "I need to talk to you ASAP after practice!!!!! Like in person even if we just talk in your car! Please!" She further texted "I've been running around all day talking to so many people, trying to make things right!!! One of the other Athletic Training students screwed me over!...She went behind my back and told my AT advisor stuff that wasn't true!!! I'm trying so hard to fix it all. I want to tell you what's going on. Please!" (Am. Cmplt. ¶ 91)

Jane Doe advised Neal that one of her peers in the Athletic Training Program had observed the hickey on Jane Doe's neck and questioned her about it. Jane Doe told Neal that her peer mistakenly assumed that Neal had taken advantage of her, despite Jane Doe's indications to the contrary. (Am. Cmplt. ¶ 94)

Upon information and belief, Dr. Clark subsequently told his wife Laura Clark, the Athletic Training Clinical Instructor ("Mrs. Clark"), about this complaint against Neal, despite the lack of any applicable protocol or a necessity to do so. While trying to figure out how to rectify the situation, Jane Doe received a phone call from both Dr. Clark and Mrs. Clark. Neal heard Jane Doe explicitly state: "I'm fine and I wasn't raped." (Am. Cmplt. ¶ 98)

At the conclusion of this phone call, Jane Doe then called her mother to tell her that she was not raped, that she was not taken advantage of and that she and Neal had engaged in consensual sexual intercourse. Jane Doe even asked her mother to call Dr. Clark to clear up this false allegation. (Am. Cmplt. ¶ 99)

Feeling extremely upset and anxious, Jane Doe asked Neal if he would drive them somewhere for a while to clear their minds. (Am. Cmplt. ¶ 101) They drove around CSUP for approximately 15 to 20 minutes, before deciding to go to Neal's house, as this was off campus. (Am. Cmplt. ¶ 101) After Neal confirmed that no one was home, they entered the house and went into Neal's bedroom. (Am. Cmplt. ¶ 102) They watched television for a little while; as they became more relaxed, they began to kiss. As the kissing became more passionate, they each removed their own clothing. Neal put on a condom and they again engaged in consensual sexual intercourse. (Am. Cmplt. ¶ 103)

Notwithstanding that the uncorroborated report of alleged sexual misconduct came from a non-witness non-party, Dr. Clark reported the alleged incident to Defendant Wilson, former Director of the Office of Equal Opportunity/Affirmative Action and Title IX Coordinator at CSUP, who commenced a formal investigation. (Am. Cmplt. ¶ 112)

**C. <u>The Prosecutorial Minded and Biased Investigation.</u>**

On October 27, 2015, Neal received written notice from Defendant Humphrey that he was "being investigated for possible alleged violation of the *Code of Student Conduct* including Non-consensual Contact and Non-Consensual Sexual Intercourse." [sic]. He was instructed that he was not permitted to have any further contact with Jane Doe. The notice did not properly identify which specific provisions Neal allegedly violated, citing only to CSUP's general Policy. (Am. Cmplt. ¶ 117)

Notwithstanding, Neal was required to meet with Defendant Wilson, on October 29, 2015 and present his version of events. Demonstrating a presumption of guilt against Neal, Defendant Wilson began the meeting by interrogating Neal, asking him three times: "Did you rape [Jane Doe]?" By the third time, Defendant Wilson was standing up and looming over Neal, apparently intending to intimidate him. (Am. Cmplt. ¶ 122)

On November 17, 2015, Defendant Humphrey delivered to Neal a Notice of Interim Suspension, pending the completion of the investigation and prior to the issuance of any finding of responsibility. (Am. Cmplt. ¶ 129) The CSUP Defendants imposed the unwarranted interim sanction on Neal though none of the applicable criteria were met. (Am. Cmplt. ¶ 130)

On November 20, Neal met with Defendant Wilson for a second investigative meeting. Head Football Coach John Wristen appeared as Neal's advisor. When Coach Wristen tried to make a statement in Neal's defense, Defendant Wilson responded that he was "The Chief," in a clear effort to assert his authority over a fellow CSUP colleague. (Am. Cmplt. ¶ 131)

### D. The Kafkaesque "Informal Disciplinary Hearing" That Was No Hearing.

Subsequently, on December 3, 2015 at 5:39 p.m. less than 24 hours before the hearing, Neal received notice that an "informal disciplinary hearing" was scheduled for the following day. This last minute notice deprived Neal of the opportunity to adequately prepare a response to the allegations and formulate a defense prior to appearing for the Hearing. (Am. Cmplt. ¶ 134)

The Notice of Hearing dated December 3, 2015 merely stated that an informal disciplinary hearing was being convened "to consider allegations that you [Neal] may have violated the *Code of Student Conduct, Sexual Misconduct (non-consensual sexual intercourse)*." The notice obscurely pointed Neal to section 18 of the Code, which vaguely identified an example of such allegation as "Any act that violates the University's *Sexual Misconduct Policy*." The failure to identify the specific allegations against him substantially hindered Neal's ability to prepare for the Hearing and formulate his response to the charges. (Am. Cmplt. ¶ 135)

Nonetheless, on December 4, 2015, Neal appeared for the "Informal Disciplinary Hearing" accompanied by his advisor, Chris Turner; the "Informal Disciplinary Hearing" in actuality was nothing more than an investigatory meeting. (Am. Cmplt. ¶ 136) Specifically, the "Informal Disciplinary Hearing" consisted solely of Defendant DeLuna providing Neal a copy of

the Investigative Report dated December 3, 2015 (the "Report") and instructing him to review it in her presence. (Am. Cmplt. ¶ 138) Neal was not afforded an opportunity to have the case heard by an impartial panel, or to confront and question the Non-Party Complainant. (Am. Cmplt. ¶ 138) Further, Defendant Wilson deprived Neal of the opportunity to identify witnesses in support of his defense, stating that he was in charge of the investigation and would be the only person to declare someone a witness. (Am. Cmplt. ¶ 142) Upon his review, Neal discovered that the Report prepared by Defendant Wilson demonstrated the one-sided and biased nature of the investigation. (Am. Cmplt. ¶ 140)

On December 8, 2015, Neal met with Defendant DeLuna for a follow up meeting to clarify the information provided by Neal on December 4, 2015. Neal reiterated that he did not penetrate Jane Doe prior to putting on a condom and that they engaged in consensual sexual activity. (Am. Cmplt. ¶ 152)

Nonetheless, on December 18, 2015, Defendant DeLuna issued a Decision Letter finding Neal "engaged in non-consensual sexual intercourse with the Complainant." Neal, however, did not have sex with "Complainant" but with Jane Doe who had not brought the complaint. Defendant DeLuna nevertheless imposed a sanction of suspension pending Jane Doe's graduation or disenrollment from campus, in addition to the following conditions: (i) Neal will need to enroll in an educational course and/or counseling for a minimum of six weeks regarding sexual assault/victimization and demonstrate completion of the course or counseling in writing; and (ii) a "No Contact Order" remains in effect, until further notice is received from the Dean of Student Life or Defendant DeLuna. (Am. Cmplt. ¶ 153)

Defendant DeLuna, the hearing officer in charge of issuing the final decision, did not personally interview the Non-Party Complainant, Jane Doe, or Neal. Instead, her decision was

made based solely on the one-sided and misleading Report prepared by Defendant Wilson, showing Defendant DeLuna's inability to act objectively. (Am. Cmplt. ¶ 154)

### E. Neal's Futile Appeal.

Neal was denied any meaningful opportunity to appeal as the Decision Letter dated December 18, 2015 consisted of a blanket statement: "I found that the Statements of the Complainant and the individuals that she confided in after the incident to be credible. These statements were consistent and demonstrated by a preponderance of the evidence that you did not have the Complainant's consent." (Am. Cmplt. ¶ 157) Again, the decision referenced Neal having sex with "Complainant" when Neal had no sex with "Complainant' but rather with Jane Doe. Further, Neal's appeal was futile because the Appeal Review Officer, Defendant Humphrey, was the individual who issued the initial notice of investigation letter and imposed the interim suspension. (Am. Cmplt. ¶ 160)

Nonetheless, Neal timely submitted an appeal of the Decision on January 6, 2016.  On January 19, 2016, Defendant Humphrey summarily denied the appeal and upheld the erroneous Decision and Sanction. (Am. Cmplt. ¶ 163)

### F. Gender Bias Against Male Athletes, Including Neal.

Throughout the investigation process, the CSUP Defendants demonstrated bias against Neal as a male athlete accused of misconduct. At the meeting on October 29, 2015, Defendant Wilson seemed to cast blame on the football team as a whole and the culture associated with it when he blatantly stated the players "have a problem." (Am. Cmplt. ¶ 176) Further, the Report noted that the allegation against Neal was one of four involving athletes, within the timeframe of October 6, 2015 - October 27, 2015. It pointed out that three of the four respondents were members of the football team, and one was a member of the soccer team, notwithstanding that

these allegations had no bearing on the events at issue or the relationship between Neal and Jane Doe. (Am. Cmplt. ¶ 177)

During the meeting of October 29, 2015, Defendant Wilson advised Neal that he would be holding a meeting with the football team in the coming weeks to address this "obvious problem" (referring to sexual misconduct complaints). In fact, this meeting did take place, on or about November 9, 2015. At that time, a female counselor identified Neal, by his first name "Grant," as an example to the entire football team of a re-enactment, about the difference between consensual and non-consensual sexual contact. Significantly, at the time of this meeting, the investigation on the charges against Neal was still underway and a hearing had not yet been scheduled. (Am. Cmplt. ¶ 178)

### G. __Neal's Damages.__

As a result of the CSUP Defendants' actions, Neal has sustained tremendous damages to his future education, career and athletic prospects, and reputation. His education and career prospects have been severely compromised as he is unable to gain admission to a comparable university and pursue his lifelong goal of becoming an orthopedic surgeon. In addition to the inability to continue his education and receive his degree, Neal has also suffered damages due to the loss of his wrestling and football scholarships and his removal from the football team. (Am. Cmplt. ¶¶ 15, 348)

## __ARGUMENT__

## I.

## __THE LEGAL STANDARD GOVERNING MOTIONS TO DISMISS__

In _Doe v. Columbia_, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016), the Second Circuit opinion begins its discussion with the basic rules governing motions to dismiss:

> On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff=s favor, to deciding whether the complaint alleges sufficient facts to survive.

Slip Op. p. 3.  The Second Circuit notes that a plaintiff is at liberty to plead different theories, even if they are inconsistent, and a Court must accept each sufficiently pleaded theory at face value.  Slip Op. p. 3.  Thus, according to the Second Circuit,

> [A] court at this stage of our proceeding is not engaged in an effort to determine the true facts. The issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim. For that reason, the court, in judging the sufficiency of the complaint, must accept the facts alleged and construe ambiguities in the light most favorable to upholding the plaintiff=s claims.  If the complaint is found to be sufficient to state a legal claim, the opposing party will have ample opportunity to contest the truth of the plaintiff=s allegations and to offer its own version.

Slip Op. pp. 3-4.  The Second Circuit then reviewed the facts alleged in the _Doe v. Columbia_ complaint in the light most favorable to the plaintiff, drawing inferences in his favor.  Slip Op. pp. 4-14.  The Circuit went on to discuss Title IX law and to point out how, applying the motion to dismiss rules, the facts alleged in the _Doe v. Columbia_ complaint plausibly pleads intentional sex discrimination in accordance with the standards set forth in _Bell Atlantic v. Twombly_ (550 U.S. 544, 555-56 (2007)) and _Ashcroft v. Iqbal_ (556 U.S. 662, (2009)), Slip Op. pp. 16-30.

The relevant question for a district court in assessing plausibility is whether "the complaint warrant[s] dismissal because it failed _in toto_ to render plaintiffs' entitlement to relief plausible." _Twombly,_ 550 U.S. 544, 569 n. 14 (2008). _See Braden v. Wal–Mart Stores, Inc.,_ 588 F.3d 585, 594 (8th Cir.2009) (explaining that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"); _Ocasio-Hernandez v. Fortuno-Burset,_ 640 F.3d 1, 14-15 (1st Cir. 2011). Further, a Court is to consider a motion to dismiss in terms of the plaintiff's actual pleadings, and not in terms of a defendant's

selective characterization of the facts. *See Armstrong Pharm., Inc. v. Micron Technologies, Inc.*, No. CIV. A 09-11197-RWZ, 2010 WL 745057, at *2 (D. Mass. 2010); *Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.*, 822 F. Supp. 2d 84, 93 (D.N.H. 2011).

Accepting all factual allegations in the Amended Complaint as true, Neal has certainly pleaded facts sufficient to establish plausible claims for relief under federal and state law.

## II.

## THE AMENDED COMPLAINT STATES A CLAIM OF TITLE IX DISCRIMINATION

The CSUP Defendants, citing to the pleading standards of *Twombly* and *Iqbal*, contend that Neal's Title IX claim must fail because he cannot allege any actual nexus between his gender and the mistreatment, and has not alleged any disparate impact in connection with the disciplinary process. *See* CSU-Pueblo Defendants' Motion to Dismiss Plaintiff's Amended Complaint, at 1 ("Motion to Dismiss"). Critical examination of the allegations as a whole and controlling Title IX standards lead unequivocally to the contrary conclusion, that the Amended Complaint does sufficiently state a Title IX claim.

### A. **The Controlling Title IX Standard.**

Title IX bars the imposition of university discipline where gender is a motivating factor in the decision. In *Yusuf v. Vassar College*, 35 F.3d at 715, the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias will generally fall within two categories. Under the first category, the claim is that there is an "erroneous outcome" in plaintiff being found to have committed an offense and disciplined. *Id.* Under the second category, the plaintiff alleges "selective enforcement" in terms of selective initiation or severity of penalty. *Id.* Concerning a claim under the "erroneous outcome" category, the *Yusuf* court specified "the pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as

a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The *Yusuf* standard remains the controlling legal standard for a gender bias claim brought under Title IX. *See Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014); *Williams v. Franklin & Marshall College*, 2000 WL 62316 at *2 (E.D. Pa. 2000); *Doe v. Salisbury*, 123 F. Supp. 3d 748 (D. Md. 2015).

Since Title IX was modeled after Title VI and VII of the Civil Rights Act of 1964, courts have frequently applied Title VII's framework and principles to Title IX claims. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000); *Murray v. N.Y. Univ. Coll. Of Dentistry,* 57 F.3d 243, 248-49 (2d Cir. 1995) (stating Title VII standards should be applied in determining a university's liability for a student's claim of sexual harassment under Title IX). For instance, because evidence of discrimination would most likely be within the defendants' sole possession and control at the pleading stage, allegations made upon information and belief are sufficient to withstand a motion to dismiss. *See Grajales v. P.R.Ports Auth.*, 682 F.3d 40, 49 (1st Cir.2012) ("'[s]moking gun' proof of discrimination is rarely available ... at the pleading stage"); *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir.2012) ("information and belief" is appropriate in pleadings, does not mean pure speculation).

**B. The University Defendants' Misapplication of *Twombly* and *Iqbal.*

The CSUP Defendants misapply the standards established in *Twombly* and *Iqbal* in two ways.

*First*, the CSUP Defendants erroneously contend that this Court should disregard the factual allegations in the Amended Complaint on the grounds that they are insufficiently

particularized and thus should be treated as speculative and conclusory. Contrary to the CSUP Defendants' contentions, the 90-page Amended Complaint is quite particularized, but in any event, a Title IX plaintiff is not required to present "particularized facts" as required by a heightened pleading standard. *See* *Blank v. Knox Coll.*, No. 14-CV-1386, 2015 WL 328602 (C.D. Ill. 2015) (internal citations omitted). It is generally accepted that, in the discrimination context, a court "cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Cooperman v. Individual Inc.*, 171 F.3d 43, 48-9 (1st Cir. 1999)) quoting *Shaw v. Digital*, 82 F.3d 1194, 1225 (1st Cir.1996); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) ("[w]hen a federal court reviews the sufficiency of a complaint…its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims") (internal citations and quotations omitted).

Instead, a Court must determine whether a claim has facial plausibility -- that is, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Blank v. Knox Coll.*, No. 14-CV-1386, 2015 WL 328602, at *2 (C.D. Ill. 2015) (internal citations omitted). Moreover, "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct." *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034  at *8 (2d Cir. July 29, 2016). Adopting the legal principles from Title VII cases, Judge Leval clarified the pleading standards for a Title IX claim at the motion to dismiss stage in *Doe v. Columbia* as follows:

> "[a] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a *minimal plausible inference* of such discrimination."

14

_Doe v. Columbia_, No. 15-1536, 2016 WL 4056034 at *4 (2d Cir. July 29, 2016). Judge Leval's decision follows the _McDonnell-Douglas_ framework in which plaintiffs alleging employment discrimination in violation of Title VII need present only minimal evidence supporting an inference of discrimination in order to prevail.[1] Extending this principle to the Title IX context, the Second Circuit noted: "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias." _Doe v. Columbia,_ No. 15-1536, 2016 WL 4056034 at *8 (2d Cir. July 29, 2016). Neal directly attributes the deficiencies in CSUP's investigation process to his gender by demonstrating how a reasonable review of the evidence could not have led to a finding of responsibility.

_Second_, the CSUP Defendants fail to recognize that in _Twombly_ and _Iqbal_, the Supreme Court does not just state general rules governing motions to dismiss and pronounce a complaint conclusory or not, but rather carefully applies those rules to the specifics of the claims and pleaded facts in a context specific analysis. There is no invitation to ignore pleaded facts.

In _Twombly_, a class of subscribers of local telephone and/or high speed internet services brought an action against incumbent local exchange carriers ("ILECs") for conspiring to restrain trade in violation of § 1 of the Sherman Act. The _Twombly_ complaint alleged that the ILECs engaged in parallel conduct in their respective service areas to inhibit the growth of competitive local exchange carriers ("CLECs") and agreed to refrain from competing with each other, as indicated by their common failure to pursue business opportunities in contiguous markets. The Supreme Court ruled that the _Twombly_ complaint, in alleging the facts of parallel business

---

[1] _McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) _holding modified by_ _Hazen Paper Co. v. Biggins_, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).

conduct and a bare assertion of conspiracy, did not state a Sherman Act § 1 claim. The Supreme Court's requirement of alleging facts showing "plausible grounds" was in the context of a Sherman Act § 1 complaint requiring pleaded facts from which an inference of an agreement in restraint of trade could be made, which meant facts other than the parallel business conduct. *Twombly* is not an invitation to ignore pleaded facts supportive of the claim.

In *Iqbal*, a Muslim Pakistani brought a *Bivens* action against numerous federal officials, including the U.S. Attorney General and the FBI Director, alleging unconstitutional discrimination.  Mr. Iqbal complained: that he was designated a person "of high interest" because of his race, religion and national origin in violation of the First and Fifth Amendments; that the FBI arrested and detained thousands of Arab Muslim men as part of the FBI's September 11 investigations; that Attorney General Ashcroft and FBI Director Mueller knew of, condoned, and willfully and maliciously agreed to subject Mr. Iqbal to harsh maximum security conditions as a matter of policy solely on account of Mr. Iqbal's race, religion and national origin and for no legitimate interest; and that Ashcroft was the principal architect and Mueller was instrumental in execution of the policy. The Supreme Court noted that just as the motion to dismiss the *Twombly* complaint required consideration of antitrust principles, the motion to dismiss the *Iqbal* complaint required consideration of the legal principles governing unconstitutional discrimination and qualified immunity and that  Mr. Iqbal had failed to plead facts showing that Attorney General Ashcroft and FBI Director Mueller adopted and implemented the subject detention policies not for neutral investigative reasons, but to discriminate because of race, religion and national origin. 556 U.S. at 666-669, 675-678. In *Iqbal*, the Supreme Court's requirement of alleging facts showing "plausible grounds" was in the context of a *Bivens* complaint requiring pleaded facts from which an inference of purposeful discrimination in

violation of the Constitution could be made. *Iqbal* is not an invitation to ignore pleaded facts supportive of the claim

### C. Neal Sufficiently Pleads An Erroneous Outcome Claim.

Neal's "erroneous outcome" claim of intentional sex discrimination arises from the totality of the circumstances. *Doe v. Washington and Lee University*, No. 6:14-cv-00052, 2015 WL 4647996 *10 (W.D. Va. Aug. 5, 2015) ("Given the totality of the circumstances, including the flaws in the proceedings and statements made by W&L officials, Plaintiff has plausibly established a causal link between his expulsion and gender bias").

Those circumstances include: (i) the irrational transmogrification of consensual sex with Jane Doe into non-consensual sex with non-witness/non-party "Complainant," *Doe v. Washington and Lee University, supra* (transmogrifying consensual sex into coerced sex is discriminatory); (ii) a biased, prosecutorial minded investigation that failed to keep the roles of prosecutor, witness and judge separate as required by due process, *Tumey v. State of Ohio*, 273 U.S. 510, 534 (1927); (iii) a badly flawed, Kafkaesque, railroading procedural process that resulted in the disregard of critical facts and exculpatory information which would have altered the finding against Neal as a male athlete accused of misconduct, *Doe v. Washington and Lee University, supra* (procedural flaws reflecting a practice of railroading males supportive of Title IX "erroneous outcome" case), *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts"); (iv) the manipulation of the preponderance standard reflecting the failure to shave a burden of proof as required by due process, *Tumey v. State of Ohio, supra* (having a burden of proof is a requirement of due process); and (v) the broader context, atmosphere and general sentiment at the university concerning sexual misconduct allegations at the time of the

relevant proceeding to infer a plausible bias against Plaintiff, _Doe v. Columbia_, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016).

The allegations of the Amended Complaint set forth CSUP's discriminatory conduct on the basis of Neal's male gender. A cause of action for an erroneous outcome case of intentional sex discrimination in violation of Title IX is pleaded:

110.    Here, the complainant was not the alleged victim, but a peer of Jane Doe's, who reported a second hand account of a sexual encounter between two consenting adults. After confronting Jane Doe about a hickey on her neck, and having observed Plaintiff and Jane Doe interact previously, Complainant presumed that Plaintiff, as a member of the football team, must have engaged in non-consensual sexual contact with Jane Doe….

114.    In fact, at no time did Jane Doe tell Defendant Wilson that she was involved in non-consensual sex with Plaintiff. To the contrary, at her meeting with Defendant Wilson on October 27, Jane Doe informed Mr. Wilson: "our stories are the same and he's a good guy. He's not a rapist, he's not a criminal, it's not even worth any of this hoopla!"…

141.    Defendant Wilson mischaracterized the testimony provided by Jane Doe in order to elicit testimony that would support a finding of guilt. Specifically, Jane Doe clearly stated that she advised Plaintiff that she did not want to have _unprotected_ sex because she was not on birth control; she never stated that she did not want to have sex at all...

147.    The Report inexplicably included a comment from Mrs. Clark, in which she stated "it saddens me that she wants to protect this person because he was a football player, but the University needs to know about what happened as it is not acceptable." This subjective and uninformed opinion should not have been included in the Report as it had no bearing whatsoever on the veracity of the allegations and served only to further bias the factfinder against Plaintiff as the male accused….

149.    Notably, while accepting as true the statements of biased third-party witnesses, Defendant Wilson failed to disclose to Plaintiff the identities of the remaining adverse witnesses referenced in the Report, thus hindering Plaintiff's ability to challenge their credibility and confront all witnesses against him….

174.    The CSUP Defendants demonstrated a bias against Plaintiff as the male accused when they failed to inform him of the nature of the allegations against him, in violation of Plaintiff's right to fair process. While CSUP commenced its investigation of the alleged incident on October 26, 2015, it did

not inform Plaintiff of the exact charges against him until December 4, 2015, after Defendant Wilson had completed his investigation and after Plaintiff had been required to provide a statement and appear for two investigative meetings….

177.   Furthermore, the Report curiously notes that the allegation against Plaintiff was one of four involving athletes, within the timeframe of October 6, 2015 - October 27, 2015. It is pointed out that three of the four respondents were members of the football team, and one was a member of the soccer team. Yet, it is inexplicable why such a reference was even included in the Report concerning Plaintiff; other potential allegations had no bearing on the events at issue or the relationship between Plaintiff and Jane Doe. Certainly, the insertion of such highly inflammatory and irrelevant information was intended for the sole purpose of slanting the factfinder's ultimate determination. The inclusion of this information demonstrates an inherent prejudice against male athletes and a sweeping statement of guilt against Plaintiff.

178.   Incredibly, during the meeting of October 29, Defendant Wilson advised Plaintiff that he would be holding a meeting with the football team in the coming weeks to address this "obvious problem" (referring to sexual misconduct complaints). In fact, this meeting did take place, on or about November 9, 2015. At that time, a female counselor identified Plaintiff, by name, as an example to the entire football team of a re-enactment, about the difference between consensual and non-consensual sexual contact. As Plaintiff was the only individual with his first name on the team, he was readily identifiable by all those present. Significantly, at the time of this meeting, the investigation on the charges against Plaintiff was still underway and a hearing had not yet been scheduled…

313.   During Plaintiff's first meeting with Defendant Wilson on October 29, it became apparent that Defendant Wilson was critical of the football team and its culture, stating the players "have a problem" in reference to acts of sexual misconduct….

316.   Upon information and belief, Defendants did not make any such similar presentations to any of the women's athletic teams at CSUP.

Neal's allegations, when reviewed as a whole in the totality of the circumstances, describe how CSUP made an erroneous finding of Neal being responsible for sexual misconduct, notwithstanding that the Non-Party Complainant was a third-party non-witness who had no direct knowledge of the alleged incident, and whose account directly conflicted with Jane Doe's account that the incident was consensual. Moreover, CSUP applied its stated policies and

procedures and gender-biased practices in a manner that discriminated against Plaintiff on the

basis of his sex and led to an erroneous and adverse outcome. Specifically:

- Defendants commenced an investigation and required Plaintiff to provide a statement concerning his version of the events prior to notifying him of the exact nature of the allegations against him.

- Defendants improperly placed the burden of proof on Plaintiff, as respondent, to disprove statements made by third-party witnesses, which had no independent validity, and establish that Jane Doe had clearly consented to the sexual encounter.

- Defendants disregarded all evidence tending to exculpate Plaintiff, including the voice recording taken by Plaintiff, hand written letters, snap chats, numerous text messages and a subsequent sexual encounter less than 24 hours after the alleged Incident.

- Defendants only interviewed those witnesses favorable to Complainant, and denied Plaintiff of the opportunity to identify witnesses favorable to his defense.

- Defendants deprived Plaintiff of the right to a formal hearing before a panel of impartial decision makers, denied him of the opportunity to confront and question his accuser; and denied him the ability to challenge all witnesses against him.

- Defendants failed to provide Plaintiff any rationale for their Decision, usurping any meaningful opportunity to appeal as he was not informed of the basis for their findings.

(Am. Cmplt. ¶ 308). Based on the foregoing, Neal has adequately pleaded facts demonstrating

how Neal was discriminated against on the basis of his gender. (Am. Cmplt. ¶¶ 116-182). A fair

reading of the evidence reveals the complaint lacked any corroboration or reliability. (Am.

Cmplt. ¶¶ 186). Neal has also demonstrated how CSUP's investigation process was influenced

by both internal and external pressures to handle sexual misconduct complaints more

aggressively.  (Am. Cmplt. ¶¶ 14, 165, 172-173, 206-211, 217). Given what is actually alleged,

Neal has presented a plausible claim for a violation of Title IX.

### D.  The Cases Cited By The University Defendants Are Distinguishable and

**The Arguments Made By The University Defendants Are Without Merit.**

Each of the cases cited by the CSUP Defendants is distinguishable from the instant matter; the plaintiffs in the cases relied upon failed to plead more than broad assertions of gender discrimination. *See Johnson v. Western State*, 71 F. Supp. 3d 1217 (D. Colo. 2014) (sole allegation to support gender bias under erroneous outcome theory was inaccurate inference that disciplinary action was taken by group of individuals of the opposite sex); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001 (N.D. Ohio Sept. 16, 2015) (erroneous outcome portion was sufficient but gender bias portion was not; made general allegations that preferential treatment of Jane Doe "is undeniably linked to her female gender and against Plaintiff's male gender"); *Brown v. Castleton State College*, 663 F. Supp. 2d 392 (D. Vt. 2009) (court specifically stated if Plaintiff had noted statements from decision-makers showing bias, it would have easily tipped his claim across line from conceivable to plausible); *Doe v. University of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009) (Plaintiff contended the university's actions were "wrong, willful, intentional, reckless, in clear violation of Title IX's requirements…" but did not allege that university's actions were motivated by sexual bias or that disciplinary procedures discriminatorily applied or motivated); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712 (E.D. Va. 2015) (Plaintiff made two allegations that gender bias was the "only explanation" for the outcome of his proceeding; court allowed leave to amend complaint); *Tanyi v. Appalachian State University*, No. 5:14-CV-170RLV, 2015 WL 4478853 (W.D.N.C. July 22, 2015) (complaint was devoid of any allegations concerning gender bias whatsoever); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015), (summary judgment motion after discovery conducted); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573 (E.D. Va. 1996) (court found complaint properly set forth claim for relief under Title IX

however evidence before court showed no genuine issue of material fact and school entitled to summary judgment).

Contrary to the cases cited by the CSUP Defendants, here, Plaintiff's Amended Complaint sets forth specific allegations that satisfy the requisite *minimal plausible inference* of gender discrimination. Plaintiff has sufficiently satisfied the *Yusuf* standard by identifying "…statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." 35 F.3d at 715. *See* Amended Cmplt. at 176, 178.

The CSUP Defendants fail to consider the allegations of the Amended Complaint as a whole when analyzing the sufficiency of Neal's gender bias claim. For instance, the CSUP Defendants overlook Defendant Wilson's demonstrated bias against male athletes as one factor revealing the discrimination that permeated CSUP's investigation process. The fact that Defendant Wilson was not the ultimate decision maker is irrelevant; his influence on the process, by virtue of acting as the sole investigator, was apparent. *See Holcomb v. Iona Coll.,* 521 F.3d 130, 143 (2d Cir. 2008) (holding a plaintiff is "entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker," so long as a biased person endowed with institutional influence "played a meaningful role in the process"); *Doe v. Columbia*, *supra* *8 (biased investigator had influence on the process contributed to the showing of intentional discrimination). Similarly, the CSUP Defendants assert that Neal's claim should be dismissed on the grounds that he "cannot cite a pattern of disciplinary action targeting male students." The CSUP Defendants once again misconstrue the pleading requirements established by *Yusuf.* A pattern of decision making is only one example of the various factors a plaintiff could allege to demonstrate a plausible claim of gender bias. When viewed in the totality of the circumstances,

there is no question that Neal has pled sufficient information to support a *minimal plausible inference* that gender was a motivating factor in CSUP's decision.

In accordance with *Yusuf*, Neal has raised a plausible inference of the Decision being the product of intentional discrimination.  Neal is entitled to proceed in this litigation.  To quote the Second Circuit, "[t]he role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 at *9 (2d Cir. July 29, 2016).

## III.

### THE AMENDED COMPLAINT STATES A FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM

The CSUP Defendants seek dismissal of Neal's Fourteenth Amendment claim on the grounds that the individual defendants are entitled to qualified immunity for their discretionary actions. The Amended Complaint, however, pleads sufficient facts that would strip the qualified immunity from the university officials named in their individual capacities.

As an initial matter, this defense should be seen as premature because a qualified immunity claim is generally addressed by way of summary judgment. *See Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) ("summary judgment provides the typical vehicle for asserting a qualified immunity defense"). Raising a qualified immunity defense via motion to dismiss, "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen,* 371 F.3d 1199, 1201 (10th Cir.2004). "[I]t is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.' " *Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (emphasis in original)." *McAllister v. Kellogg*, 637 F. App'x 518, 519 (10th Cir. 2016).

Thus, in considering a qualified immunity defense on a motion to dismiss, a Court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. _Pearson v. Callahan_, 555 U.S. 223, 223–24, 129 S. Ct. 808, 811, 172 L. Ed. 2d 565 (2009).

Here, the qualified immunity defense cannot withstand the stringent standard of a rule 12(b)(6) motion to dismiss. _See_ _McAllister v. Kellogg_, 637 F. App'x 518, 519 (10th Cir. 2016); _Seamons v. Snow_, 84 F.3d 1226, 1238 (10th Cir.1996) (retaining jurisdiction and reversing Rule 12(b)(6) motion to dismiss on qualified immunity because the complaint, and all inferences in favor of plaintiff, established a claim that defendants violated clearly established law); _Schwartz v. Booker_, 702 F.3d 573, 588 (10th Cir. 2012) (affirming district court order denying defendants' qualified immunity defense when substantive due process rights well established).

## A. The CSUP Defendants Violated Plaintiff's Constitutional Rights.

In his Amended Complaint, Neal clearly pleads how the CSUP individual defendants deprived him of a protected liberty and property interest in his public education without due process when they conducted a biased investigation of a complaint not brought by the woman with whom Neal had consensual sex, held a Kafkaesque "informal disciplinary hearing" and issued an unwarranted suspension.

When Neal appeared for the "informal disciplinary hearing" on December 4, 2015, he discovered that in actuality, it was nothing more than an investigatory meeting, during which Defendant DeLuna provided Plaintiff with a copy of the Investigative Report and instructed him to review it in her presence. When Neal questioned Defendant DeLuna regarding whether he could identify witnesses in support of his defense, she declined, stating her review was based only on what was in the file and the information gathered at the "hearing". (Am. Cmplt. ¶ 137)

24

Neal was not provided written notice of the charges when Defendant Humphrey vaguely informed him that he was "being investigated for possible alleged violation of the *Code of Student Conduct* including Non-consensual Contact and Non-Consensual Sexual Intercourse." [sic]. The notice did not properly identify which specific provisions Plaintiff allegedly violated, citing only to CSUP's general Policy. (Am. Cmplt. ¶ 117) While accepting as true the statements of biased third-party witnesses, Defendant Wilson failed to disclose to Neal the identities of the remaining adverse witnesses referenced in the Report, thus hindering Neal's ability to challenge their credibility and confront all witnesses against him. (Am. Cmplt. ¶ 149) Defendants deprived Neal of the opportunity to present witnesses and evidence in support of his defense when they disregarded physical evidence tending to exculpate Neal, including a voice recording of Jane Doe stating nothing improper had occurred, hand written letters, snap chats, numerous text messages and a subsequent sexual encounter that occurred less than 24 hours after the alleged Incident. (Am. Cmplt. ¶ 185) Defendant Wilson deprived Neal of the opportunity to identify witnesses in support of his defense, when he proclaimed that he was in charge of the investigation and would be the only person to declare someone a witness in this matter. (Am. Cmplt. ¶ 142).

Based on the foregoing, Neal has alleged a deprivation of actual constitutional rights: (i) the right to written notice of the charges against him; (ii) a hearing before an impartial tribunal; (iii) the right to question one's accuser; (iv) the right to challenge the credibility of witnesses; and (v) the right to present evidence and witnesses in support of his defense. Am. Cmplt. ¶ 343.

**B.  Plaintiff's Constitutional Rights Were Well Established.**

It is generally accepted that a student's interest in pursuing a public education falls within the liberty and property protections of the Fourteenth Amendment. *See Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975); *Davis v. Regis Coll., Inc.*, 830 P.2d

25

1098, 1100 (Colo. App. 1991) ("a student's interest in attending a public university is a constitutionally protected property right"). Students facing expulsion or suspension from a public educational institution are therefore entitled to due process protections. *See, Goss,* 419 U.S. at 575–76, 95 S.Ct. at 737; *Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150, 157; *W. v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358, 1364 (10th Cir. 2000) ("No one disputes that a student faced with the possibility of suspension from public school is entitled to due process.")

The Tenth Circuit has long acknowledged the fundamental constitutional principle that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *Staton v. Mayes,* 552 F.2d 908, 913 (10th Cir. 1977); *see also Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 518 (10th Cir. 1998). "The test as to whether a party has been afforded procedural due process is one of 'fundamental fairness' in the light of the total circumstances…it does require adequate notice of opposing claims, reasonable opportunity to prepare and meet them in an orderly hearing adapted to the nature of the case and finally, a fair and impartial decision." *Sigma Chi Fraternity v. Regents of Univ. of Colo.,* 258 F. Supp. 515, 528 (D. Colo. 1966). In addition, "the requirements of notice and of a fair and impartial hearing mean that the parties must be given a fair opportunity to present their positions." *Sigma Chi Fraternity v. Regents of Univ. of Colo.,* 258 F. Supp. at 528. As outlined in Paragraph (2) above, and detailed in the Amended Complaint at ¶¶ 108-188, Neal was deprived of his constitutional rights throughout CSUP's investigation. Accepting the facts as alleged, any reasonable person in defendants' positions would recognize that Neal was deprived of his liberty and property interests in a public education without due process.

**C. The Individual Defendants Participated In, And Approved Of, The Constitutional Deprivations.**

26

In his Amended Complaint, Neal connects the individual defendants' participation in the investigation process directly to the constitutional deprivations. *See* Am. Cmplt. ¶¶ 346-347. As Title IX Coordinator, Defendant Wilson: conducted a biased and superficial investigation when he deprived Neal of the opportunity to identify witnesses in support of his defense (Am. Cmplt. ¶ 142); failed to disclose to Neal the identities of the remaining adverse witnesses referenced in the Report, hindering Neal's ability to challenge their credibility and confront all witnesses against him (Am. Cmplt. ¶149); required Neal to participate in the investigative process, submit to interviews and provide statements before being made aware of the exact nature of the allegations against him (Am. Cmplt. ¶ 175); and demonstrated an inherent bias against Neal throughout the investigation process. (Am. Cmplt. ¶ 179)

Defendant DeLuna similarly deprived Neal of the opportunity to present witnesses and evidence in support of his defense (Am. Cmplt. ¶ 143); deprived Neal of a formal hearing (Am. Cmplt. ¶ 138); and issued a decision that failed to include a rationale or detailed explanation of factual findings. (Am. Cmplt. ¶158).

Defendant Humphrey deprived Neal of his constitutional rights to due process when she vaguely notified Neal that he was being investigated for a violation of CSUP's policies, without identifying the specific provisions at issue (Am. Cmplt. ¶ 117); assessed an unwarranted interim suspension pending the completion of the investigation and prior to the issuance of any finding of responsibility (Am. Cmplt. ¶ 129); and failed to consider exculpatory evidence in denying his appeal. (Am. Cmplt. ¶163).

The pleaded facts show that the individual Defendants participated in, and approved of, the various constitutional deprivations which strip them of a qualified immunity defense.

## IV.

## THE AMENDED COMPLAINT PLEADS STATE LAW CLAIMS

### A. **The Amended Complaint States a Claim for Breach of Contract.**

The CSUP Defendants rely heavily on case law from the Tenth Circuit to support their position that a contract was not formed between Neal and the University. It is, however, a deep rooted legal principle that federal courts are required to apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 868 (10th Cir. 1998). There is no question that contract law is one such substantive matter governed by the state in which the contract was allegedly breached. *See e.g. Evans v. Kirke-Van Orsdel*, 122 F. App'x 947, 949 (10th Cir. 2004) ("While federal procedural law prescribes our standard of review, state substantive law governs the contract issues presented"); *Sandoval v. City of Boulder,* 388 F.3d 1312 (10th Cir.2004) (applying federal substantive law to Title VII claims and state substantive law to supplemental state breach of contract and promissory estoppel claims). Accordingly, to determine whether a contract was formed between Neal and CSUP, the Court must look to Colorado contract law.

Colorado recognizes a breach of contract when the following elements are present: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *See Quals v. Lunn*, No. 11-CV-01453-REB-KMT, 2012 WL 280669, at *1 (D. Colo. Jan. 31, 2012).

Notably, the majority of the cases cited by the CSUP Defendants in support of their position that an educational contract is not recognized in the Tenth Circuit arise outside the District of Colorado.[2] The CSUP Defendants cite to only one case arising in this judicial district,

---

[2] *See Slaughter v. Brigham Young Univ.*, 514 F.2d 622 (10th Cir. 1975), arising in the District of Oklahoma; *Doe v. Oklahoma City University*, 406 Fed. Appx. 248 (10th Cir. 2010), arising in the District of Oklahoma; *Yet Li v. University of Tulsa*, 2013 WL 352116 (N.D. Okla. Jan. 29, 2013); *Ruegegger v. Board of Regents of Western New Mexico University*, 141 N.M. 306 (N.M. App. 2006), arising in New Mexico.

*Borwick v. University of Denver*, in support of its position that a school's handbook does not form a contract. However, the CSUP Defendants wholly misinterpret the court's holding in *Borwick*. Contrary to the CSUP Defendants' allegation, the Tenth Circuit did not make any general finding as to whether a handbook forms a contract between a university and a student. Instead, the Tenth Circuit affirmed the district court's dismissal on the grounds that plaintiff's claims were conclusory and "failed to demonstrate that an enforceable contract existed."

Colorado has expressly recognized that "the relationship between a student and a university is grounded in contract, indicating some type of a reciprocal relationship." *Davis v. Regis Coll., Inc.*, 830 P.2d 1098, 1100 (Colo. App. 1991); *CenCor, Inc. v. Tolman*, 868 P.2d 396, 398 (Colo. 1994) ("The basic relationship between a student and an educational institution is contractual in nature"). Further, "[m]aterials actually provided to a student, including enrollment agreements and catalogs, may become part of the agreement." *CenCor, Inc. v. Tolman*, 868 P.2d 396, 398 (Colo. 1994).

 Plaintiff has indisputably stated a cause of action for breach of contract against CSUP. Plaintiff accepted the terms of the contracts by accepting CSUP's offer of admission and paying the required tuition and fees. (Cmplt. ¶ 353.) In exchange for Plaintiff's payment of tuition, CSUP agreed to, *inter alia,* the following:

    (i)    "All students have the right to expect a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed…" (Am. Cmplt. ¶ 356);

    (ii)    "Students have the right to a disciplinary hearing to discuss the allegations brought forth against them." (Motion to Dismiss, Ex. A-1, p. 4; Am. Cmplt. ¶361);

    (iii)    "The right to be fully informed of the nature and extent of all alleged violations contained within the complaint." (Am. Cmplt. ¶366);

    (iv)     "Determinations shall be made on the basis of a preponderance of the evidence, i.e. whether it is more likely than not that a Respondent committed the alleged violation(s)." (Motion to Dismiss, Ex. A-1, p. 12; Am. Cmplt. ¶371);

    (v)     "Students have the right to privacy with respect to all disciplinary action…" (Am. Cmplt. ¶ 377);

    (vi)    The Sexual Misconduct Policy further affords an accused student "the right not to have any personal information released by the University to the public without prior consent" and guarantees "the University will protect the privacy of all parties." (Am. Cmplt. ¶ 377);

    (vii)    "Written notification of a hearing shall include…a detailed description of the allegations to be considered." (Am. Cmplt. ¶ 381);

    (viii)    "The right to present witnesses and documentary evidence, and the right to question and/or challenge witnesses and documentary evidence presented by others." (Am. Cmplt. ¶ 386).

Neal has sufficiently stated how CSUP breached specific provisions of the parties'

contract(s), *inter alia*:

    (i)     Defendants conducted a one-sided and biased investigation against Neal when, among other things, they accepted the statements of third-party witnesses as more credible than Neal and ignored evidence tending to exculpate Neal of any wrongdoing. (Am. Cmplt. ¶ 358);

    (ii)    Defendant Wilson demonstrated an inherent prejudice against male athletes accused of misconduct, significantly hindering his ability to conduct an objective investigation. (Am. Cmplt. ¶ 359);

    (iii)    At no time was Neal afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and challenge any witnesses against him, all before an impartial and objective factfinder. (Am. Cmplt. ¶ 364);

    (iv)    The notification of charge did not properly identify which specific provisions Neal allegedly violated, citing only to CSUP's general Policy. (Am. Cmplt. ¶ 367);

    (v)     While CSUP commenced its investigation of the alleged incident on October 26, 2015, it did not inform Neal of the exact charges against him until the "hearing" date on December 4, 2015, after Defendant Wilson had already completed his investigation and after Neal had been required to provide a statement and appear for two investigative meetings.  (Am. Cmplt. ¶ 368);

(vi)     Defendants improperly placed the burden of proof on Neal to prove that Jane Doe consented to the sexual activity, rather than requiring Complainant to prove that Jane Doe had not consented. (Am. Cmplt. ¶ 373);

(vii)    Shortly after notifying Neal that he was the subject of a Title IX investigation, an individual from CSUP held a meeting with the entire football team, during which she identified Plaintiff by name as part of a re-enactment regarding consent. Plaintiff was readily identifiable to all present as the student accused of rape, despite the fact that the investigation was pending and a decision had not yet been made. (Am. Cmplt. ¶ 379);

(viii)   The Notice of Hearing letter merely advised that an informal disciplinary hearing would be convened "to consider allegations that you may have violated the *Code of Student Conduct, Sexual Misconduct (non-consensual sexual intercourse)*. The notice obscurely pointed Neal to section 18 of the Code, which vaguely identified an example of such allegation as "Any act that violates the University's *Sexual Misconduct Policy.*" (Am. Cmplt. ¶¶ 382-383);

(ix)     Neal was denied the opportunity to present witnesses in support of his defense. In fact, when Neal questioned Defendant DeLuna as to whether he could identify witnesses for her to speak with, she declined, stating her review of the matter would be based solely on what was included in Defendant Wilson's Report, along with the information gathered at the Hearing (which consisted only of Plaintiff responding to her clarifying questions). (Am. Cmplt. ¶ 387);

(x)      Defendants denied Neal the opportunity to present witnesses and evidence when Defendant Humphrey disregarded the testimony of Neal's roommates, who had observed Neal and Jane Doe engaged in consensual sexual intercourse the day after the Incident. (Am. Cmplt. ¶ 388);

(xi)     Neal was denied the right to question the Complainant, and was never even made aware of the identities of all witnesses against him. Defendants prevented Plaintiff from establishing his credibility when he was prohibited from challenging the witnesses against him. (Am. Cmplt. ¶ 389).

The foregoing violations demonstrate how the CSUP Defendants acted arbitrarily and capriciously when they failed to adhere to CSUP's stated policies and procedures and deprived Neal of his contractually guaranteed rights.

**B. Breach of the Covenant of Good Faith and Fair Dealing
Is Part and Parcel With Its Breach of Contract.**

Under Colorado law, "every contract contains an implied duty of good faith and fair dealing, requiring the parties to the agreement to perform their contractual obligations in good faith and in a reasonable manner. The purpose of the duty is to effectuate the intentions of the parties or to honor their reasonable expectations as expressed in their agreement." *O'Reilly v. Physicians Mut. Ins. Co.,* 992 P.2d 644, 646 (Colo. App. 1999) (internal citations omitted); *see also City of Boulder v. Pub. Serv. Co. of Colorado*, 996 P.2d 198, 205 (Colo. App. 1999).

Neal has sufficiently alleged that CSUP breached the covenant of good faith and fair dealing by not reasonably discharging its duties under the parties' contract, including the specific provisions outlined in Section A, *supra*. The objectives of the parties' contracts contemplate that a student accused of misconduct will have a full and fair opportunity to defend himself, to be notified of the exact charges against him, to present relevant evidence, call relevant witnesses, and confront and question adverse witnesses. CSUP did not act in good faith when it deprived Neal of these rights due to numerous violations of its policies, based on a systemic gender bias against Neal as the male accused.

**C.   The Amended Complaint States a Claim for Promissory Estoppel.**

Absent a determination that the Code of Conduct created a contract between CSUP and Neal, Neal has sufficiently pleaded the elements of promissory estoppel in the alternative.  A cause of action for promissory estoppel is stated where: (1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice. *Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142, 151 (Colo. 2006). "A promise may be stated in words... or may be inferred wholly or partly from conduct." *Leighton v. City & Cty. of Denver*, No. 14-CV-02812-PAB-NYW, 2015 WL 5532751, at *6 (D. Colo. Sept. 21, 2015).

Contrary to the CSUP Defendants' characterizations of the allegations, Neal's promissory estoppel claim does not rely on vague assertions. (Motion to Dismiss at 24). Instead, Neal's Amended Complaint identifies the specific promises that CSUP was obliged to adhere to, and which Neal relied upon, to his detriment. (Am. Cmplt. ¶¶ 56-58) Viewing the factual allegations as a whole, the Amended Complaint plausibly supports a finding that the CSUP Defendants breached various provisions of the contract with Neal. *See* Section A *supra*.

In reliance on CSUP's representations, covenants and warranties, Neal accepted admission to CSUP and paid the required tuition and fees. As a result of CSUP's discriminatory actions, which led to a finding of "responsible" for sexual misconduct and a sanction of suspension on his record*,* Neal has sustained significant damages including, without limitation, loss of educational, athletic and career opportunities, damages to reputation, past and future economic losses, emotional distress, and other direct and consequential damages. (Am. Cmplt. ¶ 406)

## V.

## ALTERNATIVELY, LEAVE TO AMEND IS WARRANTED

Based on the foregoing, and given the greater nationwide implications of any finding in this case, the Court should exercise its discretion to grant Neal leave to amend his Amended Complaint. Fed. R. Civ. P. 15(a). Finally, insofar as this action has been brought pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332, the Court should retain Neal's state law causes of action in the event that Plaintiff's Title IX and Fourteenth Amendment claims are dismissed.

## <u>CONCLUSION</u>

For the reasons stated above, the Colorado State University-Pueblo Defendants' Motion to Dismiss should be denied, and the Court should grant such further and other relief as is deemed just and proper.

**Dated this 30th day of August 2016**

*/s/ Michael J. Mirabella*
*[ e-filing – August 30, 2016]*
Michael J. Mirabella, Esq.
Michael Mirabella, P.C.
450 E. 17th Ave., Suite 400
Denver, CO  80203
720-931-2094 (ph)
303-592-4385
mmirabella@mbellalaw.com
Counsel for Plaintiff

*/s/ Andrew T. Miltenberg*
*/s/ Tara J. Davis*
*/s/ Philip A. Byler, Esq.*
*[ e-filing – August 30,2016]*
Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
Philip A. Byler, Esq.
363 7th Avenue, Fifth Floor
New York, NY  10001
212-736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
pbyler@nmllplaw.com
Counsel for Plaintiff