IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-873-RM-CBS

GRANT NEAL,

       Plaintiff,

v.

COLORADO STATE UNIVERSITY-PUEBLO,
BOARD OF GOVERNORS OF THE COLORADO STATE UNIVERSITY SYSTEM,
ROOSEVELT WILSON, in his official capacity,
JENNIFER DELUNA, in her official capacity,
LESLEY DIMARE, in her official capacity,
KAITLYN BLAKEY, in her official capacity,
MARIE HUMPHREY, in her official capacity,
UNITED STATES DEPARTMENT OF EDUCATION,
UNITED STATES DEPARTMENT OF EDUCATION OFFICE FOR CIVIL RIGHTS,
JOHN B. KING, JR., in his individual and official capacities,
CATHERINE LHAMON, in her individual and official capacities, and
UNITED STATES OF AMERICA,

       Defendants.

_____

## RECOMMENDATION ON MOTIONS TO DISMISS
_____

Magistrate Judge Craig B. Shaffer

      Plaintiff Grant Neal alleges that the Board of Governors of the Colorado State University

system (hereinafter referred to as the "Board of Governors"), Colorado State University-Pueblo

("CSU-Pueblo") and five individuals in their official capacities for CSU-Pueblo (collectively, the

"State Defendants") violated federal and state laws in erroneously finding him responsible for

sexual misconduct and suspending him from CSU-Pueblo.  Mr. Neal also claims that through its

enforcement of a 2011 "Dear Colleague Letter" ("2011 DCL"), the U.S. Department of

Education ("DOE"), its Office of Civil Rights ("OCR") and related federal Defendants[1] pressured the State Defendants to discipline males accused of sexual misconduct, such as Plaintiff, regardless of whether the allegations had merit.  Plaintiff seeks judicial review of whether DOE violated the Administrative Procedures Act in promulgating the 2011 DCL.

The case is before the court on Judge Raymond P. Moore's referral of Defendants' motions (docs. #27, 31) to dismiss the Amended Complaint ("AC," doc. #8).  Plaintiff waived oral argument (doc. #75), and Defendants did not oppose that waiver.  For the reasons that follow, the court recommends granting in part and denying in part the State Defendants' motion. The court recommends granting the Federal Defendants' motion.

## BACKGROUND

The court draws the following allegations from the AC, which it must accept as true for purposes of the Rule 12(b)(6) arguments.

I.      *State Defendants*

A female student in the CSU-Pueblo athletic training program (referred to anonymously as "Complainant") alleged to the director of athletic training (Dr. Roger Clark) that on Saturday, October 25, 2015, Plaintiff had raped another female student in the athletic training program, referred to anonymously as Jane Doe.  AC at ¶¶ 9–10, 90.  Plaintiff alleges that his sexual conduct with Ms. Doe was consensual and that Ms. Doe stated and acknowledged several times that their sexual conduct was consensual.  AC at *e.g.,* ¶¶ 1, 9, 85, 91–95, 98–99, 114.  Plaintiff alleges that "[g]iven Plaintiff's  status as a high profile football player, Complainant presumed that Plaintiff had engaged in non-consensual contact with Jane Doe."  AC at ¶ 89.

---

[1] The other federal defendants are the United States and two individuals in their individual and official capacities for DOE: then-Secretary of Education, John B. King, Jr., and then-Assistant Secretary for OCR, Catherine Lhamon.  Collectively with DOE and OCR, these are referred to hereafter as the "Federal Defendants."

Complainant made the allegations without informing Ms. Doe or Plaintiff. *Id.* at ¶ 91. Her allegations were based upon a conversation she had with Ms. Doe on October 26, occasioned by Complainant noticing a "hickey" on Ms. Doe's neck. *Id.* at ¶ 89. The athletic training program prohibits trainers (such as Ms. Doe) from "fraterniz[ing] with athletes, and … doing so could result in severe consequences including removal from the Athletic Training Program." *Id.* at ¶ 73. *See also Id.* at *e.g.,* ¶¶ 80, 102. Ms. Doe allegedly had "described the encounter [in which she received the hickey] to Complainant in a manner that would conceal her relationship with Plaintiff, while also protecting her position in the program." *Id.* at ¶ 113.

By sometime on October 27, 2015, Dr. Clark reported the alleged incident to his wife, Laura Clark, another faculty member in the program (*Id.* at ¶ 97), and to Defendant Roosevelt Wilson, the CSU-Pueblo director of the office of equal opportunity/affirmative action and Title IX coordinator. AC at ¶ 100. On October 27, 2015, Mr. Wilson began investigating the allegations and met with Ms. Doe. *Id.* at ¶¶ 112, 114. That same day, Marie Humphrey issued a notice of investigation to Plaintiff. The notice stated "that he was 'being investigated for possible alleged violation of the Code of Student Conduct including Non-consensual Contact and Non-Consensual Sexual Intercourse.' [sic]." *Id.* at ¶ 117. The notice also prohibited him from further contact with Jane Doe. *Id.*

Plaintiff alleges that the CSU-Pueblo Code of Student Conduct (the "Code") and Sexual Misconduct Policy (the "Policy") that he received upon acceptance to the school provide accused students the following procedures (among others):

> "The right to be fully informed of the nature and extent of all alleged violations contained within the complaint;" "The right to be present for all testimony given and evidence presented before a hearing authority;" "The right to present witnesses and documentary evidence;" "The right to question and/or challenge witnesses and documentary evidence presented by others;" [and]

> "The right not to have any personal information released by the
> University to the public without prior consent."

AC at ¶ 56 (in part).  He further alleges that the "Policy provides that students accused of sexual

misconduct are entitled to the hearing process set forth in the Code."  *Id.* at ¶ 58.  "During a

disciplinary hearing, both parties may provide information to the hearing authority for

consideration, including witness statements and evidence."  *Id.* at ¶ 64.  "Determinations of

responsibility are made using the preponderance of the evidence standard, which is defined by

the Code as: 'whether it is more likely than not that a Respondent committed the alleged

violation(s).'"  *Id.* at ¶ 65.  The Policy also provides for appeals on several grounds.  *Id.* at ¶ 68.

Plaintiff alleges that from inception to completion, CSU-Pueblo railroaded him in order

to find him guilty of the accused sexual misconduct regardless of the lack of evidence or merit in

the allegations.  He alleges that CSU-Pueblo did so because of gender bias against accused male

athletes, the school's self-interest in its reputation, and the school's financial interest (*i.e.,* its

federal funding) in demonstrating to Federal Defendants that it would discipline accused males.

He alleges for instance that

> Wilson failed to consider Jane Doe's motivation for insinuating to
> Complainant that something improper may have occurred, when
> Complainant confronted Jane Doe about the hickey on her neck.
> Namely, recognizing the potential consequences of being
> disciplined for engaging in a relationship with a football player,
> Jane Doe described the encounter to Complainant in a manner that
> would conceal her relationship with Plaintiff, while also protecting
> her position in the program.
>
> In fact, at no time did Jane Doe tell Defendant Wilson that
> she was involved in non-consensual sex with Plaintiff.  To the
> contrary, at her meeting with Defendant Wilson on October 27,
> Jane Doe informed Mr. Wilson: "our stories are the same and he's
> a good guy.  He's not a rapist, he's not a criminal, it's not even
> worth any of this hoopla!"
>
> Nonetheless, CSUP pursued an investigation calculated to
> lead to the foregone conclusion that Plaintiff was responsible for
> the misconduct alleged.

Defendant Wilson accepted the statements of subjective, hearsay witnesses as credible and ignored evidence tending to exculpate Plaintiff, all while demonstrating an inherent prejudice against male athletes.

AC at ¶¶ 113–116.

During the investigation, Wilson met with Plaintiff twice.  In the first meeting, October 29, 2015, Plaintiff alleges that

Wilson began the meeting by interrogating Plaintiff, asking him three times: "Did you rape [Jane Doe]?" By the third time, Defendant Wilson was standing up and looming over Plaintiff, apparently intending to intimidate him.  * * * Defendant Wilson indicated to Plaintiff that the Complainant had described the encounter as an egregious act of rape and threatened that "he would get to the bottom of it."

AC at ¶¶ 122, 124.  For the second meeting, November 20, 2015, Plaintiff brought the head football coach, John Wristen, as his advisor.  During the November 20 meeting "Defendant Wilson indicated that there were ultimately four individuals who came forward to report the encounter to the Title IX office."  *Id.* at ¶ 132.  However, until Wilson completed the investigation, he failed to inform Plaintiff who the four witnesses were.  In addition, at the November 20 meeting,

[w]hen Coach Wristen tried to make a statement in Plaintiff's defense, Defendant Wilson responded that he was "The Chief," in a clear effort to assert his authority over a fellow CSUP colleague.

AC at ¶ 131.  Plaintiff further alleges that during the investigation, "Defendant Wilson professed that he was in charge of the investigation and would be the only person to declare someone a witness in this matter," which "depriv[ed] Plaintiff of the opportunity to identify witnesses in support of his defense."  *Id.* at ¶ 142.

From his investigation, Wilson prepared a report dated December 3, 2015.  AC at ¶ 112. Wilson provided his report to Defendant Jennifer DeLuna, the CSU-Pueblo director of diversity

and inclusion.  That same day, Plaintiff was given less than 24 hours' notice that Ms. DeLuna would hold an "informal disciplinary hearing."  *Id.* at ¶ 133.  Plaintiff alleges that the Code of Conduct does not define such a procedure (*Id.*), and that the Code required the notice of hearing to include "a detailed description of the allegations to be considered."  *Id.* at ¶ 135.  The notice, however, stated only the same description as the notice of investigation: that Plaintiff "may have violated the Code of Student Conduct, Sexual Misconduct (non-consensual sexual intercourse)." *Id.*  Plaintiff alleges that the short notice deprived him of the ability to formulate a defense.

On December 4, 2015 DeLuna held the informal hearing with Plaintiff and his advisor, Chris Turner.  Plaintiff alleges this "hearing" was "in actuality … nothing more than an investigatory meeting …[and] a sham" (*Id*. at ¶ 136) in which he was handed Wilson's 14 page investigative report for the first time, tasked with reviewing it, and was not permitted to copy it or take notes.  *Id.* at ¶ 139.  Plaintiff made "repeated requests [for a copy of the report … but] he did not obtain a full copy of the Report until after his appeal was denied."  *Id.* at ¶ 151.

The informal hearing was the first time that CSU-Pueblo informed Plaintiff of the identities of the witnesses with whom Wilson had spoken in the investigation.  *Id.* and ¶ 149. The witnesses identified in the Wilson report apparently included the Complainant, Ms. Doe, Dr. Clark, and Mrs. Clark.  *See, e.g., Id.* at ¶¶ 141, 144, 145.  However, Plaintiff also alleges that the report "failed to disclose to Plaintiff the identities of the remaining adverse witnesses referenced in the Report, thus hindering Plaintiff's ability to challenge their credibility and confront all witnesses against him."  *Id.* at ¶ 149.

Ms. DeLuna did not hear from any witnesses nor (apparently) receive any documentary evidence at the December 4 meeting.  Plaintiff informed DeLuna in this meeting that while Wilson's report mischaracterized Ms. Doe as not intending to have sex at all the evening of

October 25, "Jane Doe clearly stated that she advised Plaintiff that she did not want to have

unprotected sex because she was not on birth control; she never stated that she did not want to

have sex at all."  AC at ¶ 141.[2]

Regarding the December 4 meeting, Plaintiff also alleges that

> [u]pon learning that Dr. Clark and Mrs. Clark had reported the
> most egregious and damaging allegations to CSUP's Title IX
> office, Plaintiff expressed his concern regarding a potential conflict
> of interest; namely, Dr. Clark and Mrs. Clark hold Jane Doe's
> degree, as a member of the Athletic Training Program.

AC at ¶ 148.  Plaintiff alleges that both Dr. and Mrs. Clark knew only what the Complainant had

said to Dr. Clark, and that both Dr. and Mrs. Clark coerced or pressed Ms. Doe into believing or

admitting that the sexual conduct in question was inappropriate or improper.  *Id*. at ¶¶ 144-147.

The report included Ms. Clark's comment recognizing that Ms. Doe did not want Plaintiff to be

investigated.  *Id.* at ¶ 147.

On December 8, 2015, Plaintiff had "a follow up meeting to clarify the information

provided by Plaintiff on December 4, 2015. Plaintiff reiterated that he did not penetrate Jane Doe

prior to putting on a condom, and that they engaged in consensual sexual activity."  *Id.* at ¶ 152.

> [W]hen Plaintiff questioned Defendant DeLuna at the meeting of
> December 8, 2015 regarding whether he could identify witnesses
> to her or whether she needed to speak with anyone about his
> character, she declined, stating her review was based only on what
> was in the file and the information gathered at the Hearing.

*Id.* at ¶ 143.

"[O]n December 18, 2015, Defendant DeLuna notified Plaintiff that he had been found

responsible for 'Sexual Misconduct' in violation of CSUP's Code of Conduct (the 'Decision').

CSUP assessed an unwarranted and severe penalty of suspension for the duration of Jane Doe's

_____

[2] Plaintiff does not expressly allege that he informed DeLuna of this fact in the December 4
informal hearing, but the court infers this from the allegation in Paragraph 152 that Plaintiff
"reiterated" it at the December 8 meeting.

education at CSUP (the 'Sanction')."  AC at ¶ 11.  The Decision "repeatedly refers to Jane Doe

as the complainant, when in fact, the complainant was an uninvolved third-party."  *Id.* at ¶ 153.

Plaintiff alleges the Decision was erroneous.  The Decision imposed sanctions, including

"suspension pending Jane Doe's graduation or disenrollment from campus."  *Id.*

On January 6, 2016, Plaintiff appealed to Marie Humphrey, the CSU-Pueblo Dean of

Students and Residence Life.  On January 19, 2016, Humphrey denied the appeal.  Plaintiff

alleges that the procedural flaws and bias continued on his appeal when the hearing officer did

not consider material evidence that Plaintiff offered from his roommates, of which Plaintiff had

been unaware prior to the Decision.  AC at ¶ 186 (third bullet point).[3]

Because of the Decision and Sanction, Plaintiff

> is unable to gain admission to another university to obtain his
> degree and the significant monies spent on obtaining a college
> education at CSUP have been squandered.  In addition to the
> damages sustained by Plaintiff, including his inability to continue
> his education and receive his degree, the loss of his wrestling and
> football scholarships, and his removal from the football team
> Plaintiff has sustained tremendous damages to his future
> education, career and athletic prospects, and reputation.

*Id.* at ¶ 15.

Plaintiff alleges that the disciplinary matter was procedurally inadequate.  He identifies

several procedures that he alleges CSU-Pueblo should have provided but did not, among them:

adequate notice of the charges being investigated; identification of the adverse witnesses; an

evidentiary hearing for witnesses to testify subject to cross-examination and for Plaintiff to

present other evidence in his defense; and adequate notice of the allegations before such hearing.

Plaintiff further alleges that the evidentiary standard CSU-Pueblo used – preponderance of the

---

[3] Two of the CSU-Pueblo officials were not involved in the disciplinary matter: Kaitlyn Blakey, the associate director, office of equal opportunity, affirmative action and deputy Title IX coordinator; and Lesley DiMare, the president of CSU-Pueblo.  AC at ¶¶ 22, 309.

evidence – was unfair and insufficient for the criminal-like charges and potential sanctions.

Plaintiff also alleges several procedural irregularities, *i.e.,* deviations from the process that the Code or Policy[4] provided.  For example, Plaintiff alleges that on November 17, 2015, Humphrey assessed an interim suspension against Plaintiff.  AC at ¶¶ 127, 129.  Plaintiff alleges that the Code limits the circumstances in which interim measures can be imposed, and none of the criteria were applicable to him.  *Id.* ¶¶ 126, 130.  Plaintiff alleges further facts in support regarding an October 30, 2015 football trip for which Humphrey and Wilson authorized Plaintiff and Jane Doe to travel together and stay in the same hotel.  *Id.* at ¶ 130.  Plaintiff also alleges that DeLuna gave Plaintiff less than 24 hours' notice that she would hold an "informal disciplinary hearing" without a description of either the specific allegations or evidence that would be considered.  *Id.* at ¶¶ 133, 135.  Plaintiff alleges that the Code and Policy do not define an informal hearing, required description of the fact allegations to be considered (*i.e.,* the Wilson report), and more timely notice to allow him to prepare.  *Id.* at ¶¶ 133–135.

Based on these fact allegations, Mr. Neal claims that State Defendants deprived him of procedural due process under the 14th Amendment of the U.S. Constitution.  Plaintiff further alleges that in conducting the disciplinary matter, State Defendants discriminated against him on the basis of his gender in violation of Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq*. ("Title IX"), breached CSU-Pueblo's contract with Plaintiff, and breached the covenant of good faith and fair dealing.  Plaintiff further claims promissory estoppel against CSU-Pueblo.  *See* AC at Counts I–V.  In each of those counts, Plaintiff seeks damages.  Through a declaratory judgment claim, Plaintiff also seeks injunctive relief: restoral of his reputation, expungement of his disciplinary record, expungement of his suspension, destruction of any record of the

---

[4] CSU-Pueblo argues that the AC relies on the CSU, not CSU-Pueblo, Code of Conduct.  On a Rule 12(b)(6) motion, the court must assume the fact allegations are true.  CSU-Pueblo also does not argue that any textual differences between the two Codes are significant at this point.

complaint against Plaintiff, and readmission to CSU-Pueblo.  AC at Count VII, ¶¶ 415–19.

## II.    *Federal Defendants*

Plaintiff alleges that Federal Defendants coerced the State Defendants to conduct the disciplinary matter in the manner that Plaintiff alleges violated Title IX and his due process rights.  AC at ¶ 201–213.  Plaintiff alleges that on April 4, 2011, OCR issued the 2011 DCL.  *Id.* at ¶ 199.  He alleges that the 2011 DCL required schools, including CSU-Pueblo, to conduct disciplinary matters regarding alleged sexual violence as a form of sexual discrimination or harassment subject to Title IX (a) without providing the accused the right of cross-examination, (b) using the preponderance of evidence standard, and (c) providing that an unsuccessful complainant can appeal, which Plaintiff characterizes as a form of double jeopardy.  *Id.* at ¶¶ 6, 183, 202–204.

Plaintiff alleges that the 2011 DCL changed the substantive law, such that DOE was required to follow notice and comment rulemaking procedures to implement that change.  AC at *e.g.,* ¶¶ 3, 7, 198, 201.  DOE did not follow those procedures.  Plaintiff claims the 2011 DCL is therefore void under the Administrative Procedure Act, 5 U.S.C. § 553.  *Id.* at ¶ 8.

Plaintiff also alleges that DOE aggressively enforced the 2011 DCL in a manner that pressured schools (including CSU-Pueblo) to find male students responsible for sexual misconduct and impose severe sanctions regardless of the evidence.  Plaintiff points to DOE statements (by Defendant Lhamon) to a Senate committee that DOE would revoke federal funding to schools found noncompliant with the 2011 DCL (AC at ¶¶ 231, 234–236); "more than 249 investigations against colleges and universities" for reviewing their compliance with the DCL (*Id.* at ¶ 229); and draconian settlement agreements in which DOE required schools to admit that their disciplinary procedures or policies violated the 2011 DCL to avoid the DOE revoking their federal funding.  *Id.* at ¶¶ 230, 237–238.

10

Plaintiff alleges that in his disciplinary matter, CSU-Pueblo discriminated against him on the basis of gender, denied his due process, and arrived at an erroneous outcome at least in part because CSU-Pueblo was attempting to conform to DOE/OCR's enforcement of the 2011 DCL:

> In light of the evidence (or lack thereof), the Decision can only be explained by CSUP's discriminatory bias against males and its underlying motive to protect the University's reputation and financial wellbeing, by acting in compliance with the Dear Colleague Letter.
> Upon information and belief, in response to the significant pressure placed on the CSUP Defendants by the Federal Defendants to comply with the mandates of the 2011 Dear Colleague Letter, CSUP conducted a substantially flawed and biased investigation process leading to an erroneous Decision and Sanction.

AC at ¶¶ 13–14.

## ANALYSIS

I.     *Standards of Review*

    A.     *Rule 12(b)(1)*

Federal courts, as courts of limited jurisdiction, must have a statutory basis for their jurisdiction.  *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)).  Pursuant to Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a complaint for lack of subject matter jurisdiction. The determination of a court's jurisdiction over subject matter is a question of law.  *Madsen v. U.S. ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir. 1987).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir. 1974).

A motion to dismiss for a lack of subject matter jurisdiction may take two forms.  *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  It may facially attack or it may

challenge the facts upon which subject matter jurisdiction depends.  *Id.* at 1002–1003.

> When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1003 (internal citations omitted); *see also Cooke v. Hickenlooper,* No. 13–cv–01300–MSK–MJW, 2013 WL 6384218, at *2, n.4 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colo. Outfitters Ass'n v. Hickenlooper,* 823 F.3d 537 (10th Cir. 2016).  "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction."  *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

    B.    *Rule 12(b)(6)*

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  In the Tenth Circuit,

> [t]he *Twombly/Iqbal* standard is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or formulaic recitation of the elements of a cause of action, which the Court stated will not do.  In other words, Rule 8(a)(2) still lives.... Under Rule 8, specific facts are not necessary; the statement need

12

> only give the defendant fair notice of what the ... claim is and the
> ground upon which it rests.

*Pueblo of Jemez v. United States,* 790 F.3d 1143, 1172 (10th Cir. 2015) (internal brackets

omitted; quoting *Khalik v. United Air Lines,* 671 F.3d 1188, 1191–92 (10th Cir. 2012)).

"Determining whether a complaint states a plausible claim for relief will … be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Iqbal,* 556 U.S. at 679; *see also Pueblo of Jemez*, 790 F.3d at 1172.  The court must

construe the fact allegations and any reasonable inferences from them in the light most favorable

to Plaintiff.  *Sanchez v. Hartley,* 810 F.3d 750, 754 (10th Cir. 2016).

II.     *State Defendants' Motion to Dismiss*

 A. *CSU-Pueblo's Capacity to Be Sued.*

State Defendants argue that CSU-Pueblo is only a campus of CSU and is not an entity

capable of being sued.  They further argue that the Board of Governors is the appropriate party to

sue, and that the claim against CSU-Pueblo should accordingly be dismissed.  Doc. #27 at p. 1,

n.1.  They rely upon *Roberts v. Colorado State Board of Agriculture,* 998 F.2d 824, 826–27

(10th Cir. 1993); C.R.S. §§ 23–30–102(1) and 23–31–101 *et seq.*  Plaintiff did not address this

argument.  State Defendants are correct.  *Roberts,* 998 F.3d at 827; *Persik v. Colo. State Univ.*,

60 F. App'x 209, 211 (10th Cir. 2003) (citing *Roberts*).[5]  The court recommends that CSU-

Pueblo be dismissed as a party, as the Board of Governors is the appropriate person to sue.

 B. *Title IX Claim*

Under Title IX of the Civil Rights Act, "[n]o person in the United States shall, on the

basis of sex,[6] be excluded from participation in, be denied the benefits of, or be subjected to

_____

[5] Subsequent to *Roberts* and *Persik,* the Board of Governors replaced the Board of Agriculture as
the governing entity for the CSU system.  C.R.S. § 23–30–102(1).
[6] In the context of Title IX, courts typically refer to "sex" and "gender" interchangeably.  *See,
e.g., Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 651 (1999).

discrimination under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a).

> The statute's only express enforcement mechanism, § 1682, is an administrative procedure resulting in the withdrawal of federal funding from institutions that are not in compliance.  In addition, this Court has recognized an implied private right of action … [for which] both injunctive relief and damages are available.

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009).

State Defendants first argue that the Title IX claim should be dismissed as to the individual Defendants (Wilson, DeLuna, DiMare, Blakey and Humphrey) because "Title IX … [does] not authorize[e] suit against school officials, teachers, and other individuals." *Fitzgerald,* 555 U.S. at 257.  Plaintiff originally sued the individual State Defendants in their official and individual capacities.  After the motions to dismiss were briefed, Plaintiff dismissed the claims against Wilson, DeLuna, DiMare, Blakey and Humphrey in their individual capacities.  Doc. #77.  This leaves these Defendants only in their official capacities.  "Official capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985) (internal quotation marks omitted).  Thus, "[c]laims brought against state employees in their official capacities are equivalent to claims brought against the state itself." *Johnson v. W. State Univ*., 71 F. Supp. 3d 1217, 1229–30 (D. Colo. 2014) (citing *Graham; McMillian v. Monroe Cty.,* 520 U.S. 781, 785 n. 2 (1997); *Moss v. Kopp,* 559 F.3d 1155, 1168 (10th Cir. 2009)).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.  The Board of Governors is a Defendant.  It appears that the Tenth Circuit has not decided whether official capacity claims against government officials are duplicative of a claim against the government

agency. *See, e.g., London v. Beaty,* 612 F. App'x 910, 912 n.2 (10th Cir. 2015); *Brooks v. Bd. of Educ., Farmington Mun. Sch.,* 617 F. App'x 887, 891, n.2 (10th Cir. 2015). This court and others have found official capacity claims are duplicative of the claim against the agency and should be dismissed on that basis. *See, e.g., Ulibarri v. City & Cty. of Denver,* No. 07–cv–01814–WDM–MJW, 2010 WL 5287495, at *1 (D. Colo. Dec. 7, 2010) (claims under the Americans with Disabilities Act and the Rehabilitation Act); *Miller v. Brungardt,* 916 F. Supp. 1096, 1098 (D. Kan. 1996) (Title VII claims brought against employees in official capacities were duplicative of the claim against the employer). Plaintiff's claim against Wilson, DeLuna, DiMare, Blakey and Humphrey in their official capacities is duplicative of the claim against the Board of Governors, and on that basis, the court recommends dismissing the individuals from the Title IX claim.

The Board of Governors next argues that Plaintiff fails to plausibly allege the gender discrimination element of a Title IX claim because Plaintiff "does not and cannot allege any actual nexus between his gender and his purported mistreatment." Doc. #27 at p. 6. Neither the Supreme Court nor the Tenth Circuit has yet addressed a Title IX claim for a school's alleged discrimination in a disciplinary proceeding. Apparently on that basis, the Board of Governors characterizes Plaintiff's claim as "novel." Doc. #27 at p. 7.

The District of Rhode Island more aptly described a veritable "wave of litigation aris[ing] in the wake of the 2011" DCL alleging schools discriminated against males accused of sexual misconduct. *Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 181 (D.R.I. 2016). The Board of Governors and Plaintiff together selected no less than 20 such cases from the pool existing mid-2016, and that pool continues to expand. *See, e.g., Doe v. Cummins,* – F. App'x –, No. 16–3334, 2016 WL 7093996, at *13 (6th Cir. Dec. 6, 2016); *Ritter v. Okla. City Univ.,* No. Civ–16–0438–

HE, 2016 WL 3982554 (W.D. Okla. July 22, 2016); *Collick v. William Paterson Univ.,* Civ. No. 16–471(KM) (JBC), 2016 WL 6824374 (D.N.J. Nov. 17, 2016), *appeal pending; Doe v. Trustees of Boston Coll.,* No. 15–cv–10790, 2016 WL 5799297 (D. Mass. Oct. 4, 2016), *appeal pending; Doe v. Lynn Univ., Inc.,* –F. Supp. 3d –, No. 9:16–cv–80850, 2017 WL 237631 (S.D. Fla. Jan. 19, 2017); *Doe v. Baum,* –F. Supp. 3d –, No. 16–13174, 2017 WL 57241 (E.D. Mich. Jan. 5, 2017); *Doe v. W. New England Univ.,* No. 15–30192–MAP, 2017 WL 113059 (D. Mass. Jan. 11, 2017).

Both sides in this case rely on *Yusuf v. Vassar College,* 35 F.3d 709, 714 (2d Cir. 1994) for the legal standard, as do most of the reported cases addressing an accused person's Title IX claim for gender discrimination in a disciplinary proceeding.  *See, e.g., Johnson*, 71 F. Supp. 3d at 1224; *Ritter*, 2016 WL 3982554, at *1; *Doe v. Columbia Univ.,* 831 F.3d 46, 55–56 (2d Cir. 2016); *Cummins*, 2016 WL 7093996, at *12-13; *Lynn Univ.,* 2017 WL 237631, at *2–3.  *See also Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961–62 (4th Cir. 1997) (unsuccessful complainant's Title IX claim alleging discrimination in disciplinary proceeding), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999), *aff'd sub nom, United States v. Morrison,* 529 U.S. 598 (2000).  *Yusuf* held that

> Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories[: either] … the plaintiff was innocent and wrongly found to have committed an offense[;] or … the plaintiff alleges selective enforcement [because] the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.

*Yusuf,* 35 F.3d at 715.  In this case, Plaintiff alleges an "erroneous outcome" claim. Doc. #55 (Response) at p. 17.  This claim requires the Plaintiff to

> allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.  ….

> However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.  A complaint may also allege particular procedural flaws affecting the proof.

*Yusuf*, 35 F.3d at 715.  The plaintiff must also allege non-conclusory facts that demonstrate the flawed outcome is causally connected to gender bias.  *Id*.

> [G]ender bias [must be] … a motivating factor behind the erroneous finding.  Allegations of a causal connection … can be of the kind that are found in the familiar setting of Title VII cases. …. Such allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.

*Id*.  "[S]ome allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias."  *Id.*  The allegations should "go … beyond the surmises of the plaintiff as to what was in the minds of others and involve provable events that in the aggregate would allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding."  *Id.* at 716.

In short, the erroneous outcome claim requires **"**providing facts that cast doubt on the accuracy of the outcome of the disciplinary hearing and establish circumstances that show that gender bias motivated the outcome."  *Boston Coll.,* 2016 WL 5799297, at *24.  "The predominant question is whether the college's actions were motivated by gender bias or if the disciplinary procedures establish a pattern of decision-making that applies a chauvinistic view of the sexes."  *Id.  See also Doe v. Univ. of the S.,* 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

In addition, a disciplined male's Title IX claim alleging discrimination should be subject to the standard for a school's Title IX liability regarding peer-on-peer sexual harassment: a

school is subject to Title IX claims when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 648 (1999) (unsuccessful complainant's Title IX claim).[7] *See, e.g., Ross v. Univ. of Tulsa,* 180 F. Supp. 3d 951, 970 n.16 (N.D. Okla. 2016) (unsuccessful female complainant's Title IX claim alleging a "sham" disciplinary proceeding showed deliberate indifference to the sexual assault that she had alleged), *appeal pending.* In *Ross,* the court noted some similarity between the unsuccessful complainant's claim that the proceeding on her complaint was a sham, and disciplined males' claims alleging discrimination in their proceeding. The court held that "intentionally biased student conduct proceedings, or clearly unreasonable methods of handling student reports of sexual violence" would come within the parameters of *Davis* and *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 290–91 (1998). *Ross,* 180 F. Supp. 3d at 970. *See also Doe v. Salisbury Univ.,* 123 F. Supp. 3d 748, 765–68 (D. Md. 2015) (deliberate indifference is not a stand-alone claim but rather a standard of liability that the court appears to assume is consistent with *Yusuf*).

The court concludes that *Yusuf's* framework – requiring facts to doubt the accuracy of the school's decision and causal connection to gender bias – anticipated and is consistent with the *Davis* standard of "clearly unreasonable" responses to alleged sexual harassment "in light of the known circumstances," or as *Ross* articulates it, "intentionally biased or clearly unreasonable" disciplinary proceedings.

Applying these legal standards to Plaintiff's allegations, Wilson's alleged failures to

---

[7] *Davis* regards an unsuccessful complainant's claim for a school's deliberate indifference to her complaints of another student's sexual harassment. Plaintiff does not allege deliberate indifference, which in any case would seem at best an awkward construction. *See, e.g., Baum,* 2017 WL 57241, at *26 ("It is doubtful that the case law governing claims of 'deliberate indifference' under Title IX can be applied in any coherent fashion to the facts of this case," internal quotation marks omitted).

(among other things) consider that Jane Doe told Wilson the sexual encounter was consensual, the physical or documentary evidence in which she consistently said the same thing, her motivation to not be disciplined by her department for her prohibited relationship with a football player, the Clarks' conflicts of interest, Wilson's failure to question any witnesses favorable to Plaintiff (*e.g.,* Coach Wristen), and Wilson's failure to identify to Plaintiff the witnesses against him before completing the investigation all suggest bias and inaccuracy in the outcome. *Columbia*, 831 F.3d at 57.  The short notice for his informal hearing with DeLuna, DeLuna's statement that she would not consider information outside of Wilson's investigative file, and the failure to set a formal hearing for testimony and presentation of other evidence likewise suggest bias.  The alleged failure to consider Ms. Doe's post-incident consensual sex with Plaintiff also suggests bias. *See, e.g., Doe v. Washington & Lee Univ.,* No. 6:14–cv–00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015).  So too does Humphrey's refusal to consider testimony from Plaintiff's roommates, despite Plaintiff being unaware that they were percipient witnesses of Plaintiff's post-incident consensual sex with Ms. Doe until after the Decision issued.

But "[w]hile those allegations support the inference of bias, they do not necessarily relate to bias on account of sex." *Columbia*, 831 F.3d at 57.  To show that the university's bias was based on his gender, Plaintiff alleges additional categories of facts.  First, giving reasonable inferences to the allegations, Plaintiff alleges that the Federal Defendants' 2011 DCL introduced a policy that coerced schools such as CSU-Pueblo to find against men who were alleged to have engaged in sexual misconduct. *Id*. at ¶¶ 201–04, 209–211 217 ("governmental pressure imposed on CSUP to issue more guilty findings against male students accused of misconduct"), ¶ 320 ("CSUP's mishandling of Plaintiff's investigation was wrongfully informed by federal

pressure"). He alleges in detail that DOE has aggressively enforced that policy in a manner that while purporting to be gender-neutral, is intended and understood by schools (including CSU-Pueblo) as a policy that they must find against accused men in order to avoid DOE investigations and the threat of having their federal funding revoked. AC at *e.g.,* ¶¶ 201, 209, 211, 217, 229–237. Plaintiff further alleges that Wilson was "pressured to meet a quota [of males disciplined for sexual misconduct] by the Office for Civil Rights," *Id.* at ¶ 165, and "the CSUP Defendants have recognized the increased pressure, both internally and from the United States government, to aggressively discipline male students accused of sexual misconduct." *Id.* at ¶ 172. "[T]he number of on-campus forcible sex offenses investigated has increased, from only 1 in 2010 to 7 in 2014." *Id.* at ¶ 173.

> Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants at CSUP.
>
> Upon information and belief, the CSUP Defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

AC at ¶¶ 170–171.[8]

Lower courts appear divided in whether allegations of a reverse gender backlash from the 2011 DCL and the DOE's enforcement thereof are sufficient, standing alone, to plead Title IX gender bias. *See, e.g., Cummins,* 2016 WL 7093996, at *13; *Doe v. Regents of the Univ. of Cal.,* No. 15–cv–2478SVWJEM, 2016 WL 5515711, at *5 (C.D. Cal. July 25, 2016) (collecting cases on both sides of the divide); *Brown Univ.,* 166 F. Supp. 3d at 186 (same).

Plaintiff does not appear to allege that the 2011 DCL itself (as opposed to the DOE/OCR

---

[8] "The *Twombly* plausibility standard … does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." *Ritter*, 2016 WL 3982554, at *2 (internal quotation marks omitted).

enforcement thereof) is gender-biased on its face, but to the extent he intended to do so, the document in itself is written in a gender-neutral manner and notes the DOE's concern regarding sexual assault on campuses regardless of the genders of the assaulter and assaulted.  Doc. #31–1 at p. 2 of the 2011 DCL.[9]  Thus the 2011 DCL in itself would not support the necessary causal connection between Plaintiff's erroneous outcome and gender bias.  *See, e.g., Cummins*, 2016 WL 7093996, at *13.  *Compare, Salisbury Univ.,* 123 F. Supp. 3d at 766 (university notices and newsletters relating to sexual assault on college campuses that were "gender-neutral tone[d], addressed to all students, and published to improve campus safety for both men and women" did not support inference of gender bias).

Similarly, Plaintiff does not appear to rely solely on a disproportionate effect on males, but this too would be insufficient standing alone.  *See, e.g., Univ. of Cal.,* 2016 WL 5515711, at *5 ("higher rate of sexual assaults committed by men against women, or filed by women against men" do not infer gender discrimination against males); *Austin v. Univ. of Or.,* – F. Supp. 3d –, No. 15–cv–2257–MC, 2016 WL 4708540, at *8 (D. Or. Sep. 8, 2016) (same); *Tsuruta v. Augustana Univ.,* No. 4:15–cv–04150–KES, 2015 WL 5838602, at *4 (D.S.D. Oct. 7, 2015) (same).

Rather, Plaintiff alleges that (a) DOE/OCR's *enforcement* of the 2011 DCL has become gender-skewed against men, or has become widely understood by schools as such (AC at ¶ 212); (b) CSU-Pueblo was influenced by the pressure or coercion of DOE/OCR's enforcement, to slant the procedures against Plaintiff so as to demonstrate to DOE/OCR that it would find accused men – not just accused persons of any gender – responsible for sexual misconduct and impose

---

[9] Plaintiff references the 2011 DCL in the AC but does not attach it.  The court can take judicial notice of the document without converting to summary judgment as a document central to and referenced in the AC (the authenticity of which Plaintiff does not appear to dispute) and as a public record of DOE/OCR.  *See, e.g., Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010).

sanctions (AC at ¶¶ 165, 172, 341–44); (c) CSU-Pueblo has financial incentive to not challenge the legality of DOE's enforcement (*Id.* at ¶ 256);[10] (d) underlying facts that raise doubt of the accuracy of the outcome (*Id.* at *e.g.,* ¶¶ 72–107, 113–114, 185–186); (e) CSU-Pueblo reached the erroneous outcome at least in part because of the procedural shortcomings that CSU-Pueblo employed, bowing to DOE/OCR pressure to discipline males (*Id.* at *e.g.,* ¶¶ 6, 12–14, 109-68, 172, 256); (f) that CSU-Pueblo has "communications evidencing Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused" (*Id.* at ¶ 317); (g) "all students that have been expelled from CSUP for sexual misconduct have been male," (*Id.* at ¶ 319); and (h) CSU-Pueblo always finds male respondents, particularly male athletes, responsible of sexual misconduct regardless of the evidence or lack thereof.  *Id.* at ¶ 323.

It would give this court some pause to find the above facts insufficient to plead plausible gender bias.  In *Yusuf,* the court addressed allegations

> that a false and somewhat stale charge of sexual harassment was made against him only after he pursued criminal charges for a brutal assault by the complainant's boyfriend … and actions by the presiding official of the disciplinary tribunal [that] prevented him from fully defending himself[, and] … that males accused of sexual harassment at Vassar are "historically and systematically" and "invariably found guilty, regardless of the evidence"

*Yusuf*, 35 F.3d at 716.  The court found those allegations sufficed to plead gender bias. Staleness, the retaliatory nature of the disciplinary complaint, procedural shortcomings, and systemic findings against accused men do not sound like stronger indicia of gender bias than what Plaintiff has alleged regarding the implementation of the 2011 DCL, procedural

---

[10] Plaintiff alleges that many universities and colleges (including CSU-Pueblo) depend on federal funding for a significant percentage of their overall funds.  AC at ¶¶ 256–261.  Plaintiff alleges that schools have no incentive to litigate the legality of DOE's enforcement of the 2011 DCL; schools bear no ill consequences from DOE when they unfairly find against an accused person. DOE is a party in this case only because Plaintiff sued that entity; the Board of Governors has not brought claims against DOE.

shortcomings, and systemic findings against accused males.  As in *Yusuf,* these are fact allegations that are verifiable and if proven would infer that discrimination against men infected the Decision.[11]  *See also Salisbury,* 123 F. Supp. 3d at 768 (allegations that the school had communications evidencing wrongful discipline on the basis of the accused's gender and favoring female complainants against male respondents, and that the school acted to demonstrate to DOE that it would aggressively discipline male students); *Collick*, 2016 WL 6824374, at *12 (allegations of procedural shortcomings and pressure from the DOE; "commonsense inference that the public's and the policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight" and thus used the male plaintiff to show the university would sanction males accused of sexual misconduct); *Boston Coll.,* 2016 WL 5799297, at *25 ("Doe's point that sexual assault on campuses is a subject of increasing public attention and controversy, with external pressures from a variety of sources, is well-taken," but granting summary judgment to the school because plaintiff failed to present evidence showing the pressures influenced his disciplinary proceeding).

Several of the courts that reject similar allegations (for example, that male respondents are always found guilty regardless of the evidence, or that the school used the plaintiff to placate either the DOE or the public) appear to draw inferences against the plaintiff, weigh facts in a manner that the Tenth Circuit reserves for motions for summary judgment or trial, or rely on the lower court decision that *Columbia* later reversed as employing an erroneously high pleading standard.  *See, e.g., Baum*, 2017 WL 57241, at *24 (for instance, weighing statistics provided by plaintiff); *Doe v. Univ. of Cincinnati,* 173 F. Supp. 3d 586, 602, 607-08 (S.D. Ohio 2016)

---

[11] The Board of Governors argues that *Yusuf* would be decided differently after *Iqbal,* but *Yusuf* twice noted that conclusory allegations would not support gender bias, and with regard to dismissing a claim due to alternative explanations for challenged conduct, anticipated *Iqbal* in only doing so based on the complaint itself identifying those alternative explanations.  *Yusuf,* 35 F.3d at 714–715.

(discussing allegations of gender bias in context of due process and Title IX claims); *Univ. of Cal.,* 2016 WL 5515711, at *4–5 (inferring facts contrary to plaintiff's allegation that he was unaware the complainant had taken hydrocodone and five alcoholic drinks, and did not appear intoxicated; weighing facts that investigating official, who had previously been criticized for leniency in investigating sexual misconduct allegations, was only an investigator, not on the plaintiff's decision panel); *Doe v. Univ. of Mass.–Amherst,* Civ. No. 14–30143–MGM, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (relying on the lower court's pleading standard that *Columbia* later reversed), *appeal dismissed* (1st Cir. Nov. 4, 2016); *Tanyi v. Appalachian State Univ.*, Civ. No. 5:14–170RLV, 2015 WL 4478853, at *9 (N.C. Jul. 22, 2015) (same). *See also Brown v. Castleton State Coll.,* 663 F. Supp. 2d 392, 404 (D. Vt. 2009) (inferring against plaintiff that the school's investigators of plaintiff's complaint that nursing department discriminated against him on the basis of his gender, in discounting his evidence and accepting without question the testimony of the nursing department's witnesses, would not harbor the gender bias of the department); *Doe v. Rector & Visitors of George Mason Univ.,* 132 F. Supp. 3d 712, 732–733 n.27 (E.D. Va. 2015) (no allegation that school used plaintiff to make a point to DOE/OCR; inferring against plaintiff that  the existence of non-pled, lawful motivations made his allegation of gender bias implausible, relying on the lower court that *Columbia* later reversed), *recon. den'd on other issue*, 149 F. Supp. 3d 602 (E.D. Va. 2016).

However, the court need not resolve whether the above allegations would suffice standing alone.  Plaintiff also alleges statements by the CSU-Pueblo investigator that amply support that gender bias infected the proceeding.  Plaintiff alleges Wilson demonstrated prejudice against male athletes in three instances.  During his October 29, 2015 meeting with Plaintiff, he "was critical of the football team and its culture, stating the players 'have a problem'

in reference to acts of sexual misconduct."  AC at ¶ 313.  Wilson said that he

> would be holding a meeting with the football team in the coming
> weeks to address this "obvious problem" (referring to sexual
> misconduct complaints). In fact, this meeting did take place, on or
> about November 9, 2015.   At that time, a female counselor
> identified Plaintiff, by name, as an example to the entire football
> team about the difference between consensual and non-consensual
> contact.  As Plaintiff was the only individual with the first name
> "Grant" on the team, he was readily identifiable by all those
> present.  Thus, when Plaintiff was suspended on an interim basis
> approximately one week later, it became public knowledge that
> Plaintiff was being accused of rape.  Significantly, at the time of
> this meeting, the investigation of the charges against Plaintiff was
> still underway and a hearing had not yet been scheduled. …
> [CSUP] evidenced a clear presumption of guilt against Plaintiff,
> prior to the conclusion of the investigation and issuance of a
> decision.

*Id.* at ¶ 315.  Wilson did not have similar meetings with women's teams.  *Id.* at ¶ 316.

Wilson also apparently silenced Coach Wristen when he attempted to speak in Plaintiff's

defense at the November 20, 2015 investigative meeting.  *Id.* at ¶ 131 ("When Coach Wristen

tried to make a statement in Plaintiff's defense, … Wilson responded that he was "The Chief," in

a clear effort to assert his authority over a fellow CSUP colleague.").  Giving reasonable

inferences, Plaintiff alleges that Wilson had already concluded that the football team – not just

individual members thereof –"had a problem" with sexual misconduct and excluded Plaintiff's

relevant witness[12] because he was the coach of that team.  Wilson also "fail[ed] to question a

single witness favorable to Plaintiff.  Depriving Plaintiff of the opportunity to identify witnesses

in support of his defense … Wilson professed that he was in charge of the investigation and

would be the only person to declare someone a witness in this matter."  AC at ¶ 142.

Plaintiff further alleges that Wilson's prejudice against male athletes figured prominently

---

[12] The court infers that Coach Wristen attempted to speak in Plaintiff's defense as a character
witness.  The Board of Governors does not appear to dispute that character witnesses would have
been relevant and permissible.  Doc. #66 at p. 14 n.9.

in Wilson's report, on which the hearing officer relied in finding against Plaintiff.  In his report

for hearing officer DeLuna, Wilson "noted that the subject complaint was one of four (all

involving athletes) that allegedly occurred within the timeframe of October 6 – October 27, 2015

… [and] point[ed] out that three of the four respondents were members of the football team."

AC at ¶¶ 177, 314.  The fourth accused athlete was on the soccer team.  *Id.*[13]  Plaintiff alleges

that the three other complaints "had no bearing on the events at issue or the relationship between

Plaintiff and Jane Doe. … The inclusion of this information demonstrates an inherent prejudice

against male athletes and a sweeping statement of guilt against Plaintiff."  *Id.* at ¶ 177.

Wilson's comments suggest that his investigation and report were infected with

discrimination against Plaintiff as a male athlete (particularly as a member of the football team).

DeLuna then told Plaintiff that she would not consider information that was not in the file from

Wilson or provided at the informal hearing, and on appeal, Humphrey likewise refused to

consider new information – the witnesses of whose percipient knowledge Plaintiff had

previously been unaware.

Taking all of Plaintiff's allegations together –gender-skewed implementation of the 2011

DCL, pressure to avoid DOE investigation and loss of federal funding, procedural shortcomings

against Plaintiff's ability to present evidence and question witnesses, and Wilson's gender-biased

statements – these facts are similar to those in cases that find plausible gender bias allegations.

For instance, in *Brown University*, the disciplined male student alleged statements by a Brown

professor and former employee concerning the school's gender bias regarding sexual misconduct

allegations.  *Brown Univ.,* 166 F. Supp. 3d at 189.  In *Ritter*, the court concluded that a male

graduate student stated plausible selective enforcement and erroneous outcome claims because of

---

[13] Plaintiff does not expressly allege the gender of the soccer player who Wilson mentioned as the fourth, but given his other allegations, particularly ¶ 170, the court infers that it was a male soccer player.

the asserted facts underlying plaintiff's alleged offense, the alleged manner in which the investigation and disciplinary process was conducted, the allegation that females facing comparable disciplinary charges have been treated more favorably than plaintiff and the assertion that, because of his gender, the sanctions imposed on plaintiff were disproportionate to the severity of the charges.

*Ritter*, 2016 WL 3982554 at *2. Substituting the allegation that female respondents received better treatment for Plaintiff's allegations of Wilson's statements, *Ritter's* allegations are akin to Plaintiff's. *See also Williams v. Franklin & Marshall Coll.,* No. Civ. A. 99–0234, 2000 WL 62316, at *1–2 (E.D. Pa. Jan. 13, 2000) (alleged "a witch-hunt against male students on a totally unfounded belief that date-rape activities were rampant …. [which] crusade culminated in utterly false allegations of misconduct against plaintiff," "that males were treated differently from females in disciplinary matters," and the school violated its regulations); *Lynn Univ.*, 2017 WL 237631, at *5; *Salisbury Univ.*, 123 F. Supp. 3d at 768 (allegations that university possessed communications evidencing bias against males accused of sexual misconduct, and use of plaintiff to demonstrate to DOE and the public that the university would aggressively discipline accused males); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 747, 751 (S.D. Ohio 2014) (alleged procedural shortcomings; school made the disciplined male a "scapegoat" in reaction to DOE investigations of the school; and a "pattern of decision-making" reflecting bias on the basis of male gender); *Washington & Lee Univ.*, 2015 WL 4647996, at *10 (alleging procedural shortcomings and biased statements of an official with "considerable influence" over the outcome).

Plaintiff's facts are also similar to *Columbia*, in which the plaintiff alleged the school's Title IX investigator similarly slanted the investigation against the accused male, and the hearing panel erroneously found him responsible on that record because

> having been severely criticized in the student body and in the
> public press for toleration of sexual assault [particularly by male
> athletes] of female students, Columbia was motivated in this
> instance to accept the female's accusation of sexual assault and
> reject the male's claim of consent, so as to show the student body
> and the public that the University is serious about protecting
> female students from sexual assault by male students—especially
> varsity athletes.

*Columbia*, 831 F.3d at 57–58.  While Plaintiff's allegations would be stronger if he alleged (as in

*Columbia)* that CSU-Pueblo had recently been criticized for not taking complaints against male

athletes seriously, the court found such facts were "ample" support, not the minimum necessary

to survive Rule 12.  *Id.* at 57.

The Board of Governors characterizes the *Columbia* decision as an outlier (Doc. #66 at

p.2) and notes that a petition for rehearing or rehearing *en banc* was pending at the time of the

Board's reply.  That petition was subsequently denied.[14]  The Board of Governors further argues

that *Columbia* erred in finding that the Title VII *McDonnell Douglas* standard for pleading

discrimination[15] applies to Title IX claims.  Doc. #66 at p. 7.  The court need not resolve that

question because Plaintiff's allegations go well beyond "facts supporting a minimal plausible

inference of discriminatory intent."  *Columbia,* 831 F.3d at 55.  In addition, several courts cite

*Columbia* as a correct statement of the law and either rely on it in finding similar allegations

plausible (*see, e.g., Lynn Univ.,* 2017 WL 237631, at *5), or distinguish it with good reason on

the facts.  *Cummins*, 2016 WL 7093996, at *13; *Baum*, 2017 WL 57241, at *24–25.

The Board of Governors also cites a case that disagrees with *Columbia's* pleading

---

[14] Plaintiff moved for leave to supplement his response to indicate that the Second Circuit denied
the petition *en banc*.  Doc. #67.  None of the Defendants responded to the motion.  Plaintiff's
motion to supplement is granted.

[15] The Tenth Circuit generally applies Title VII's legal principles to Title IX claims.  *Gossett v.
Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally
assessed Title IX discrimination claims under the same legal analysis as Title VII claims,"
quoted in *Johnson*, 71 F. Supp. 3d at 1224).

standard: *Austin v. University of Oregon.  Austin* declined to follow *Columbia's* extension of *McDonnell-Douglass* as putting universities in a "double bind" in which they are susceptible to being sued for either not responding to alleged sexual assault aggressively enough or for "simply … enforcing rules against alleged perpetrators."  *Austin,* 2016 WL 4708540, at *9.  This statement may be *dicta,* given the paucity of facts alleged in *Austin* for gender bias.  *Id.* at *8–9.  Regardless, *Austin* is not persuasive on this point.  In holding that schools can be subject to money damages regarding peer-to-peer sexual harassment under Title IX, the Supreme Court noted that "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a [school's] response [to alleged harassment] as not "clearly unreasonable" as a matter of law."  *Davis*, 526 U.S. at 649.  *Columbia's* pleading standard is consistent with *Yusuf* and *Davis*.

Plaintiff's fact allegations also distinguish this case from *Cummins*, in which the plaintiff alleged only generic pressure from the 2011 DCL and DOE enforcement for the school to find against men accused of nonconsensual sex.  Plaintiff's allegations distinguish this case from *Johnson* and others in which the plaintiff alleged only (a) that he was male and the other persons involved in the disciplinary proceeding were female, (b) a disproportionate effect in most respondents being male, or (c) assertions of officials attempting to intimidate or use flawed procedures against the accused without being suggestive of gender bias.  *See, e.g., Johnson,* 71 F. Supp. 3d at 1225-26; *W. New England Univ.,* 2017 WL 113059, at *28; *Painter v. Doe,* No. 3:15–cv–369–MOC–DCK, 2016 WL 4650045, at *12 (W.D.N.C. Aug. 1, 2016), *rec. adopted*, 2016 WL 4644495 (W.D.N.C. Sept. 6, 2016) (factual allegations supported that plaintiff was treated differently than the female complainant, but no facts linking the different treatment to the gender bias that plaintiff alleged only conclusorily); *Doe v. Case W. Reserve Univ.*, No. 1:14–

cv–2044, 2015 WL 5522001, at *5 (N.D. Ohio Sept. 16, 2015) (alleged only the gender of

complainant, procedural flaws, hostility toward plaintiff in the proceeding, and disparate impact);

*Blank v. Knox Coll.,* No. 14–cv–1386, 2015 WL 328602, at *2 (C.D. Ill. Jan. 26, 2015) (plaintiff

alleged procedural flaws in the proceeding but no facts to link those flaws to his gender); *Univ.*

*of the S.,* 687 F. Supp. 2d at 756 (plaintiff alleged procedural flaws in the proceeding but no facts

to link those flaws to his gender).[16]

    The Board of Governors further argues for dismissal under *Iqbal* because there are

"obvious [lawful] alternative explanation[s]" for the school to have decided against Plaintiff, and

for Title IX's disproportionate impact on males: the fact that most sexual assault complaints are

made by females against males."  Doc. #66 at pp. 4, 5 (quoting *Iqbal,* 556 U.S. at 682).  This is

the same interpretation of *Iqbal* that *Columbia* rejected.  This interpretation of *Iqbal* asks the

court to disbelieve or infer against Plaintiff, which the court cannot do on Rule 12(b)(6) motions.

*See, e.g., Sanchez,* 810 F.3d at 754 (the court must construe reasonable inferences from the fact

allegations in the light most favorable to the non-moving party); *Brown Univ.,* 166 F. Supp. 3d at

188.  Plaintiff does not allege facts that suggest an equally likely, lawful explanation for CSU-

Pueblo's allegedly gender-skewed implementation of the 2011 DCL, procedural shortcomings

and Wilson's statements.  Nor does Plaintiff's claim rest on merely disproportionate impact.

    The Board of Governors further argues that the link between the alleged shortcomings in

the disciplinary matter and Plaintiff's gender is only "inferential and conclusory."  Doc. #66 at p.

5.  Alleging causation through reasonable inferences from non-conclusory fact allegations is

---

[16] Although the court does not reference each of the numerous cases that the Board of Governors
cites regarding this issue, the court has read and considered all of them, and notes that two of
those cases are summary judgment decisions that review evidence (and lack thereof).  *Xiaolu*
*Peter Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015); *Haley v. Virginia Com.*
*Univ.,* 948 F. Supp. 573, 578 (E.D. Va. 1996) (finding plaintiff adequately stated the claim, but
failed to prevent evidence to survive summary judgment).  None of the Board's cases involve
allegations that are so similar to Plaintiff's as to persuade the court that dismissal is appropriate.

sufficient to survive Rule 12(b)(6).  *See, e.g., Yusuf,* 35 F.3d at 715 (must plead causal

connection through the types of facts that would allege a Title VII claim, such as statements that

tend to show the influence of gender in the proceeding).[17]  The Board of Governors' argument

ignores that Plaintiff alleges that the school used him to show DOE/OCR its willingness to

discipline men accused of sexual misconduct; specific gender-biased statements of the

investigator; the investigator's statement that only he would decide who the witnesses were; the

lack of a formal hearing and short notice of the informal one, etc.  The Board of Governors'

characterization of these allegations as only speculation or innuendo (doc. #27 at p. 6) ignores

that Plaintiff alleges *conduct*, not just his belief of what these officials were thinking.  The

allegations are not conclusory regarding causation.

Finally, the foregoing *Yusuf* analysis is equally consonant with *Ross's* standard (based on

*Davis)* of "intentionally biased student conduct proceedings, or clearly unreasonable methods of

handling student reports of sexual violence."  *Ross*, 180 F. Supp. 3d at 970 (citing *Davis,* 526

U.S. at 642).  Plaintiff's non-conclusory allegations discussed in this recommendation plausibly

demonstrate that the proceeding was intentionally biased and used clearly unreasonable methods

in responding to Plaintiff's alleged sexual misconduct.

In sum, Plaintiff alleges that CSU-Pueblo disciplined him, at least in part, because

Plaintiff was a male athlete and erroneously on the facts.  He alleges detailed facts that show

reason to doubt the accuracy of the decision.  He also alleges detailed facts supporting his

allegation that gender bias infected the proceeding and decision.  These suffice to suggest "that

the discipline occurred 'because ... of sex.'"  *Johnson*, 71 F. Supp. 3d at 1226.  Plaintiff's Title

---

[17] To the extent that the Board of Governors means that the allegations do not support but-for causation, *Yusuf* only requires that gender bias be a "motivating factor."  *Yusuf,* 35 F.3d at 715. *See also Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2522–23 (2013) (for Title VII, "[i]t suffices … to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

IX claim is plausible, and the court recommends denial of the Board of Governors' motion to dismiss this claim.

>    C.    *14th Amendment Procedural Due Process Claim*

Plaintiff brings his second claim for relief against the State Defendants, alleging that they violated his procedural due process rights under the Fourteenth Amendment to the U.S. Constitution.  Plaintiff seeks damages.  Through his claim for declaratory judgment, Plaintiff also seeks injunctive relief to redress the alleged due process violations.  AC at ¶¶ 415–419.[18]

>    1.    *The Claim for Damages: Eleventh Amendment Immunity*

Regarding this claim for damages, the Board of Governors argues Eleventh Amendment immunity for itself and the state individuals in their official capacities, citing *Edelman v. Jordan,* 415 U.S. 651, 662–63 (1974).  Doc. #27 at p. 13, n.9.[19]  Plaintiff did not respond to this argument.  In his response, he argues he is entitled to damages without specifying under which claim or claims he seeks those damages.  Doc. #55 at p. 10.

> The Eleventh Amendment bars a suit for damages against a state in federal court, absent a waiver of immunity by the state. … Congress did not abrogate state Eleventh Amendment immunity when it enacted § 1983 …; however, that immunity extends only to the states and governmental entities that are "arms of the state." ... The arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states.

*Watson v. Univ. of Utah Med. Ctr.,* 75 F.3d 569, 574–75 (10th Cir. 1996) (citing *inter alia Edelman,* 415 U.S. at 663).

---

[18] The AC refers only to the Fourteenth Amendment for this claim, but the Amendment does not itself provide a right of action.  U.S. Const. amend. XIV § 5.  The private right of action is in 42 U.S.C. § 1983.

[19] State Defendants also briefed the qualified immunity defense, but this doctrine applies only to government officials in their individual capacities.  *See, e.g., Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014).  Because Plaintiff has since dismissed the individual State Defendants in their individual capacities, the court need not address this argument.

> The analysis requires an examination of three factors: (1) the
> state's legal liability for a judgment; (2) the degree of autonomy
> from the state—both as a matter of law and the amount of guidance
> and control exercised by the state; and (3) the extent of financing
> the agency receives independent of the state treasury and its ability
> to provide for its own financing.

*U.S. ex rel. Ruotsinoja v. Bd. of Governors of the Colo. State Univ. Sys.,* 43 F. Supp. 3d 1190,

1193 (D. Colo. 2014) (internal quotation marks omitted).  In *Ruotsinoja,* the court analyzed the

above factors, found the Board of Governors was an arm of the state, and granted dismissal due

to Eleventh Amendment immunity.  *Id.*

Here, State Defendants do not address whether the pertinent facts have remained the

same since *Ruotsinoja.*  However, "addressing the threshold jurisdictional matter [is] obligatory"

if "directly asserted" by a state defendant.  *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942

(10th Cir. 2008).  Courts have typically not re-analyzed the arm-of-state factors where recent

caselaw found the government entity was an arm of state.  *See, e.g., Jemaneh v. Univ. of Wyo.*,

82 F. Supp. 3d 1281, 1302–03 (D. Colo.), *aff'd,* 622 F. App'x 765 (10th Cir. 2015), *cert. denied,*

136 S. Ct. 2419 (2016); *Harold v. Univ. of Colo. Hosp.,* No. 15–cv–01919–GPG, 2016 WL

741031, at *2–3 (D. Colo. Feb. 25, 2016); *Englehart v. Bd. of Regents for the Okla. Agric. &

Mech. Colls.,* No. 15– cv–138–JED–PJC, 2016 WL 3645193, at *3 (N.D. Okla. June 30, 2016)

("The Tenth Circuit has "consistently held" that state colleges and universities—as well as their

governing boards of regents—are arms of the state and therefore enjoy Eleventh Amendment

immunity").

The Board of Governors is an arm of the state, and Plaintiff does not argue that the Board

has waived its immunity. *Ruotsinoja,* 43 F. Supp. 3d at 1193.  The claims against Wilson,

DeLuna, DiMare, Blakey and Humphrey in their official capacities are treated as the same as a

claim against the Board of Governors.  Accordingly, the court recommends dismissing the due

process claim for damages due to Eleventh Amendment immunity.  The dismissal should be without prejudice because the court lacks jurisdiction over the claim.  *See, e.g., Amin v. Voigtsberger,* 560 F. App'x 780, 783 (10th Cir. 2014).

2.     <em>The Claim for Injunctive Relief.</em>

As to the individual State Defendants in their official capacities, just as with Plaintiff's Title IX claim, the claim is duplicative of Plaintiff's claim against the Board of Governors.  The court recommends granting the motion to dismiss Wilson, DeLuna, DiMare, Blakey, and Humphrey in their official capacities from the due process claim for injunctive relief.  Thus, the only part of Plaintiff's due process claim that remains for Rule 12(b)(6) analysis is the claim for injunctive relief against the Board of Governors.[20]

Plaintiff asserts that CSU-Pueblo deprived him of procedural due process because of bias and several procedural flaws.  AC at pp. 23–43, ¶¶ 108–188; ¶¶ 339–44.  Plaintiff asserts both a liberty interest and property interest.  *Id.* at *e.g.,* ¶¶ 337, 338, 343, 348.  "The Fourteenth Amendment provides that a state shall not 'deprive any person of life, liberty, or property, without due process of law.'"  *Brown v. Univ. of Kan.,* 599 F. App'x 833, 837 (10th Cir. 2015) (quoting *Lauck v. Campbell Cty.,* 627 F.3d 805, 811 (10th Cir. 2010); U.S. Const. amend. XIV, § 1).  "Under this amendment, we address two questions.  The first is whether a liberty or property interest exists.  The second is whether the State provided sufficient procedures."  *Brown,* 599 F. App'x at 837.  The Board of Governors does not dispute that Plaintiff adequately alleges liberty and property interests for which he is entitled to due process.  The Board argues that Plaintiff's due process claim fails because it provided sufficient procedures.[21]  "The question then becomes

---

[20] As noted *supra*, Plaintiff seeks restoration of his reputation, expungement and readmission to CSU-Pueblo.  AC at ¶ 419.

[21] The court infers that the Board of Governors is arguing Plaintiff cannot show he is likely to suffer a due process violation if the court orders readjudication.

the adequacy of the procedures." *Id.*

The U.S. Supreme Court has not yet addressed what process is due to students who face the potential for expulsion or suspensions of more than ten days, but they are entitled to at least the process that the Court has required for shorter suspensions:

> Due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Goss v. Lopez,* 419 U.S. 565, 581 (1975).  *Goss* also "explained that '[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.'"  *Watson ex rel. Watson v. Beckel,* 242 F.3d 1237, 1240 (10th Cir. 2001) (citing *Goss*, 419 U.S. at 584).

In *Watson*, the Tenth Circuit followed other circuits in applying the balancing test of *Mathews v. Eldridge,* 424 U.S. 319 (1976) to school disciplinary proceedings that result in longer-term suspensions "because the test crystallizes the balancing of student interests against school interests suggested in the *Goss* decision."  *Watson*, 242 F.3d at 1240.  Hence,

> [w]hen a university considers expulsion [or suspensions longer than 10 days], it must use procedures accounting for the conflicting interests.  To consider those interests, we weigh (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail.  The objective is to ensure balancing of the students' interest in unfair or mistaken exclusion from the educational process and the school's interest in discipline and order.

*Brown,* 599 F. App'x at 837 (internal quotation marks and citations omitted, citing *Watson*).

Although *Goss* noted "that severe disciplinary action could require 'more formal procedures,'

[that is] not necessarily the equivalent of a trial." *Id.*  Due process is "flexible and calls for such

procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471,

481 (1972).  "[T]he very nature of due process negates any concept of inflexible procedures

universally applicable to every imaginable situation." *Bd. of Curators of Univ. of Missouri v.

Horowitz*, 435 U.S. 78, 85–86 (1978) (internal quotation marks omitted).

     Here, "the private interest that will be affected by the official action" is substantial.  In a

case where a graduate student "faced expulsion [in a disciplinary proceeding] … his private

interest was exceptionally robust." *Siblerud v. Colo. State Bd. of Agri.,* 896 F. Supp. 1506, 1516

(D. Colo. 1995).[22]  The Board of Governors does not dispute that Plaintiff has a significant

property interest in continuing to attend university at CSU-Pueblo and in his tuition payments

made to date.

> The … private interest involved in this case is the right to remain
> at a public institution of higher learning in which the plaintiffs
> were students in good standing.  It requires no argument to
> demonstrate that education is vital and, indeed, basic to civilized
> society.  Without sufficient education the plaintiffs would not be
> able to earn an adequate livelihood, to enjoy life to the fullest, or to
> fulfill as completely as possible the duties and responsibilities of
> good citizens.

*Dixon v. Ala. State Bd. of Ed.,* 294 F.2d 150, 156–57 (5th Cir. 1961).  Plaintiff is subject to a

long-term suspension from the university for as long as Jane Doe is a student at CSU-Pueblo.

Plaintiff alleges that "[h]e is unable to transfer to a comparable undergraduate institution because

of the erroneous disciplinary finding." AC at ¶ 348.

     Nor does the Board of Governors dispute that Plaintiff's liberty interest in his good name,

reputation and integrity adds further weight to his interests that were at stake in the proceeding.

---

[22] In *Siblerud,* the court dismissed the claim as barred by a statute of limitations, but also
addressed the merits of the student's claim "to stave off similar controversies before they find
their way into court."  896 F. Supp. 2d at 1508.  The court's discussion of the merits may be
*dicta,* but the court finds *Siblerud's* reasoning in applying the *Mathews* test persuasive.

Plaintiff alleges that because the proceeding resulted in a false finding that he had raped Jane

Doe, the alleged gender bias and procedural flaws in that proceeding wrongly deprived him of

his "protected liberty interest in his good name, reputation, honor, and integrity." AC at ¶ 329.

He further claims that "[t]he allegations in th[e disciplinary proceeding] … case resulted in a

sanction [multi-year suspension] that will have lifelong ramifications for Plaintiff, and are quasi-

criminal in nature." *Id.* at ¶ 339. In addition to being unable to transfer to another school,

Plaintiff alleges that "[h]is lifelong goal of becoming of an orthopedic surgeon has been

shattered." *Id.* at ¶ 348.

      The Board of Governors does not point to any case within the Tenth Circuit that

addresses a similar combination of serious property and liberty interests in a disciplinary

proceeding. Plaintiff does: *Tonkovich v. Kansas Board of Regents,* 159 F.3d 504 (10th Cir.

1998). In that case, a male professor had been accused of sexual misconduct with students and

was dismissed after a pre-termination hearing. He alleged due process violations regarding his

property interest in continued employment and his liberty interest in his reputation and good

name. *Id.* at 525–26. The university had already provided full notice of the charges, the identity

of adverse witnesses, and a trial-like evidentiary hearing at which the plaintiff cross-examined

the adverse witnesses. *Id.* at 520–21. Since the university had already provided full, formal

procedures, the court had no occasion to analyze whether the combination of the two serious

interests had made all of those procedures necessary for due process. *Tonkovich* does not

suggest the Tenth Circuit would disagree with finding Plaintiff's combined property and liberty

interests result in a greater personal interest for the *Mathews* balancing test. *See also George

Mason Univ.,* 149 F. Supp. 2d at 622 ("common sense suffices to understand that an adjudication

of responsibility for sexual misconduct carries a much more powerful stigma than an

adjudication of run-of-the-mill assault or vandalism").

To address the "probable value" of the procedures that Plaintiff alleges he should have been provided, and CSU-Pueblo's interest in those procedures, the court must look at the specific procedures at issue.  In his Amended Complaint, Plaintiff does not state whether he claims all or only some of the numerous, alleged shortcomings violated his due process.  *See also* Doc. #55 (Response) at pp. 2–10, 23–27.  In its motion, the Board of Governors addresses a few of those shortcomings, but primarily argues at a generic level that due process required only notice and an opportunity to be heard, and in its view, Plaintiff received both.  Doc. #27 at pp. 17–18.  In his response, Plaintiff summarizes his due process rights that he claims were violated:

> (i) the right to written notice of the charges against him; (ii) a hearing before an impartial tribunal; (iii) the right to question one's accuser; (iv) the right to challenge the credibility of witnesses; and (v) the right to present evidence and witnesses in support of his defense.

Doc. #55 at p. 25 (citing AC at ¶ 343).  However, Plaintiff does not apply any legal authorities to these particular procedures.  The summary also omits several procedural flaws that elsewhere in the same response he argues are due process violations.  Doc. #55 at pp. 7, 9, 17, 25, 27.

Based on Plaintiff's response, the court understands Plaintiff to assert that he suffered the following due process violations: (1) inadequately detailed notice of the charges; (2) lack of impartiality due to bias in CSU-Pueblo's self-interest in protecting its reputation and its federal funding; (3) an interim suspension that was unwarranted under the Code or Policy; (4) untimely and inadequate notice of the allegations to be considered at the informal hearing; (5) lack of a formal or evidentiary hearing, including the rights to (i) question Plaintiff's accuser (the Complainant), (ii) question the persons whom Wilson had interviewed, and (iii) present evidence and witnesses in support of Plaintiff's defense; (6) failure to use "an adequate standard of

review," *i.e.,* using the preponderance standard instead of "clear and convincing" and ultimately

not following even the preponderance standard; (7) lack of fact findings and reasoning in the

Decision; and (8) his appeal was heard by an official who was involved in the earlier phases of

the proceeding.[23]  The court recommends denying the motion to dismiss as to the procedures in

(6), (7) and (8) because the Board of Governors did not address these issues in its motion or

reply.

> *Notice of charges.*  Plaintiff contends that he

>> was not provided written notice of the charges when Defendant
>> Humphrey vaguely informed him that he was "being investigated
>> for possible alleged violation of the *Code of Student Conduct*
>> including Non-consensual Contact and Non-Consensual Sexual
>> Intercourse." [sic]. The notice did not properly identify which
>> specific provisions Plaintiff allegedly violated, citing only to
>> CSUP's general Policy.

Doc. #55 (Response) at p. 24 (citing AC at ¶ 117).  However, the court has jurisdiction over the

due process claim only as to injunctive relief going forward as to the "permanency, and future

handling of Plaintiff's formal student record at CSUP."  AC at ¶ 418.  Plaintiff is now aware of

the allegations from receiving a copy of the Wilson report.  Assuming Plaintiff proves his claims,

the court may order CSU-Pueblo to re-adjudicate the disciplinary proceeding; in that case, the

allegations in the Wilson report are the allegations that would be at issue in the re-adjudication.

Because of Eleventh Amendment immunity, the court does not have jurisdiction to decide

whether CSU-Pueblo's notice of the charges violated due process.  *See, e.g., Jemaneh,* 82 F.

Supp. 3d at 1303 (Eleventh Amendment immunity "applies to preclude a plaintiff from seeking a

declaration that a state officer has violated federal rights in the past").  If the court did have

jurisdiction over this issue, the court would recommend dismissing this part of the claim because

---

[23] Plaintiff may allege additional procedural aspects for this claim, but the court is concerned
here only with the allegations that are briefed.

any additional detail regarding specific sections of the Code would have little probable value for avoiding an erroneous result.  *See, e.g., Watson*, 242 F.3d at 1241.

*Biased proceeding.*  Based on the same allegations that support his Title IX claim, Plaintiff alleges that he was deprived of his procedural right to a decision from an impartial tribunal.  That is, he alleges that Wilson stacked the investigation against him and indicated in statements in the investigation that he already considered Plaintiff guilty.  Wilson wrote an investigatory report giving his conclusions that witnesses with no direct knowledge were more credible than both of the persons who were personally involved (Jane Doe and Plaintiff).  Plaintiff further alleges that Wilson ignored the physical evidence that was consistent with Plaintiff's and Jane Doe's versions of the story.  DeLuna and Humphrey then refused to consider any evidence other than Wilson's report.  Plaintiff alleges all three acted in CSU-Pueblo's self-interest in protecting its reputation and its federal funding from DOE/OCR's enforcement of the 2011 DCL.[24]

Applying the *Mathews* balancing test to a claim of bias is awkward.  The probative value of impartiality for avoiding erroneous decisions is unquestionably high; it is the bedrock for all procedures requisite to due process.  The Board of Governors does not articulate any interest it would have in not providing an impartial investigation and tribunal for disciplinary proceedings. The Board of Governors points to a presumption of honesty and integrity, citing *Mangels v. Pena,* 789 F.2d 836, 838 (10th Cir. 1986), and argues a "substantial showing of personal bias" is required for this claim, such as a "pecuniary interest in the outcome."  Doc. #27 at p. 17 (citing

---

[24] The Board's motion did not address Plaintiff's allegations that this arrangement was also biased because the roles of investigator, prosecutor and judge overlapped.  AC at *e.g.,* ¶¶ 154–168.  *See also* Doc. #55 (Plaintiff's response) at pp. 2, 6–9, 17 (citing a criminal case, *Tumey v. Ohio*, 273 U.S. 510, 534 (1927)).  The Board of Governors asserts only that the allegation regarding Wilson's bias in the investigation is conclusory as to discriminatory motive.  Doc. #66 at pp. 2, n.1.  The parties' briefing of this issue for the due process claim is too cursory for the court to resolve on the present motion.

*inter alia Corstvet v. Boger,* 757 F.2d 223, 229 (10th Cir. 1985); *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)).

In the Tenth Circuit, a due process claim regarding bias in a proceeding requires more than just investigators' statements on the merits. *See, e.g., Staton v. Mayes,* 552 F.2d 908, 914–15 (10th Cir. 1977). "[S]tatements on the merits [before the decision] by those who must make factual determinations on contested fact issues … where the fact finding is critical" would clearly suffice, *Id.,* but Plaintiff does not allege that DeLuna or Humphrey made such statements. He does allege that Humphrey's issuance of the interim suspension – when unwarranted under the Code or Policy – indicates she had already decided against him. Giving Plaintiff the reasonable inferences from his fact allegations (AC at ¶¶ 130, 160), that may support this claim. *Cf., Doe v. Rector & Visitors of George Mason Univ.,* 149 F. Supp. 3d 602, 620 (E.D. Va. 2016).

More importantly, "the issue is whether [CSU-Pueblo] … 'had some personal or financial stake in the decision that might create a conflict of interest.'" *Crawford v. Deer Creek Pub. Sch.,* No. Civ–16–751–R, 2017 WL 150035, at *4 (W.D. Okla. Jan. 13, 2017) (quoting *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Ed. Ass'n,* 426 U.S. 482, 491–92 (1976)). If Plaintiff's allegations of CSU-Pueblo's self-interest were conclusory, this would not suffice. *See, e.g., Riggins v. Goodman,* 572 F.3d 1101, 1113 (10th Cir. 2009); *Brown,* 599 F. App'x at 838. But Plaintiff alleges facts that if true would be a "substantial showing" of bias: CSU-Pueblo's self-interest in its reputation and federal funding. As noted *supra,* Plaintiff alleges facts regarding DOE/OCR's enforcement of the 2011 DCL that coerced schools such as CSU-Pueblo to find accused males guilty, particularly male athletes. The Board of Governors as the movant bears the burden of proving it is entitled to dismissal, and it has not persuaded the court as to this issue.

*Interim suspension unwarranted under the Code or Policy, and inadequate notice of informal hearing.*[25]  Plaintiff bases this part of the claim on the Code or Policy.  As the Board of Governors argues, "the university's "failure to follow its own regulations does not, by itself, give rise to a constitutional violation." *Brown*, 599 F. App'x at 838 (citing *inter alia Horowitz,* 435 U.S. at 92 n. 8; *Trotter v. Regents of the Univ. of N.M.,* 219 F.3d 1179, 1185 (10th Cir. 2000)). "[E]ven in the disciplinary context, a school's failure to comply with its own rules does not, in itself, constitute a violation of the Fourteenth Amendment." *Id.* (internal quotation marks omitted).  Indeed, "[t]he Due Process Clause ... does not require the University to follow any specific set of detailed procedures as long as the procedures the University actually follows are basically fair ones...." *Brown*, 599 F. App'x at 838 (internal quotation marks omitted). *See also Jemaneh*, 82 F. Supp. 3d at 1301 (citing *Trotter*).  CSU-Pueblo's failure to follow its Code or Policy does not support a due process claim.

*Lack of a formal or evidentiary hearing,* including the rights to (i) question Plaintiff's accuser (the Complainant), (ii) question the other persons whom Wilson had interviewed, and (iii) present evidence and witnesses in support of Plaintiff's defense.  The probable values of allowing Plaintiff a hearing or meeting with the decisional officer, to question the persons whom Wilson had interviewed, to present his own witnesses, and to present documentary evidence are each high in this case.  Plaintiff denies that he engaged in nonconsensual sex with Jane Doe and asserts that Jane Doe agreed that their sexual encounter was consensual.  Plaintiff claims that the Complainant, the Clarks, and the other unidentified witnesses in the report had no direct knowledge of the alleged incident with Ms. Doe.  He also alleges the Clarks had a conflict of interest.  If there had been an in person meeting for each of these persons to tell their side of the

---

[25] As to the untimeliness of the notice of informal hearing, the Board of Governors does not address this issue, and the court therefore recommends denying the motion as to that issue.

story to the decisional officer, and for Plaintiff to ask or suggest questions regarding the indirect nature of the testimony from all but Jane Doe and the alleged conflict of interest, that would have made the allegedly erroneous decision less likely.  The same is true of Plaintiff's documentary evidence; allowing Plaintiff to present the audio recording, snapchats, text messages, etc., instead of apparently only reading Wilson's report, would make an erroneous decision less likely.[26]

The Board of Governors however argues in its reply that Plaintiff never attempted to present witnesses in his defense.  Giving reasonable inferences, Plaintiff brought Coach Wristen to the second meeting with Wilson as both an advisor and as a character witness.  Wilson also told Plaintiff that only *Wilson* would decide who the witnesses were (Doc. #55 at p. 25 (citing AC at ¶ 142); this preemptively prevented Plaintiff from attempting to bring witnesses to the later meetings, including with DeLuna.  And when he asked at the "informal hearing," DeLuna told Plaintiff that she would not consider any information outside of Wilson's report and that hearing.  Doc. #55 at p. 24; AC at ¶¶ 137, 139.  Plaintiff also attempted to present his roommates on his appeal, and Humphrey would not consider them despite their percipient knowledge being previously unknown to Plaintiff.

The Board of Governors appears to argue that despite Wilson's instructions, Plaintiff nonetheless had to bring his witnesses to the meetings with Wilson and DeLuna to preserve this claim.  If the disciplinary matter had been in a court of law, that may have been true.  In court, a plaintiff can be expected to make "offers of proof" to preserve errors for appeal.  But the Board's entire argument regarding this claim is that the disciplinary proceeding is not subject to the

---

[26] At some point, Wilson also "disregarded overwhelming physical evidence tending to exculpate Plaintiff, including a voice recording of Jane Doe stating nothing improper had occurred, hand written letters, snap chats, numerous text messages and a subsequent sexual encounter less than 24 hours after the alleged Incident."  AC at ¶ 185.  The Amended Complaint leaves somewhat unclear whether Plaintiff attempted to present that evidence to DeLuna, but given his other allegations (*Id.* at ¶ 308), the court will infer that he did.

procedures required in a court of law.  Surely if CSU-Pueblo was not required to provide the protections of trial procedures, Plaintiff was not required to prosecute his defense according to trial procedures either.  The same is true as to whether Plaintiff requested to question the adverse witnesses.  Because of Wilson's previous comments regarding Wilson's control over who CSU-Pueblo would consider as witnesses, and CSU-Pueblo not calling any witnesses at the informal hearing, Plaintiff does not have to allege that he either brought witnesses with him or requested to question the adverse witnesses.  *Cf., Siblerud,* 896 F. Supp. at 1517, nn. 25, 26.

As for CSU-Pueblo's interest in not providing a hearing for witnesses to testify in Plaintiff's presence and be subject to cross-examination – these procedures would no doubt increase the resources that CSU-Pueblo spent on the proceeding.  In support of its not doing so, CSU-Pueblo cites cases that hold cross-examination of witnesses is not generally a due process required in school disciplinary actions.  Doc. #27 at p. 17 (citing *Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir. 1993); *Sterrett v. Cowan*, 85 F. Supp. 3d 916, 929 (E.D. Mich. 2015)); Doc. #66 at p. 13 (citing *Watson; Gaspar v. Bruton,* 513 F.2d 843 (10th Cir. 1975)).

But to say that cross-examination is not *generally* required is quite different from saying that as a matter of law, it was not required here.  *See, e.g., George Mason Univ.,* 149 F. Supp. 3d at 622.  In *Osteen*, the student had pled guilty to the underlying crime (assaulting two men outside a bar).  *Osteen*, 13 F.3d at 225.  The court therefore did not need to address whether cross-examination could ever be necessary due to credibility issues, etc.  The record was void of evidence that the school had an incentive to "jerry-rig" disciplinary proceedings against students.  *Id.* at 226.  Here, in contrast, Plaintiff alleges facts that support CSU-Pueblo does have such an incentive as to male students accused of sexual misconduct.  The *Osteen* court noted that the school's sanction had not prevented the student from enrolling in another college, thus he did not

need the "procedural protections thought necessary in litigation because large interests of liberty or property may be at stake." *Id.* Here, Plaintiff plausibly alleges under Tenth Circuit law that "large interests of liberty [and] property" were at stake.

Like *Osteen,* the plaintiff in *Watson* admitted the underlying fact that caused his expulsion. *Watson,* 242 F.3d at 1242 (assault of roommate). Also like *Osteen*, *Watson* argued only a property interest in continuing to attend a public school; he did not argue a liberty interest in his reputation and good name. *Cf., George Mason Univ.,* 149 F. Supp. 3d at 621–22 (distinguishing *Watson*). Similarly, *Gaspar* did not purport to decide the due process question in a context like Plaintiff's. The Board of Governors cites the case as having dismissed a claim that was based in part on the inability to cross-examine witnesses.[27] Yet *Gaspar* regards an academic decision. *Gaspar,* 513 F.2d at 850–51. Due process for disciplinary proceedings is more extensive than for academic decisions. *Brown,* 599 F. App'x at 837 (citing *Harris v. Blake,* 798 F.2d 419, 423 (10th Cir. 1986)); *see also Jemaneh,* 82 F. Supp. 3d at 1301. Finally, *Sterrett v. Cowan*, 85 F.Supp.3d 916, 929 (E.D. Mich. 2015) was vacated without an opinion, immediately before the Sixth Circuit dismissed the appeal from that decision.

In ruling that cross-examination was not required due process in a disciplinary proceeding that found the student had engaged in sexual misconduct, *Sterrett* relies on *Flaim v. Medical College of Ohio,* 418 F.3d 629, 636 (6th Cir. 2005). *Flaim* recognizes that under the *Mathews* test,

> An accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence. It may also include the right to call exculpatory witnesses. ... Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases.

---

[27] The opinion also appears to reflect that the college did permit the student's counsel to cross-examine witnesses at the hearing. *Gaspar,* 513 F.2d at 848.

*Flaim*, 418 F.3d at 636 (collecting cases).  In *Flaim*, the court found a medical student who had

been convicted of a felony did not have a right to cross-examine the arresting officer in his

disciplinary hearing.  But the court reached that conclusion because

> at the hearing and prior to addressing the committee, Flaim was
> able to listen to and observe the officer's testimony.  Flaim then
> had the opportunity to present his version of events, during which
> he had the opportunity to point out inconsistencies or
> contradictions in the officer's testimony.  * * * The Second Circuit
> has … recognized that "[t]he right to cross-examine witnesses
> generally has not been considered an essential requirement of due
> process in school disciplinary proceedings." ... Nonetheless, the
> court noted that "if this case had resolved itself into a problem of
> credibility, cross-examination of witnesses might have been
> essential to a fair hearing." ... [I]n Flaim's case, it was not a choice
> between believing an accuser and an accused, where cross-
> examination is not only beneficial, but essential to due process.
> Rather … Flaim does not deny his felony conviction.

*Flaim*, 418 F.3d at 641 (citing *Winnick v. Manning,* 460 F.2d 545, 549–50 (2d Cir. 1972)).

Here, the Board of Governors did not hold a hearing for witnesses to testify with Plaintiff

present; Plaintiff's private interest to avoid an erroneous finding that he had raped Ms. Doe –an

allegation that he consistently denies and for which he apparently was never criminally

investigated or charged – is arguably even stronger than Flaim's interest, because Flaim admitted

his felony conviction.  In addition, unlike *Flaim* and *Winnick*, Plaintiff's allegations plausibly

support that the disciplinary proceeding did "resolve[] into a problem of credibility, [such that]

cross-examination of witnesses might have been essential to a fair hearing."  *Cf., Siblerud,* 896 F.

Supp. at 1517, n. 25 (suggesting that a graduate student facing expulsion should have been

allowed to "confront witness[es] and other evidence.").

Higher courts consistently admonish that due process jurisprudence cannot be applied

woodenly.  *See, e.g., Goss,* 419 U.S. at 578; *Morrissey,* 408 U.S. at 481; *Williams v.*

*Pennsylvania*, 136 S. Ct. 1899, 1922 (2016) (J. Thomas, dissenting, citing *Cafeteria Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895 (1961)); *Betterman v. Montana*, 136 S. Ct. 1609, 1619 (2016) (J. Sotomayor, concurring, citing *Morrissey*); *Harris*, 798 F.2d 419, 423 (10th Cir. 1986) (quoting *Cafeteria Workers*).  In light of the seriousness of Plaintiff's private interests at stake, and the foregoing legal authorities, the Board of Governors has not shown it is entitled to dismissal of the due process claim regarding Plaintiff's right to a hearing in which to question witnesses, present witnesses and present other evidence.  *See also Doe v. Alger,* 175 F. Supp. 3d 646, 661–662 (W.D. Va. 2016) (male student adequately alleged procedural due process violation where appeal panel reversed a decision that cleared the student of alleged rape, without hearing live testimony despite credibility issue); *Doe v. Alger,* – F. Supp. 3d –, 2016 WL 7429458, at *14-16 (W.D. Va. Dec. 23, 2016) (granting summary judgment to student); *George Mason Univ.,* 149 F. Supp. 3d at 614-622 (granting disciplined male's summary judgment motion for due process violations of liberty interest in, *inter alia*, issuing decision "devoid of explanation," lack of notice regarding certain allegations on appeal; and "impermissibly biased decision makers").  In short, the court concludes that the Board of Governors has not shown that this aspect of the due process claim fails as a matter of law in the Tenth Circuit; the issue is better addressed on a factual record.

      D.     *Breach of Contract and Covenant of Good Faith and Fair Dealing*

     The Board of Governors[28] also seeks dismissal of Plaintiff's breach of contract and covenant of good faith claims, arguing that the Code and Policy are not contracts.

> The basic relationship between a student and an educational institution is contractual in nature. … Materials actually provided to a student, including enrollment agreements and catalogs, may become part of the agreement.

---

[28] Although the title of this claim (and Plaintiff's other state law claims) states it is against the "CSUP Defendants," the only Defendant whom he alleges in the claim is CSU-Pueblo.

*CenCor, Inc. v. Tolman,* 868 P.2d 396, 398 (Colo. 1994). Plaintiff alleges CSU-Pueblo did not perform several of the provisions describing what CSU-Pueblo would do and provide to students in disciplinary proceedings and in the sexual misconduct policy. The Board of Governors argues those principles do not apply in the disciplinary context. However, it cites no Colorado case that carves out the school's student code of conduct and sexual misconduct policy despite the university-student "relationship …[being] contractual in nature." The Board of Governors cites *Borwick v. University of Denver,* 569 F. App'x 602, 605–06 (10th Cir. 2014). In *Borwick*, the district court treated the question of whether a student handbook was a contract as an issue requiring evidence, and the student had not presented sufficient evidence in support. The Tenth Circuit rejected the student's *pro se* argument on appeal because it was "conclusory and unsupported by citation to the evidentiary record or legal authority." *Id.* Neither the district court nor the Tenth Circuit purported to find that as a matter of Colorado law, a university's handbook, code of conduct, written policies given to students, etc. cannot form part of the university's contract with students.

Moreover, in both of the Colorado state court precedents that the Board of Governors cites, *CenCor* and *Davis v. Regis Coll., Inc.,* 830 P.2d 1098, 1100 (Colo. App. 1991), the courts relied in part on decisions of other jurisdictions. Several district courts have permitted disciplined males' similar breach of contract claims to survive Rule 12. *See, e.g., Xiaolu,* 97 F. Supp. 3d at 481–82 (analyzing, and dismissing, plaintiff's breach of contract claim in light of the evidence on summary judgment); *Boston College*, 2016 WL 5799297, at *8–21 (same); *Collick*, 2016 WL 6824374, at *22–23; *Franklin & Marshall,* 2000 WL 62316, at *2 (finding fact issues on plaintiff's breach of contract claim). In short, the Board of Governors has not shown grounds to dismiss the breach of contract claim. Its argument regarding the covenant of good faith and

fair dealing relies on the same faulty reasoning.[29]   The court accordingly recommends denying

the motion to dismiss the breach of contract and good faith claims.

   E.      *Promissory Estoppel*

   The Board of Governors argues that Plaintiff's promissory estoppel claim fails for lack of

specific promises and lack of reliance thereon.

>    The elements of a promissory estoppel claim are (1) the promisor
>    made a promise to the promisee; (2) the promisor should have
>    reasonably expected that the promise would induce action or
>    forbearance by the promisee; (3) the promisee reasonably relied on
>    the promise to his or her detriment; and (4) the promise must be
>    enforced to prevent injustice.

*Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142, 151 (Colo. 2006).  "[T]he concept of

promissory estoppel was developed by equity to enforce, in appropriate circumstances, a

unilateral promise for which no consideration was provided."  *Soderlun v. Pub. Serv. Co. of

Colo.,* 944 P.2d 616, 620 (Colo. App. 1997).

   In its motion, the Board of Governors focuses upon the promises that Plaintiff

summarizes in Paragraph 402 of the AC:

>    CSUP expected or should have expected Plaintiff to accept its offer
>    of admission, incur tuition and fees expenses, and choose not to
>    attend other colleges based on its express and implied promises
>    that CSUP would not tolerate, and Plaintiff would not suffer,
>    discrimination or harassment by fellow students or faculty
>    members and would not deny Plaintiff his procedural rights should
>    he be accused of a violation of CSUP's policies.

   The Board argues that the first promise is too vague to enforce or rely upon, and that

Plaintiff does not allege that he reported discrimination or harassment to CSU-Pueblo.  As to the

---

[29] The Board of Governors argues that "Colorado law does not recognize an independent action
for breach of such [good faith] contractual duties," doc. #27 at p. 23, but its cited cases only
recognize that there is no such *tort* claim (except as to an insurance carrier).  *See, e.g.,
Centennial Square, Ltd. v. Resolution Trust Co.,* 815 P.2d 1002, 1004 (Colo. App. 1991); *Colo.
Interstate Gas Co. v. Chemco, Inc.,* 833 P.2d 786, 792 (Colo. App. 1991), *aff'd,* 854 P.2d 1232
(Colo. 1993).  Plaintiff recognizes the claim is contractual.  Doc. #55 at p. 32.

second promise, the Board argues that the allegations show CSU-Pueblo did not deprive him of any procedures to which the Code and Policy entitled him.  It further argues that Plaintiff could not have relied on these promises, as he alleges, in choosing to attend CSU-Pueblo and paying tuition.

In response, Plaintiff points to the several promises in the Code and Policy that he would:

> be treated with respect by University officials; … [have] a prompt investigation and appropriate resolution; … be fully informed of campus conduct rules and procedures; … be fully informed of the nature and extent of all alleged violations contained within the complaint; … be present for all testimony given and evidence presented before a hearing authority; … [have the] rights to present witnesses and documentary evidence[,] … question and/or challenge witnesses and documentary evidence presented by others; … not … have any personal information released by the University to the public without prior consent[;] * * * fair treatment; … privacy; … written notice; … a hearing … an advisor; … an appeal[; and] * * * [as a] student[] accused of sexual misconduct[, he was] … entitled to the hearing process set forth in the Code.

AC at ¶¶ 56–58 (paragraph breaks omitted).  In its reply, the Board of Governors did not address these allegations.  Except for the right to an advisor, Plaintiff alleges that CSU-Pueblo denied him each of these alleged rights and procedures.  The Board disputes that allegation, but the court cannot resolve the factual dispute on a Rule 12(b)(6) motion.  Moreover, the Board's argument that Plaintiff must allege that he reported discrimination is incorrect.  Plaintiff alleges the gender discrimination occurred in the disciplinary proceeding and that CSU-Pueblo furthered that discrimination in issuing the Decision and imposing the Sanction.

Other than the rights to "respect," "appropriate resolution," and "fair treatment" (*see Soderlun,* 944 P.2d at 621; *Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1465 (10th Cir. 1994); *Hoyt v. Target Stores,* 981 P.2d 188, 194 (Colo. App. 1998)), the promises that Plaintiff alleges describe particular information, actions, and procedures that CSU-Pueblo said it would provide

to students in disciplinary actions.  The Board of Governors does not cite any cases that have found similarly detailed promises to be too vague to state a promissory estoppel claim.  *G&A Land, LLC, v. City of Brighton,* 233 P.3d 701, 702–705 (Colo. App. 2010) (claim that city had promised to acquire plaintiffs' properties by condemnation, in actions showing it was authorized to do so, wished to negotiate, and that it might initiate proceeding, failed for lack of evidence to survive defendant's summary judgment motion); *Soderlun,* 944 P.2d at 620 (affirming dismissal of claim as to "statements contained in PSC's Corporate Code of Business Conduct, enjoining all employees to observe high ethical and moral standards when dealing with other employees" as "indefinitely generic"); *Hoyt,* 981 P.2d at 194 (holding that trial court should have granted defendant's motion for directed verdict because a promise of "fair and consistent treatment" is too vague to enforce).  The trial court decision that was on appeal in *Cherokee Metropolitan* found the claim failed for lack of evidence only after a two-day trial.  148 P.3d at 146.  CSU-Pueblo's promised procedures are more akin to the detailed guidelines that *Vasey* distinguished as enforceable promises.  *Vasey,* 29 F.3d at 1465 (applying Colorado law).  As the movant, the Board of Governors must show it is entitled to the relief it requests, and (except as noted above) it has not shown that Plaintiff alleges promises that are too vague.

For the reliance element, Plaintiff alleges his decision to attend CSU-Pueblo instead of other schools, and his payment of tuition.  AC at ¶ 403; Doc. #55 at p. 33.  The Board of Governors argues that Plaintiff could not have relied on the promises in the Code and Policy when he chose to attend CSU-Pueblo because he did not receive them until after he was accepted.  Doc. #27 at p. 25, n.11.  The Board further argues that "it is difficult to conceive of a claim premised on the idea that any student, when deciding to enroll, relies upon the single-investigator or hearing panel model for Title IX investigations."  Doc. #66 at p. 17.

The Board of Governors does not, however, address Plaintiff's allegation that at the time of the October 2015 incident, he was a sophomore.  AC at ¶¶ 1, 51.  Giving reasonable inferences, Plaintiff alleges that he paid tuition three times, the most recent payment being for the fall 2015 semester.  He therefore alleges reliance on the promises in the Code and Policy each time that he paid tuition to continue attending CSU-Pueblo, and this would include for the fall of 2015.

In addition, the Board of Governors points out that Plaintiff does not allege he actually attempted to present witnesses in his meetings with Wilson, DeLuna and Humphrey.  Doc. #66 at p. 14.  Plaintiff instead alleges that the investigator had told him that only the investigator could declare someone a witness.  AC at ¶ 142.  He alleges CSU-Pueblo's promise that it would provide students with "a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed," (*Id.* at ¶¶ 108, 356), and its promises relating more specifically to the right to be present for all testimony and evidence presented.  *Id.* at *e.g.,* ¶¶ 56, 58, 64.  He further alleges being blindsided when he was shown Wilson's report and found that Wilson's investigation was one-sided; Wilson failed to "question a single witness favorable to Plaintiff.  *Id.* at ¶¶ 140–142.  Giving reasonable inferences, these allegations appear to support that in addition to when he paid tuition, Plaintiff also relied on CSU-Pueblo's promises when (after his first meeting in which Coach Wristen was not permitted to speak) he forbore from bringing witnesses to his meetings with Wilson, DeLuna, and Humphrey.  In short, the court is not persuaded that the promissory estoppel claim should be dismissed for lack of alleged reliance.

In its reply, the Board of Governors raises a new argument regarding this claim: governmental immunity.  The Board argues that it is immune from the promissory estoppel claim

pursuant to the Colorado Governmental Immunity Act because Plaintiff's claim is based on

tortious conduct and is not subject to an exception under C.R.S. § 24–10–106(1).  The Board

further argues that Plaintiff failed to provide notice of the claim within the time required under

C.R.S. § 24–10–109.   In its motion, the Board characterized Colorado's promissory estoppel

doctrine as a variety of contract claim.  Doc. #27 at pp. 23–24.

> Defendants cannot raise new arguments in a reply brief. … "When
> a party puts forth new arguments in a reply brief, a court may
> avoid error by either: (1) choosing not to rely on the new
> arguments in determining the outcome of the motion; or (2)
> permitting the nonmoving party to file a surreply."

*In re Molycorp, Inc. Sec. Litig..,* 157 F. Supp. 3d 987, 1003, n.10 (D. Colo. 2016), *as amended*

(Jan. 28, 2016) (internal quotation marks omitted, quoting *Pippin v. Burlington Res. Oil & Gas*

*Co.,* 440 F.3d 1186, 1192 (10th Cir. 2006)).  Regardless that the court can consider subject

matter jurisdiction "at any time," Doc. 66 at p. 17 n.11, the court will not consider the CGIA

arguments raised only in a reply brief.  If the Board of Governors believes the law supports such

an argument, it may raise the issue in a proper motion.

III.     *Federal Defendants' Motion to Dismiss*

Federal Defendants argue that the court should dismiss the claims against them under

Rule 12(b)(1) for lack of subject-matter jurisdiction because Plaintiff lacks standing.  "The law

of Article III standing, which is built on separation-of-powers principles, serves to prevent the

judicial process from being used to usurp the powers of the political branches."  *Clapper v.*

*Amnesty Int'l USA,* 133 S. Ct. 1138, 1146–47 (2013).

> Because Plaintiffs have invoked Article III jurisdiction to
> challenge the conduct of the executive branch of government, the
> necessity of a case or controversy is of particular import. ....
> Restraint in the exercise of judicial review preserves not only the
> power and vitality of the judiciary, but that of each of the other two
> coordinate branches of federal government as well.

53

*Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998) (citations omitted).  "[S]tanding

jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties

seeking relief."  *Id.* at 1203 (internal quotation marks omitted).  However, when "reviewing the

standing question, the court must be careful not to decide the questions on the merits for or

against the plaintiff, and must therefore assume that on the merits the plaintiffs would be

successful in their claims."  *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th

Cir. 2006).  A plaintiff "must demonstrate standing separately for each form of relief sought" and

"for each claim he seeks to press."  *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006).

> [T]he irreducible constitutional minimum of standing contains
> three elements. First, the plaintiff must have suffered an "injury in
> fact"—an invasion of a legally protected interest which is (a)
> concrete and particularized … and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical.'" ... Second, there must be a causal
> connection between the injury and the conduct complained of—the
> injury has to be "fairly ... trace[able] to the challenged action of the
> defendant, and not ... th[e] result [of] the independent action of
> some third party not before the court." ... Third, it must be
> "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992) (citations and footnote omitted).  *See*

*also Colo. Outfitters Ass'n v. Hickenlooper,* 823 F.3d 537, 543 (10th Cir. 2016).  "The party

invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at

561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice, for on a motion to dismiss we presume that general allegations embrace

those specific facts that are necessary to support the claim."  *Id.* (internal citations and quotation

marks omitted).

"Although the 'traceability' of a plaintiff's harm to the defendant's actions need not rise to

the level of proximate causation, Article III does "require proof of a substantial likelihood that

the defendant's conduct caused plaintiff's injury in fact."  *Habecker v. Town of Estes Park,* 518

F.3d 1217, 1225 (10th Cir. 2008) (internal quotation marks omitted).

> [W]here the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking. … That an injury is indirect does not necessarily defeat standing, [b]ut it may make it substantially more difficult ... to establish that, in fact, the asserted injury was the consequence of the defendants' actions.

*Habecker,* 518 F.3d at 1225 (internal quotation marks omitted, citing *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 45 (1976) and *Warth v. Seldin,* 422 U.S. 490, 504–05 (1975)).

An allegation that a federal agency coerced another person (*e.g.,* state or local governmental entities or other regulated persons) to take a specific action (or to decline to take some action) that harmed the plaintiff in a way that otherwise meets standing requirements is sufficient for Article III standing.

> While, as we have said, it does not suffice if the injury complained of is th[e] result [of] the *independent* action of some third party not before the court ... that does not exclude injury produced by determinative or coercive effect upon the action of someone else.

*Bennett v. Spear,* 520 U.S. 154, 169 (1997) (emphasis original; internal quotation marks and citations omitted). *See also S. Utah Wilderness All. v. Palma,* 707 F.3d 1143, 1155–56 (10th Cir. 2013) (environmental plaintiff who was not the subject of the allegedly unlawful government action or inaction had standing due to particularized injury in fact); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1169–70 (9th Cir. 2011) (federal agency's "coercive power to enforce ESA § 9 caused the Bureau to reduce water flows, which injured the" plaintiff growers and thus conferred standing); *Mendia v. Garcia,* 768 F.3d 1009, 1012–13 (9th Cir. 2014) ('what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain").

In this case, Plaintiff claims that pursuant to 5 U.S.C. § 702, the 2011 DCL is a "final

agency action" subject to judicial review for compliance with the notice and comment

rulemaking procedures of 5 U.S.C. § 553.  AC at *e.g.,* ¶¶ 216, 225, 226, 245, 254, 276–279.

Unlike in his claims against the Board of Governors – in which Plaintiff largely focuses on

DOE/OCR's actions in *enforcing* the 2011 DCL – for his claims against the Federal Defendants,

Plaintiff focuses on the 2011 DCL itself as the source of his injuries.  *Id.* at *e.g.,* ¶¶ 6, 199–210,

243–44.  In a few paragraphs, Plaintiff refers to Federal Defendants' "implementation and

enforcement" of the letter as coercing schools and causing his injuries (*Id.* at ¶¶ 211–212, 242),

but he does not allege that DOE/OCR's actions in enforcing the letter are final agency actions

that are subject to judicial review.  *Id.* at ¶¶ 229–241.  He also does not bring a claim that would

apply to an agency's enforcement actions, as opposed to § 553 regarding the promulgation of

rules.  In his response, Plaintiff disclaims that this case involves "judicial oversight of agency

enforcement discretion" and distinguishes one of Federal Defendants' key cases, *National

Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930 (D.C. Cir. 2004), on this basis.  Doc.

#56 at pp. 21–22.

     Although in his response Plaintiff marshals several opinions regarding the causation

element, they do not change the facts here.  Plaintiff does not meet the causation element as to

any of his injuries that he claims the 2011 DCL caused in substantial part, and for which he

claims he needs injunctive relief against the Federal Defendants.  Plaintiff argues that the 2011

DCL itself caused CSU-Pueblo and other schools to (a) use the preponderance standard; (b)

deprive him of cross-examination; or (c) permit unsuccessful complainants to appeal.  Of those

three procedures, the 2011 DCL makes only one mandatory: the preponderance standard.  AC at

p. 62 ¶ 278 (first bullet point on page), ¶ 280; Doc. #31–1 at p. 11 of the 2011 DCL.  However,

Federal Defendants attach to their motion an affidavit of Johnna Doyle, counsel for the CSU

system.  Doc. #31–4 at p. 2.  Ms. Doyle certifies and attaches three versions of the CSU-Pueblo

Student of Code of Conduct, including the 2010–11 school year Code that was current when the

2011 DCL issued.  Doc. #31–4 at p. 3 ¶¶ 3–9.[30]  The 2010–11 Code already used the

preponderance of the evidence standard.  *Id.* at Doyle Ex. A, p. 24 of Doc. #31–4, p. 20 of 2010–

11 Code at ¶ F.1.  While Plaintiff alleges the number of sexual misconduct investigations

increased markedly after the 2011 DCL, his allegations reflect that even in 2010 (before the 2011

DCL), CSU-Pueblo already considered sexual misconduct to be a violation of the Code and thus

subject to disciplinary proceedings.  AC at ¶ 173.  Plaintiff's allegations do not support his

conclusion that 2011 DCL was a substantial cause of CSU-Pueblo's use of the preponderance

standard in his case.

Plaintiff responds that if the court orders readjudication of his disciplinary proceeding,

CSU-Pueblo would still have to apply the preponderance of evidence standard if the 2011 DCL

still stands.  Doc. #56 at p. 17.  If the court were to find the 2011 DCL void, CSU-Pueblo could

change the standard for sexual misconduct hearings to clear and convincing evidence.  This

argument however seems equally true for any male accused of sexual misconduct in disciplinary

proceedings for as long as DOE/OCR enforce the 2011 DCL's evidentiary standard.  This is a

"generalized grievance[] more appropriately addressed in the representative branches."  *Babbitt,*

137 F.3d at 1202–03 (internal quotation marks and citations omitted).

Because the 2011 DCL does not require schools to prohibit cross-examination, Plaintiff

likewise cannot show that the 2011 DCL caused CSU-Pueblo to deprive him of that right (or that

it would likely cause CSU-Pueblo to do so in the future).  AC at p. 62 ¶ 278 (third bullet point,

"strongly discourages from allowing the parties to personally question or cross-examine each

---

[30] Even if former versions of the Code are not public records subject to judicial notice, the court
can consider these documents on a Rule 12(b)(1) motion.  *See supra* at § I.A.

other during the hearing"); Doc. #31–1 at p. 12 of 2011 DCL (same language).  Finally, Plaintiff

does not allege any injury from an unsuccessful complainant's right to appeal, nor has he shown

that he is likely to in the future.

In sum, the court recommends dismissing without prejudice the claims against Federal

Defendants for lack of standing.  *See, e.g., Brereton v. Bountiful City Corp.,* 434 F.3d 1213, 1216

(10th Cir. 2006) (dismissal for lack of jurisdiction should be without prejudice).  Given this

conclusion, the court does not reach Federal Defendants' Rule 12(b)(6) argument.

## CONCLUSION

The court RECOMMENDS granting in part and denying in part the State Defendants'

motion to dismiss consistent with the foregoing analysis.  The recommended dismissal on the

basis of Eleventh Amendment immunity should be without prejudice.  The court's

recommendation will result in each of Plaintiff's claims 1–5 and 7 going forward (at least in part)

against only the Board of Governors, and the dismissal of CSU-Pueblo, Wilson, DeLuna,

DiMare, Blakey and Humphrey.

The court further RECOMMENDS granting the Federal Defendants' motion to dismiss

without prejudice.

The court further RECOMMENDS granting Plaintiff leave to amend if he can remedy

any of the noted deficiencies.  Plaintiff's motion (doc. #67) to supplement is GRANTED.

DATED this 16th day of February, 2017.

BY THE COURT:

*s/ Craig B. Shaffer*
United States Magistrate Judge

58